EQUIPMENT, INC.

v.

The UNITED STATES.

No. 206–74.

United States Claims Court.

Oct. 8, 1982.

514

James W. Midgley, Washington, D.C., for plaintiff; A. Theodore Giattina and Numa L. Smith, Jr., Washington, D.C., of counsel.

Lenore C. Garon, with whom was Alice Daniel, Asst. Atty. Gen., Washington, D.C., for defendant.

## OPINION

FLETCHER, Judge:

By this suit, brought under the Renegotiation Act of 1951 (50 U.S.C.App. §§ 1211–1233), as amended, the plaintiff, Equipment, Inc., seeks a *de novo* determination that the profits it realized from five Government contracts for trucking services for the period 1966 to 1968 were not excessive. The petition was filed following a ruling by the Renegotiation Board that the plaintiff had realized $3,000,000 of excess profit for its fiscal year ended December 31, 1966, $2,500,000 for its fiscal year ended December 31, 1967, and $500,000 for its fiscal year ended December 31, 1968.

Equipment, Inc., a Delaware corporation, was formed on April 29, 1966, to perform trucking services for the U.S. Army in the Republic of Vietnam. Its principal place of business during the years under review was Saigon, Vietnam. Equipment, Inc. is a wholly owned subsidiary of Sea-Land Services, Inc. (Sea-Land), a trucking and shipping company with its principal place of business in Elizabeth, New Jersey. During the relevant period, Sea-Land was the principal operating subsidiary of McLean Industries, Inc. (McLean Inc.), a holding company.

During 1965, the United States had begun a rapid build-up of combat forces in Vietnam.[1] One of the problems caused by this build-up was a rapid influx of military cargo into the Port of Saigon. Local trucking firms were unable to handle the resulting large volume of cargo, and the port

---

1. From April 1965 to January 1969, the authorized U.S. troop level in South Vietnam rose from 33,000 to 550,000 men.

became clogged by such military cargo.[2] An official of the United States Government asked Malcomb McLean, the president of Sea-Land, to go to Vietnam and evaluate the situation in Saigon Port. Upon reviewing the situation, Mr. McLean determined that the condition of the port would not permit an effective container-tractor-trailer operation of the type in which Sea-Land usually engaged. After he returned from Vietnam, Mr. McLean asked his special assistant, Harry Jeter, to prepare a proposal for a pick-up and delivery trucking operation to move cargo for the Army.

In keeping with his instructions, Mr. Jeter met with Army officials in Hawaii and in Vietnam in the early part of 1966. As a result of these meetings, Jeter was asked to submit a proposal for the operation of 200 contractor-furnished trucks to provide pick-up and delivery service from Saigon Port to various points in the area. Jeter's proposal was submitted in March of 1966. Following a negotiating session in Saigon, Equipment, Inc. was awarded a letter contract to commence operations on July 16, 1966, with 200 company-furnished trucks. Jeter returned to Saigon during the last week of April to make arrangements for operations under the aforesaid letter contract. At that time, Army officials requested that Equipment, Inc. undertake a contract to operate 240 Government-furnished Ford trucks and to begin operations immediately with some of these trucks.[3] Mr. Jeter agreed to undertake this second contract and began operations on May 3, 1966, with only a skeleton staff and no support facilities.

Although the target dates for entering into formal contracts for the operation of the two fleets of trucks were in July of 1966, finalized agreements were not signed until August 31, 1966. The contracts initially covered the period from July 1, 1966, to June 30, 1967, and were subsequently extended from July 1, 1967, to June 30, 1968. The contract rate for operation of the Government-furnished Ford trucks during the two years of the contract ranged from $3.39 to $2.00 per hour, depending upon the number of hours of operation for the fleet. The contract rate for operation of the contractor-furnished International Harvester trucks during the two years of the contract ranged from $9.59 to $2.73 per hour, depending upon the number of hours of operation for the fleet. Under the contracts, Equipment, Inc. was responsible for maintaining the trucks and managing all aspects of the trucking operation. In addition, the company was required to supply the spare parts for the International Harvester trucks. The Army was required to furnish all fuel, petroleum supplies, and spare parts for the Ford trucks, and all fuel and petroleum supplies for the International Harvester trucks. In the second year of the contract for the International Harvester trucks, the Army agreed to allow Equipment, Inc. to order spare parts for the International Harvester Trucks from Army supplies.

From July 1, 1968, through December 31, 1968, Equipment, Inc. provided trucking services by a phase-out contract, under which it was paid on a per trip basis for the operation and maintenance of both the Ford and International Harvester trucks. Under this contract, Equipment's compensation ranged from $13 to $27 per trip, depending upon the destination. Equipment, Inc. was also paid $2.40 per hour demurrage for an excess time its trucks were detained while loading and unloading.

---

2. Military trucks were not used for port clearance because there was a world-wide shortage of military trucks, and because it was cheaper to utilize a commercial trucking operation. Also, the Army was short of military personnel and for political reasons did not want to send more military personnel to Vietnam.

3. Shortly after Equipment, Inc. received the letter contract for the 200 contractor-furnished trucks, Mr. Jeter received a telephone call from an Army official asking him to submit a proposal to operate 240 Government-owned trucks that were already in Vietnam. Mr. Jeter heard nothing further regarding this contract until the end of April 1966, at which time he arrived in Saigon to prepare for operations under the letter contract for the 200 contractor-furnished trucks.

In addition to operating the Fords and the 200 International Harvester trucks, from July 1, 1967, to December 31, 1968, Equipment, Inc. operated and maintained an additional 44 rebuilt International Harvester trucks and 15 pole and bridge trailers. The trailers and the 44 rebuilt trucks were provided to the Army at the rate of $2 per hour.

The dispute between the parties in this case can be divided into two distinct issues. The first issue is the proper accounting to be employed in calculating the amount of profit earned by Equipment, Inc. in performing its contracts with the Army. The profits of a contractor for renegotiation purposes, are calculated by subtracting the costs of performing the contract from the revenue received for performing the con-

tract. 50 U.S.C.App. § 1213(f). The parties agree on the amount of revenue earned by the contract for the three review years,[4] but the Government has challenged the amounts for three of Equipment's cost items in each of the review years amounting to $1,820,235 in 1966, $87,352 in 1967, and $212,168 in 1968. The table following this paragraph provides the basic figures at issue in this case. The second issue in the case is whether or not the profits earned by Equipment, Inc. on its Government contracts were excessive within the meaning of the Renegotiation Act and the cases interpreting it. After determining the appropriate allocation of costs so that profits for each of the review years can be calculated, attention will be given to the issue of the existence and extent of excessive profits.

TABLE

| | 1966 [5] | 1967 [6] | 1968 [7] |
| --- | --- | --- | --- |
| Renegotiable Sales | $5,853,760 | $8,574,531 | $5,999,881 |
| Expenses (Total) | | | |
| Claimed by plaintiff | 3,611,815 | 4,783,676 | 4,603,947 |
| Claimed by defendant | 1,791,580 | 4,696,324 | 4,816,115 |
| Deferred Compensation | | | |
| per plaintiff | 106,684 | 180,791 | 18,897 |
| per defendant | 15,545 | 43,554 | 15,369 |
| G & A Expense Allocation | | | |
| per plaintiff | 402,965 | 446,962 | 363,588 |
| per defendant | –0– | –0– | –0– |
| Depreciation | | | |
| per plaintiff | 1,608,144 | 92,117 | 55,729 |
| per defendant | 282,013 | 588,964 | 635,013 |
| Total uncontested expenses | 1,494,022 | 4,063,806 | 4,165,733 |
| Net Profit for Renegotiation | | | |
| Claimed by plaintiff | 2,241,945 | 3,790,855 | 1,395,934 |
| Claimed by defendant | 4,062,180 | 3,878,207 | 1,183,766 |
| Investment Base [8] | 2,036,413 | 3,310,113 | 1,168,059 |
| Excessive Profit [9] (defendant's figures) | 3,747,573 | 3,030,881 | 885,151 |

4. The review years in this case are the calendar years 1966, 1967, and 1968.

5. Figures from Appendix A.

6. Figures from Appendix B.

7. Figures from Appendix C.

8. Figures from fs. 95 and 96.

9. Figures include the management fee allowed by Dr. Silberman for Equipment's operation of the Government-furnished Ford trucks.

## I. *Accounting Issues.*

### A. Burden of Proof.

The allocation of the burden of proving the accuracy of financial data in renegotiation cases was set forth by this court in *Lykes Brothers Steamship Co. v. United States,* 198 Ct.Cl. 312, 459 F.2d 1393 (1972). In that case Chief Judge Cowen, speaking for a unanimous court, stated that:

In the course of pretrial proceedings, which may include an audit of plaintiff's books by defendant, the parties will likely stipulate the accuracy of much of the financial data submitted by plaintiff. However, if there is a dispute about such data, plaintiff has the burden of going forward with evidence proving the accuracy of the financial data, including the segregation of the accounting on renegotiable business from nonrenegotiable business and the propriety of plaintiff's cost allocations under accepted accounting principles. 198 Ct.Cl. at 326, 459 F.2d at 1401.

In *Camel Manufacturing Co. v. United States,* Judge Kunzig, writing for a unanimous court, interpreted *Lykes Brothers* to mean that "both the burden of proof and the risk of nonpersuasion for accounting data [are] on the plaintiff." 215 Ct.Cl. 460, 479, 572 F.2d 280, 290 (1978). *See also Aero Spacelines, Inc. v. United States,* 208 Ct.Cl. 704, 720, 530 F.2d 324, 335 (1976).

The Court of Claims has not addressed the question of what is proper cost allocation under accepted accounting principles.[10] The Renegotiation Act provides that:

[c]osts shall be determined in accordance with the method of accounting regularly employed by the contractor or subcontractor in keeping his records, but, if no such method of accounting has been em-

ployed, or if the method so employed does not, in the opinion of the Board, or, upon redetermination, in the opinion of the Court of Claims, properly reflect such costs, such costs shall be determined in accordance with such methods as in the opinion of the Board, or, upon redetermination, in the opinion of the Court of Claims, does properly reflect such costs. [50 U.S.C.App. § 1213(f) (Supp.1980).]

Modification of the plaintiff's accounting to bring about a clearer reflection of renegotiable costs is therefore within the court's authority. *Major Coat Co. v. United States,* 211 Ct.Cl. 1, 45–46, 543 F.2d 97, 123 (1976). The court has chosen not to speculate about the propriety of other methods of accounting for renegotiable revenues and costs where the method employed by plaintiff produced a reasonably correct reflection of actual values, was employed by the plaintiff for its own business records, and was appropriate to the needs of the business involved. *See A.C. Ball Co. v. United States,* 209 Ct.Cl. 223, 248, 531 F.2d 993, 1007 (1976).

Given these broad guidelines concerning the plaintiff's burden of proof of the accuracy of financial data, we turn to an examination of the three cost items in dispute: allocation of parent general and administrative (G & A) expenses to Equipment, Inc., depreciation expenses, and deferred compensation owed to Mr. Jeter.

### B. Allocation of Parent Company's General and Administration Expenses.

The dispute between the parties with regard to the item listed under expenses on plaintiff's income statement[11] entitled "General and Administrative Expenses: Parent Allocation" (G & A expenses) concerns the propriety of allocating part of the

---

**10.** The Tax Court has commented upon the issue of cost allocation in *L.T.V. Aerospace Corp. v. Renegotiation Board,* 51 Tax Ct. 369 (1968):

The statute and regulations provide that the method of accounting to be used in renegotiation proceedings shall be that "regularly employed by the contractor on such contracts in keeping his records" unless the method so employed does not, in our opinion,

"properly reflect" the costs in question. The fact that a contractor or subcontractor might have properly used another accounting method does not compel or permit us to apply that method to its receipts or expenditures if the method actually used is proper. [51 Tax Ct. at 375. *See Bay Co. v. Renegotiation Board,* 38 Tax Ct. 535, 546–48 (1962).]

**11.** See Appendices A., B., and C.

general and administrative expenses of Equipment's parent corporations to Equipment, Inc. as a cost of the contracts at issue in this case. Plaintiff contends that the amount that should be allocated to Equipment, Inc. for each of the review years is $402,965 in 1966, $446,962 in 1967, and $363,588 in 1968. Defendant, on the other hand, would not allocate any of Sea-Land or McLean Inc.'s G & A expenses to Equipment, Inc. Defendant takes the position that plaintiff's method of allocating the expenses was not a reasonable one.

The method used to allocate Sea-Land's G & A expenses to Equipment, Inc. is known as the sales method. Under this method, the ratio of Equipment's sales to the total sales of its parent (including all of Sea-Land's subsidiaries and operating divisions) is used to determine the percentage of Sea-Land's G & A expenses to be allocated to Equipment, Inc. Before the allocation was made, Sea-Land's G & A expense pool was reduced by certain expenses deemed to be unrelated to Equipment's business. After the allocation was made, the final figure for G & A expenses charged to Equipment, Inc. was reduced by the amount of G & A expenses that had been charged directly to Equipment, Inc.[12]

Defendant argues that the method used to allocate Sea-Land's G & A expenses to Equipment, Inc. was not a reasonable one. In support of this contention, defendant offered the testimony of its expert in accounting and contract cost allocation, Mr. Bernard Lynn. Mr. Lynn testified that in his opinion plaintiff's method of cost allocation was without merit. He explained that under the allocation method employed by plaintiff a subsidiary generating a large percentage of sales without an equally large drain on the parent's resources would be burdened with a large portion of the parent's G & A expenses, while an unprofit-

able and poorly managed subsidiary would be allocated only a small portion of G & A expenses although it might in fact represent a much greater drain on the parent's management resources. Mr. Lynn also criticized plaintiff's allocation method because only sales to outside entities were taken into account in determining the total sales of the parent; this total sales figure was used to calculate the percent of parent G & A expenses to be allocated to the subsidiaries and operating divisions. Parent company G & A expenses therefore were to be allocated to subsidiaries or operating divisions that did not deal with outside entities, even if those subsidiaries received administrative support from the main office. In Mr. Lynn's opinion, this had the effect of unduly burdening those subsidiaries, including Equipment, Inc., that had sales to outside entities.[13]

As additional support for its position that plaintiff's method of G & A expense allocation is not reasonable, defendant cites *Grannis & Sloan, Inc. v. Renegotiation Board,* 29 P–H Tax Ct.Mem. 89, 7 Cont.Cas.Fed. ¶ 71,202 (1960), appeal dismissed, 285 F.2d 908 (4th Cir.), *cert. denied,* 368 U.S. 822, 82 S.Ct. 40, 7 L.Ed.2d 27 (1961). In *Grannis & Sloan* the Tax Court refused to apply the sales method to determine the allocation of parent G & A expenses to a subsidiary. 7 Cont.Cas.Fed. at 61,390–91.

In support of its position that its method of G & A expense allocation was reasonable, plaintiff presented the testimony of its parent's former chief accountant, Mr. Joseph Barbera. Mr. Barbera was chief accountant at Sea-Land when Equipment, Inc. was first formed in 1966 and was responsible for setting up Equipment's books and system of accounting. Mr. Barbera testified that the sales method of allocating parent G & A expenses was used consistently for all the subsidiaries of Sea-Land. The method had

---

**12.** Defendant does not dispute the item listed as "General & Administrative: Home Office Direct Charges" under plaintiff's expenses.

**13.** Sea-Land's chief accountant during the review period and defendant's expert in finance and economics both testified that it was neces-

sary to exclude transactions between Sea-Land and its subsidiaries from the total sales base to prevent distortions in the ratio used to determine the allocation of Seal-Land's G & A expenses to its subsidiaries using the sales method.

been used for internal management purposes for several years and had proved to be accurate. In addition, Mr. Barbera noted that if it had not been accurate, he would have received protests from the top management personnel of the various subsidiaries and operating divisions of Sea-Land; the G & A allocation was one factor that determined the various division's net profits, upon which the bonuses and incentives awarded to these managers were based.

On two separate occasions the Government had accepted plaintiff's use of the sales method for allocating its G & A expenses. During the negotiations for the finalized contracts on the Ford and International Harvester trucks in 1966, the plaintiff's G & A expense allocation method was discussed as one of the contract costs. Although the Army initially refused to accept Equipment's proposed G & A allocation, by the time the final contracts were signed, the Army had agreed to the method for G & A allocation that plaintiff employed and has proposed as appropriate in this case. In May 1967, Equipment's G & A allocation was the subject of a Defense Contract Audit Agency audit. The auditor disallowed certain items in the G & A expense pool that, in his opinion, did not relate to plaintiff's operation. These disallowances were agreed to by Sea-Land officials and adjustments were made to reflect these changes. Plaintiff's method of G & A allocation was not questioned in the auditor's report. If the sales method, as applied to Equipment, Inc., is so patently inaccurate as defendant would have the court believe, the Army contract negotiators or the Defense Contract Audit Agency auditor would not have accepted it.

█ As has been noted, this court will not upset the method of accounting employed by the plaintiff where that method produced a reasonably accurate reflection of actual values, was employed by the plaintiff for its own business records, and was appropriate to the needs of the business involved.[14] *See A.C. Ball Co.,* 209 Ct.Cl. at

248, 531 F.2d at 1007. In *Camel Manufacturing,* the court examined the question of how plaintiffs could meet their burden of proving the validity of their cost allocations and financial data and addressed the issue of how the accuracy of accounting methods could be shown. In *Camel* the plaintiff offered cost allocation figures that were different from those it had offered before the Renegotiation Board. 215 Ct.Cl. at 473, 572 F.2d at 287. Plaintiff's "new" accounting data also differed from that reflected in its original books and records. *Id.* at 483, 572 F.2d at 292. Defendant, on the other hand, offered the testimony of an FBI auditor who had personally inspected plaintiff's original books. *Id.* at 472, 572 F.2d at 286. Defendant relied upon the original books to support its figures for the appropriate amount of plaintiff's sales, costs, and profits. *Id.* The court, in examining plaintiff's evidence, noted that the reworked cost allocations were prepared by plaintiff's comptroller at the time of renegotiation. *Id.* at 483 & n. 20, 572 F.2d at 292 & n. 20. The comptroller, upon hearing that financial information was to be submitted to the Renegotiation Board, decided that the figures were inaccurate and revised them to reflect the cost allocation he believed was correct. *Id.* The court noted that the comptroller was neither presented as a witness nor deposed in the course of pretrial proceedings, and therefore an explanation of the allocations by the individual who actually made them is not in the record. *See id.* at 483 n. 19, 572 F.2d at 292 n. 19. Instead, plaintiff offered the testimony of an accountant and its president. *Id.* at 483 & nn. 19–20, 572 F.2d at 292 & nn. 19–20. The court noted that "[n]either man could testify, nor were records produced, concerning the exact amount of costs which were 'misplaced' as a result of the alleged inability of the established accounting system properly to reflect costs." *Id.* at 483, 572 F.2d at 292. The court evidently found the testimony presented in support of substituting the reworked cost allocations unconvincing, since

---

14. It seems logical to this court that if a business is to remain profitable, eventually all of its

costs must be allocated to sales that bring in revenue.

the court held that plaintiff had failed to meet its *Lykes Brothers* burden of proving the accuracy of its financial data. *Id.* at 483–84, 572 F.2d at 292–93. It is important to note that in the *Camel* case plaintiff had offered financial data that differed from that in its original books and records for the review years. The court noted that plaintiff's burden of proving the accuracy of its financial data was therefore particularly heavy in this case. *Id.* at 484, 572 F.2d at 293.

■ It is clear from the court's analysis in the *Camel* case that in order to meet its burden of proof on the accounting issues in a renegotiation case, the plaintiff must offer proof that its methods of accounting accurately reflect its claimed costs of performing the contract. The court's analysis in *Camel* suggests two ways that plaintiffs can meet this burden of proof: an explanation of the accounting method by the individual who established it could be offered into evidence or financial records that substantiate the costs plaintiff seeks to allocate to its renegotiable sale could be offered. Since the contractor had not produced the necessary proof by either of these methods in *Camel,* the court held that its burden of showing the validity of its cost allocations had not been met.[15]

■ Keeping in mind the guidance offered by *Lykes Brothers* and *Camel Manufacturing,* we now turn to the question of whether Equipment, Inc. has offered sufficient proof that the allocation of G & A expenses to it from its parent was proper. One of the methods of proof suggested by the court in *Camel* for showing that plaintiff's cost figures should be accepted is an explanation of plaintiff's accounting method by the individual who was responsible for selecting and instituting use of the method. Plaintiff in this case has offered the testimony of its parent's former chief

accountant, Mr. Barbera, that the sales method of G & A expense allocation had been used consistently by Sea-Land for internal management purposes and had proved accurate. A corporation would not choose an accounting system for its own books that it did not believe was accurate. This is not a case, as in *Camel,* of a plaintiff presenting a set of figures at trial that differ from those reflected by its own books and records for the review years. Furthermore, in this case, there was an internal check on Sea-Land's accounting methods, since top management personnel for its subsidiaries and operating divisions had monetary incentives to object if the allocation was not accurate.

Defendant's evidence challenging plaintiff's accounting method for G & A allocation is unconvincing. Defendant's expert pointed out one particular set of hypothetical circumstances under which plaintiff's accounting methods would yield inaccurate allocation of G & A expenses. He did not testify, and no documentary evidence was presented to show, that this hypothetical set of circumstances matched the facts of this case. The expert's other criticisms of plaintiff's methods were contradicted by testimony from one of plaintiff's witnesses and from defendant's other expert on economics and finance.

Allocation of Sea-Land's G & A expenses is an issue that can be resolved in several equally valid ways. We see no reason to substitute a method of cost allocation for that employed by plaintiff, as we are satisfied that the method employed is sufficiently accurate, was employed by Sea-Land and Equipment for their own records, and was appropriate for plaintiff's needs. Plaintiff has therefore carried its burden of proof on this issue and its method for allocation of

---

**15.** Compare this analysis to that of Trial Judge Schwartz in *Page-River-Curran v. United States,* 216 Ct.Cl. 246, 272 n. 1, 574 F.2d 1063 (1978) (trial judge's opinion not reprinted in the Federal Reporter). The trial judge's opinion, which was adopted per curiam by the court, disposed of the defendant's challenges to plain-

tiff's financial data in a footnote. *See id.* Trial Judge Schwartz summarily accepted some and rejected other of defendant's challenges to plaintiff's financial data. The reason given for rejecting certain items of financial data was "lack of substantiation." *Id.* at 253, 574 F.2d at 1066.

Sea-Land's G & A expenses will be accepted.[16]

C. Depreciation of Capital Assets.

The parties also disagree on the expense item on Equipment's income statement entitled "Depreciation and Amortization." For the years under consideration in this case, the parties' figures for the amount of depreciation allowable are:

| | Plaintiff's Figures | Defendant's Figures |
|---|---|---|
| 1966 | $1,608,144 | $282,013 |
| 1967 | 92,117 | 588,964 |
| 1968 | 55,729 | 635,013 |

The Government challenges two aspects of the depreciation expense that Equipment, Inc. has claimed. First, the Government disputes Equipment's calculation of the useful life of certain of its capital assets. Second, it questions plaintiff's figures for the salvage value of the International Harvester trucks that it purchased in 1966 to perform one of its contracts with the Army.

■ The assets that are the subject of this dispute are the International Harvester trucks and the motor pool facilities plaintiff acquired in 1966 to begin its operations in Vietnam. A short time after these assets were acquired, plaintiff was awarded two one-year contracts, running through June 30, 1967. One of the 1966 contracts was for the operation of the 200 contractor-furnished International Harvester trucks for a guaranteed minimum of 491,400 hours of service. The other contract was for the operation of the 240 Government-furnished Ford trucks for a guaranteed minimum of 622,400 hours of service. Equipment, Inc. amortized the cost of equipment and motor pool facilities attributable to the Interna-

tional Harvesters contract over the guaranteed hours for that contract. The cost associated with the contract for operation of the Ford trucks were also amortized over the guaranteed minimum number of hours for the contract. The guaranteed minimum hours for the contracts were achieved by November of 1966, and all the amortizable costs associated with both contracts were written off in 1966.

The defendant contends that plaintiff did not correctly calculate the depreciation for these assets. The correct method of depreciation, according to the defendant, would be to amortize the cost of the equipment and motor pool facilities over the three years in which plaintiff actually performed the contracts in Vietnam. In support of its position, defendant offered the testimony of Mr. Lynn, its expert in accounting and contract cost allocation. In Mr. Lynn's opinion, Equipment's assets should have been amortized over three years because they were used to produce revenue for that entire time. As additional support for its position, the defendant pointed out that the Internal Revenue Service required Equipment, Inc. to amortize the cost of the assets at issue here over the three years that Equipment, Inc. performed the contracts with the Army.

In support of its position that the entire cost of the assets should be written off in 1966, Equipment, Inc. offered the testimony of Sea-Land's former chief accountant, Mr. Barbera. He testified that the only reasonable determination of the useful lives of the trucks and the motor pool facilities at the time they were acquired was the number of guaranteed hours in the 1966 contract. The Vietnamese Government would have im-

---

**16.** The defendant also disputes plaintiff's G & A expense allocation on a more fundamental basis. Defendant claims that Equipment, Inc. has failed to prove that it actually received the benefit of any services rendered by its parent. Defendant argues that because of the great distance between Sea-Land's office in New Jersey and Equipment's operations in Vietnam, Equipment's day-to-day operations must have been run by its general manager, Mr. Jeter. Equipment, Inc. also had its own bookkeeping staff in Vietnam and was responsible for hiring

most of its personnel. Thus, defendant argues, there was nothing for the home office to do in running Equipment's operation. Plaintiff has shown that it did receive benefits from various administrative departments of Sea-Land in preparing to undertake the contracts with the Army and throughout the period of its operations in Vietnam. Voluminous correspondence between Mr. Jeter and Mr. Spry of Sea-Land bears witness to the management assistance that Sea-Land provided.

posed customs duties greater than the value of the trucks if the trucks were taken out of Vietnam or used for other than military purposes, and therefore the value of the trucks beyond the guaranteed hours established by the contracts was uncertain. Similarly, the motor pool facilities and other leasehold improvements could not be removed, and thus would also be economically useless after the termination of the contracts. As additional support for its position, plaintiff noted that its contracts with the Government were priced to recover the total costs of these assets over the minimum guaranteed hours for the contracts. Therefore, in plaintiff's view, it should be entitled to write off the assets over the same period in which the costs of those assets were recovered.

Equipment, Inc., as plaintiff, bears the burden of proving the accuracy of its cost data, and presented Mr. Barbera's testimony to explain the schedule of depreciation proposed by it. Mr. Barbera offered two justifications for plaintiff's proposed depreciation: that at the time the useful life of the assets in question was being determined the only reasonable measure was the number of guaranteed hours in the 1966 contracts and that the contracts themselves were priced to recover the costs of these assets over the guaranteed minimum hours provided by the contracts.

The regulations dealing with the renegotiation provide that:

> [f]acilities representing permanent capital additions for the manufacture of renegotiable products or materials are depreciated for the purpose of renegotiation at the rates estimated to be deductible under the Internal Revenue Code. 32 C.F.R. § 1459.3(b).

Determinations by the Internal Revenue Service (IRS) of the deductibility of certain items for Federal tax purposes are not binding, since the regulations require that the Renegotiation Board "exercise independent judgment on whether and to what extent and for what year items are allowable as deductions or exclusions under the Internal Revenue Code." 32 C.F.R. § 1459.1(b)(4).[17] This court has read its power to redetermine costs[18] to include modifying depreciation expenses that do not properly reflect the contractor's costs of doing renegotiable business even where the depreciation expenses are in accord with Internal Revenue Code requirements for calculation of depreciation. *Major Coat,* 211 Ct.Cl. at 45–46, 543 F.2d at 123. *See Aero Spacelines,* 208 Ct.Cl. at 719–21, 530 F.2d at 364. *See also Kilgore Corp. v. United States,* 222 Ct.Cl. 189, 201, 613 F.2d 279, 286 (1979) (deduction for charitable contribution allowed by IRS was disallowed by court as a cost or expenditure allocable to renegotiable business, since it was a diversion of profits properly belonging with the total renegotiable profits for scrutiny as excessive under the Renegotiation Act).[19] For our analysis of Equipment's depreciation costs, we will examine applicable IRS regulations and any relevant IRS determinations, and then make adjustments as necessary so that the costs of performing the renegotiable work are matched against the revenues produced by it. *See Major Coat,* 211 Ct.Cl. at 46, 543 F.2d at 123.

Nowhere in the IRS regulations is the concept of how quickly the cost of an asset is recovered deemed relevant to the determination of the asset's useful life for tax purposes. Mr. Barbera's assertion that the useful lives of the assets had to be determined according to the information available when they were acquired reflects the correct method of analysis for determining the appropriate schedule of depreciation for

---

17. Thus, the fact that the IRS required Equipment, Inc. to depreciate its capital assets over a three-year period is not determinative of the schedule of depreciation to be employed for purposes of renegotiation.

18. See p. 519 of this opinion, *supra.*

19. The court's willingness to make adjustments in depreciation costs that are acceptable under the Internal Revenue Code and IRS regulations may be based in part on the realization that a taxpayer may elect among widely varying methods of depreciation for the same asset, not all which are intended to match costs with the revenues they are incurred to generate.

tax purposes. The assertion that the only reasonable measure of the asset's useful lives at the time of their acquisition was the minimum guaranteed hours of the two 1966 contracts is somewhat doubtful, however. Equipment's original contracts with the Army ran from July 1966 through June 1967, and covered two taxable years. At the time the assets were acquired (in June or July 1966), Equipment's management had no way of knowing how quickly the minimum guaranteed hours of the contracts would be used by the Army. Since the contracts were run through June 30, 1967, Equipment, Inc. could reasonably assume that the assets would still be in use in that year. Furthermore, when the contracts were undertaken, Equipment's management had several indications from Army officials that the demand for plaintiff's services would exceed the minimum guaranteed hours of the contracts.

The IRS regulations define "useful life" for a depreciable asset as "the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income." 26 C.F.R. § 1.167(a)–1(b) (1966)[20]. In *Fribourg Navigation Co. v. Commissioner,* the Supreme Court made it clear that for Federal tax purposes the estimation of the useful life of an asset is made at the time the asset is acquired. There is "no basis for disallowance of depreciation when no challenge has been made to the reasonableness or accuracy of the original estimate of useful life or salvage value." 383 U.S. 272, 278, 86 S.Ct. 862, 866, 15 L.Ed.2d 751 (1966). The question in the instant case is whether useful life should be subject to retrospective adjustment for purposes of calculating costs in a renegotiation case.

In *Major Coat* this court recognized that generally a prospective estimation of the useful life of depreciable assets is employed in calculating depreciation, but nonetheless approved the trial judge's adjustment of "plaintiff's accounts in retrospect, to match the true costs of performing the renegotiable work against the receipts derived from it." 211 Ct.Cl. at 46, 543 F.2d at 123. The plaintiff in *Major Coat* had estimated the useful life of some assets as a longer period than the assets were actually used in the business, and the trial judge adjusted plaintiff's cost figures so that for renegotiation purposes the entire cost of the assets was written off over the actual useful life of the assets rather than over their estimated useful life. *Id.* at 45–46, 543 F.2d at 122–23. The court noted that "[t]hough plaintiff may originally have estimated the useful lives of its special tools and building incorrectly, a refusal to adjust its accounts now would forever bar the proper matching of its renegotiable costs and receipts for [fiscal] 1968." *Id.* at 46, 543 F.2d at 123. The court's concern was that the contractor's costs be matched to the period in which they produced revenue.

The issue of modifying depreciation deductions allowed for tax purposes also arose in *Aero Spacelines.* In that case, the plaintiff proposed that $95,244 be added to its depreciation expenses for 1966 to compensate plaintiff for its failure to take a full year's depreciation on an airplane used to perform its contract with the Government. 208 Ct.Cl. at 719, 530 F.2d at 334. Plaintiff argued that the court had discretion to allow the additional depreciation and should do so. *Id.* at 719–20, 530 F.2d at 334. The court noted that while it had discretion to redefine costs, it would exercise that discretion only in situations in which a contractor either had not employed a regular method of accounting or had employed a method that did not properly reflect the contractor's cost of doing renegotiable business. *Id.* at 720, 530 F.2d at 334–35. The court noted that it would "exercise its discretion to redefine costs taken for tax purposes only to correct material misstatements of a contractor's cost of doing renegotiable business." *Id.* at 770, 530 F.2d at 364. The plaintiff in *Aero Spacelines* could not persuade the court to exercise its discretion

---

20. *See Niagara Mohawk Power Corp. v. United States,* 207 Ct.Cl. 576, 585, 525 F.2d 1380, 1386 (1975). *See generally Massey Motors, Inc. v.* *United States,* 364 U.S. 92, 80 S.Ct. 1411, 4 L.Ed.2d 1592 (1960).

because it could show no fact of record to suggest that use of the standard accounting principle that property is depreciated over its useful life would cause plaintiff's costs to be misstated. *Id.* at 720–21, 530 F.2d at 335.

In calculating depreciation for tax purposes, the relevant consideration concerning the useful life of an asset would be what was a reasonable estimate, at the time the asset was purchased, of the length of time it would produce income for the taxpayer.[21] For the purposes of renegotiation, however, the court is concerned with allocating depreciation to the periods in which the asset to be depreciated produced renegotiable profits. In the case of Equipment, Inc., the trucks and the motor pool facilities are appropriately depreciated over the two and one-half year period in which they were employed to produce revenue: the last 6 months of 1966, all of 1967, and throughout 1968. Since the parties agree that the cost of these assets was $1,608,144, and in plaintiff's accounting submission, this amount constitutes the entire depreciation expense for 1966, this holding will alter the depreciation expense to be allowed for the purposes of renegotiation as follows: [22]

| | Depreciation | |
|------|------------|---------------------|
| 1966 | $321,629 | |
| 1967 | 735,375 | (643,258 + 92,117) |
| 1968 | 698,987 | (643,258 + 55,729) |

The second issue that defendant has raised with respect to plaintiff's depreciation and amortization expense concerns plaintiff's calculation of the salvage value of the International Harvester trucks purchased in 1966 to perform one of Equipment's contracts with the Army. At the time the trucks were acquired, Equipment's management estimated their salvage value to be zero. In 1970, over a year after Equipment, Inc. had completed its contracts with the Army, the trucks were sold for a net gain of $250,000. Defendant asserts that plaintiff's depreciation expense should be reduced by the amount of the gain realized on the sale of the trucks so that plaintiff's depreciation expense reflects its actual costs of performing the contracts. If the gain on the sale of the trucks is not taken into account, argues defendant, the $250,-000 of extra depreciation will be a windfall for plaintiff.

Plaintiff claims that its original estimate that the trucks would have zero salvage value was reasonable. In support of this position, plaintiff points to the Vietnamese customs laws, which provided that if the trucks were taken out of the country or used for other than military purposes, duties would be imposed in excess of the value of the trucks.[23] Also, due to the hostile conditions under which the trucks were to be used, plaintiff had no way of determining whether the trucks would be in saleable condition after the termination of the contracts with the Army.

Equipment, Inc. presented the testimony of Mr. Barbera to show the rationale for assigning zero salvage value to the Interna-

---

**21.** *See* n. 18, *supra,* and accompanying text.

**22.** Equipment, Inc. did not sell the International Harvester trucks until 1970, but there is no evidence in the record to indicate that the trucks produced revenue after Equipment's contracts with the Government expired. In addition, the Government has accepted depreciation of the trucks over the term of the contracts and has not argued that depreciation expenses should be spread over a longer period.

**23.** The letter contracts under which Equipment, Inc. operated from May through August of 1966 provided that:
[u]pon expiration of the agreement by its terms, or earlier termination by whatever cause, if the Government does not elect to buy such equipment, it is agreed that Con-

tractor shall have the right, at its own expense, to remove the same back to the U.S.; and the Government agrees to cooperate with the Contractor in removing the same from Vietnam including intervention with the Vietnamese Government if required.

The finalized contracts, under which plaintiff operated for the remainder of its time in Vietnam, did not contain this provision. Presumably the provision was placed in the letter contracts to protect the contractor in case the parties were unable to agree on a final contract. Once the contract had been finalized, however, plaintiff no longer had this assurance that the Government would assist it in removing the equipment from Vietnam.

tional Harvester trucks purchased in 1966 to perform one of the company's contracts with the Army. Mr. Barbera testified that because of the hostile environment in which the trucks would be operating and potential customs restrictions on selling the trucks or removing them from the country, he estimated their economic value following the termination of the company's contracts with the Army would be zero. In addition, Mr. Jeter, Equipment's general manager, testified that the transportation costs of returning the trucks to the United States were estimated to be $1,000 per truck. Since the original value of each truck was $3,500, after a year or more service in the war-torn environment it probably would not have economically been feasible to remove the trucks from the country.[24]

IRS regulations define the salvage value of an asset as "the amount (determined at the time of acquisition) which is estimated will be realized upon sale or other disposition of an asset when it is no longer useful in the taxpayer's trade or business or in the production of his income and is to be retired from service by the taxpayer." 26 C.F.R. § 1.167(o)–1(c) (1966). As in the case of determinations of an asset's useful life, an estimate of salvage value for tax purposes is made at the time the asset is acquired (i.e., it is prospective). *Fribourg Navigation*, 383 U.S. at 278, 86 S.Ct. at 866.

■ As previously noted, the plaintiff in a negotiation case bears the burden of proving the accuracy of its financial data. The court will make adjustments in plaintiff's figures, however, even when plaintiff has shown that its estimates of future val-

ues (such as useful life or salvage value) were reasonable when made. *See Major Coat,* 211 Ct.Cl. at 45–46, 453 F.2d at 122–23. The court's concern in a renegotiation case is that renegotiable sales be matched with the costs incurred to generate those sales. To that end, the actual salvage value of plaintiff's assets must be taken into account in determining the depreciation deduction to which plaintiff is entitled for the review years. Therefore, Equipment's depreciation deductions are revised as follows:

| | Depreciation | |
|------|------------|----------------------|
| 1966 | $271,629 | (321,629 − 50,000) |
| 1967 | 635,375 | (735,375 − 100,000) |
| 1968 | 598,987 | (698,987 − 100,000) |

**D. Deferred Compensation.**

■ The final accounting issue involves the amount of deferred compensation that should be allowed as a cost of plaintiff's renegotiable business. The issue arises out of an agreement between Malcomb McLean, president of McLean Industries (the holding company for Sea-Land), and Harry Jeter, the vice president and general manager of Equipment, Inc. As an inducement for Mr. Jeter to go to Vietnam and direct Equipment's operations, he was offered a salary plus five percent of Equipment's net profits before taxes (as computed by the regular accounting methods employed by McLean Industries). The five percent bonus was to be based on net profits after renegotiation, and therefore depends upon the amount of excess profits (if any) found by this court.[25] Since we have not yet established that Equipment Inc. realized excess profits within the meaning of the Re-

---

24. In its brief, defendant refers to an exhibit that had been presented at trial and argues that this exhibit shows that plaintiff's management anticipated a residual value for the International Harvester trucks at the end of the 1966 contract. The exhibit, a memo to the file by Mr. W.D. Spry, a vice president of Sea-Land, discusses the profit margin in the pricing formula for the guaranteed minimum hours in the contract for the International Harvester trucks. Mr. Spry noted that in order to compute the correct profit margin for these hours a residual value of $500,000 should be assigned to the equipment, decreasing the costs of performing the contract. Because of our resolution of the

treatment of salvage value, we need not address the implications of this memo.

25. We also find that the formula to be employed in calculating Mr. Jeter's deferred compensation will produce a figure that is not excessive or unreasonable and therefore is deductible from renegotiable sales in its entirety. *See Kilgore Corp. v. United States,* 222 Ct.Cl. 189, 199, 613 F.2d 279, 285 (1979) (plan that provided for employer contribution of 12 percent of the after-tax income to profit-sharing plan not an improper diversion of otherwise excessive profits).

negotiation Act, it is not possible to determine at this point the amount of deferred compensation owed to Mr. Jeter or whether the entire amount should be allowed as a cost of doing renegotiable business. Therefore, we will now turn to a discussion of the factors used to determine whether and to what extent Equipment's profits were excessive. We will return to the issues concerning Mr. Jeter's bonus if it is necessary to resolve them before reaching a final determination in this case.

## II. *Statutory Factors*

■ Section 103(e) of the Renegotiation Act (50 U.S.C.App. § 1213(e)) sets out factors to be considered in assessing whether a contractor has realized excessive profits as defined by the Act. In *Major Coat* the court discussed the manner in which these "statutory factors" are to be used to determine whether or not a contractor has realized excessive profits.

> *These [statutory factors] describe the essentially comparative process by which a reasonable level of profit is determined.* The factors requiring consideration of the character of the renegotiated contractor's business, the net worth and capital employed, and the reasonableness of his costs and profits outline the information that must be assembled in order to construct a reasonably accurate comparison of the contractor's performance in the fiscal year under renegotiation (the review year) with the performance of similar firms. This group of factors provides the means of identifying the firms (including plaintiff itself in the past years) sufficiently similar to plaintiff that they may be considered part of plaintiff's "industry," and of determining the pricing policy and profit picture of that industry (or industries). Three other statutory factors focus attention on the contractor's efficiency, the business risks he assumed, and his contribution to the defense effort, to ascertain how well the renegotiated contractor fared against other firms in his industry on points affecting profitability in a competitive market.... [211 Ct.Cl. at 9, 543 F.2d at 102] [emphasis supplied].

The analysis of a contractor's renegotiable profits under these statutory factors is based upon the premise that the contractor's operation is comparable to that of others in the same industry and that comparisons of character of business, net worth, and capital employed, reasonableness of costs and profits, risk assumed, and contribution to the defense effort are made in assessing the reasonableness of the contractor's profits. *See generally Butkin Precision Manufacturing Corp. v. United States,* 211 Ct.Cl. 110, 544 F.2d 499 (1976).

### A. Burden of Proof

■ As in the case of the accounting issues, the court has assigned very specific burdens of proof on the statutory factors to the parties in a renegotiation case. In *Lykes Brothers,* the court held that:

> the contractor has the initial burden of going forward with the proof as to the statutory factors upon which it relies..... Normally when the contractor does this, it will have made a prima facie case, i.e., a showing which, unless rebutted, would justify a judgment in accord with the contractor's contentions....
>
> ....
>
> [T]he burden [then] shifts to the Government to prove that plaintiff's profits were excessive and the extent thereof. This encompasses not only the burden of going forward with evidence after plaintiff's case in chief is closed, but also the burden of persuasion. [198 Ct.Cl. at 326–27, 459 F.2d at 1401–02 (footnote omitted).]

The defendant must convince the court of the existence and amount of excessive profit by a preponderance of the evidence. *Major Coat,* 211 Ct.Cl. at 8–9, 543 F.2d at 102.

Also, in *Aero Spacelines,* Trial Judge Colaianni has described the significance attributable to plaintiff's burden of going forward with evidence on the statutory factors upon which it relies. *See,* 208 Ct.Cl. at 716–17, 530 F.2d at 332–33 (Trial Judge's opinion adopted *per curiam* ).

In several cases, however, the court has stressed that the burden on the plaintiff in presenting its prima facie case is minimal. In *Instrument Systems Corp. v. United*

States, for example, the court commented "our idea was that while throwing the burden on the defendant, we should require plaintiff to show that it had acted responsibly in invoking the process of this court, and not just for purpose of delay." 212 Ct.Cl. 99, 108, 546 F.2d 357, 362 (1976). In order to meet its burden, plaintiff need not present expert testimony. *Butkin Precision Manufacturing Corp. v. United States,* 211 Ct.Cl. 110, 130, 544 F.2d 499, 510 (1966). The only case in which the court has ruled that the plaintiff had failed to make out a prima facie case was *O'Brien Gear & Machine Co. v. United States,* 219 Ct.Cl. 187, 591 F.2d 666 (1979). In that case the Government was able to prove that the cost and profit figures submitted to the court by the plaintiff were actually false and fraudulent. 219 Ct.Cl. at 214–15, 591 F.2d at 668. In no other case has the plaintiff failed to meet its burden of proving a prima facie case. *Manufacturers Service Co. v. United States,* 217 Ct.Cl. 387, 399–400, 582 F.2d 561, 570 (1978).

Finally, it is noted here that defendant's presentation provides little or no comparative data concerning the statutory factors, despite repeated statements from this court that renegotiation is an essentially comparative process. *E.g. Major Coat,* 211 Ct.Cl. at 9, 543 F.2d at 102; *Mills Manufacturing Co. v. United States,* 215 Ct.Cl. 536, 569, 571 F.2d 1162, 1174 (1978). Consideration of the statutory factors will be followed by discussion of the defendant's proof on the excessiveness of Equipment's profits.

B. Plaintiff's Prima Facie Case and Defendant's Response Concerning the Statutory Factors.

1. Character of Business.

Section 103(e)(5) of the Renegotiation Act (50 U.S.C.App. § 1213(e)(5)) provides that a determination of excessive profits must take into account the character of the contractor's business, including the sources and nature of materials employed, complexity of manufacturing technique, character and extent of subcontracting, and the rate of turnover. To properly consider this factor the court must be given basic information about the contractor's total operation during the review years, laying a foundation for a later, meaningful comparison of the contractor's review year business and profits with the performance of firms functioning in a competitive market. *Major Coat,* 211 Ct.Cl. at 9–10, 543 F.2d at 102.[26] The evidence relating to the character of plaintiff's business provides a background against which the other statutory factors may be considered. The analysis of the character of plaintiff's business is particularly important for assessing whether or not plaintiff's profits were excessive, as we must decide what other trucking operations are comparable to Equipment, Inc. in order to determine which types of trucking operations can be compared with Equipment, Inc. to decide whether Equipment's profits were excessive. *See Major Coat,* 211 Ct.Cl. at 9, 543 F.2d at 102.

In the spring of 1966, Equipment, Inc. was incorporated to perform contracts to provide trucking services in Vietnam. The U.S. Army was in desperate need of these services at that time, since the port of Saigon had become clogged with military cargo due to escalation in troop strength that had begun in 1965. Local trucking firms were unable to handle the increased volume of cargo and for both political and logistical reasons the Army did not wish to use military personnel to clear cargo from the port. Equipment, Inc. was therefore a business

---

**26.** In *Major Coat,* the court described some areas that should be considered in developing a picture of the character of the contractor's business. These areas include the kind of renegotiable product made, the nature of the manufacturing operation and the difficulties inherent in the product's manufacture, the kind of product that the renegotiated contractor marketed commercially (if any) during the review years or in preceding years, the difficulty of making that product relative the renegotiable item, and the state of the commercial market in which the contractor had operated or was operating. 211 Ct.Cl. at 10, 543 F.2d at 102. While not all of the areas are applicable to a service, such as the trucking operation run by plaintiff, the concerns underlying the enumerated areas are applicable to a contract for services.

formed to fill a particular and acute need for trucking services. As such, plaintiff's operations were tailored to meet the needs of the Army.

An important consideration in defining the character of Equipment's business is the environment in which Equipment, Inc. operated. Needless to say, during the years that Equipment, Inc. operated in Vietnam (1966 to 1968) there was a war in progress. Due to the nature of the conflict, the division between friendly and enemy territory was tenuous and constantly changing. Under the terms of its contracts, Equipment, Inc. was not required to operate in combat zones but, practically speaking, any place in Vietnam could become a combat zone without warning. By operating in Vietnam during the conflict, Equipment's operations were exposed to hazards.

Equipment, Inc. was performing a vital function by transporting needed supplies and equipment to various military installations in and around Saigon. Equipment, Inc. was in effect part of the Army's supply line supporting the United States military mission in Vietnam. The nature of Equipment's operations made it a particular target for disruptive activity and harassment by the Viet Cong. The record shows that throughout the time that Equipment, Inc. operated in Vietnam, its trucks and facilities were in danger from the Viet Cong.

In September of 1966, the Viet Cong attacked Equipment's motor pool facilities. They set up a machine gun at the entrance to the motor pool and began firing at Equipment's employees. The dispatch area was hit by mortar fire, as was a house trailer parked on the premises. Time bombs were placed on most of the trucks parked in the yard and on some of the buildings. Most of the time bombs failed to explode. In all, 72 unexploded bombs were removed from the premises. As a result of this attack seven Vietnamese employees were killed and one Australian supervisor was captured by the Viet Cong. The Australian died about two months later in a Viet Cong prison.

An incident of the magnitude of the September 1966 attack did not occur again during the time that Equipment, Inc. operated in Vietnam, but throughout the two and one-half years that Equipment, Inc. operated in Vietnam the Viet Cong continued to disrupt its operations. Although some of Equipment's trucks were damaged as a result of Viet Cong activity, the most significant effect on Equipment's operation was the intimidation of its drivers, all of whom were Vietnamese. The only readily available work force for Equipment's operation was the local population, who were easily intimidated by or were possibly in league with the Viet Cong.

The use of Vietnamese labor presented a variety of other problems for Equipment, Inc. A majority of the Vietnamese work force did not speak English, resulting in obvious communication problems for American and Australian supervisors who did not speak Vietnamese. The wages for the native workers were set by the Vietnamese Government, but early in plaintiff's operation the workers formed a union and were prone to strike when disputes with management arose. Many of these disputes concerned the treatment of the drivers by the Vietnamese and U.S. Army troops. All of these problems, as well as periodic efforts by the Vietnamese Government to round up draft dodgers and deserters contributed to a high turnover rate among the drivers. In order to keep its operation running, Equipment, Inc. constantly recruited and trained literally truckloads of new drivers to insure that it had a sufficient supply.

Another problem that hindered plaintiff's operation was theft and pilferage of cargo, both by its employees and by others. Theft of gasoline from the trucks by employees was also a constant problem. Trucks were hijacked and, at one point, plaintiff experienced a rash of truck hijackings by members of the Vietnamese Army. If stolen trucks were recovered, parts and equipment were generally missing.

Plaintiff's management experienced difficulties in dealing with both U.S. Army and Vietnamese Government officials. Local

government officials were often corrupt. On some occasions bribes were paid to keep Vietnamese Government officials from harassing Equipment's operations. The U.S. Army was responsible for the supervision of plaintiff's operation, and both parties agree that the Army's supervision was inadequate, particularly in the early stages of plaintiff's contracts. The turnover in military personnel charged with administering Equipment's contract also resulted in problems for Equipment's management. New, inexperienced contracting officers did not understand the particular problems of running a trucking operation in Vietnam and therefore could not provide adequate supervision. Moreover, these contracting officers sometimes insisted on instituting policies and procedures that had proven ineffective or unworkable in the experience of their predecessors.

Other logistical problems beyond the control of Equipment's management hampered its operation in Vietnam. The problems included extremely long delays in loading and unloading of Equipment's trucks, which was the responsibility of the Army. Another problem faced by plaintiff's drivers was the traffic conditions in and around Saigon. The streets were narrow and very crowded with slow-moving vehicles, motor, animal, and human powered. Traffic conditions also contributed to delays in moving cargo.

While the Government disputes specific points in the Equipment's prima facie case regarding character of business, it does concede that "the character of plaintiff's business had certain unique and even difficult aspects." The Government noted that plaintiff benefitted from Government-furnished equipment, gasoline, and spare parts for trucks, and from the low cost of local labor. These factors reduced the cost of Equipment's start-up and day-to-day operations if not the confusion attendant upon the rapid start-up and adverse conditions under which Equipment, Inc. operated. The Government admits that Army supervision of Equipment, Inc. was inadequate and that frequent changes in ordering officers and contracting officers' representatives contributed to the inadequate administra-

tion. The Government also concedes that operating in a country at war created some problems for Equipment, Inc., but argued that Equipment, Inc. was generally not operating in areas viewed as security risks. Finally, the Government agreed that trucking operations in Vietnam faced unique circumstances, such as Saigon traffic conditions, the prevalence of thievery and corruption, language and cultural barriers between American or Australian supervisors and Vietnamese laborers, and security problems.

The Renegotiation Act provision on the statutory factor "character of business" lists four subfactors to be considered in assessing whether a contractor is entitled to favorable consideration under this subfactor and in determining which firms make up the industry to which the plaintiff's profits are to be compared. 50 U.S.C.App. § 1213(e)(5). The first subfactor relates to the relative complexity of the manufacturing techniques used by the contractor. *Id. See also Major Coat,* 211 Ct.Cl. at 10, 543 F.2d at 102. Although Equipment, Inc. was essentially a service-oriented corporation rather than a manufacturing concern, it is certainly within the spirit of the statute to consider the relative complexity of plaintiff's operation. Based on the difficulties experienced by Equipment, Inc., as described above, we find that Equipment's task was indeed a difficult and complex one. The record reveals the varied problems encountered by Equipment's management staff in Vietnam. If Equipment, Inc. had been operating in the United States, or even in a foreign country that was not engaged in a civil war, its management would not have been confronted with the extreme conditions that resulted from the war in Vietnam. While operating in a peaceful country would not have made Equipment, Inc. immune from labor difficulties, the causes of the labor problems were often war-related. Intimdation and infiltration of plaintiff's employees by the Viet Cong were major problems, and mistreatment of plaintiff's employees by Vietnamese and U.S. troops accounted for many

of Equipment's labor problems. The war also contributed to the magnitude of plaintiff's problem of widespread theft of trucks and cargo. Plaintiff's other problems were to varying extents war-related. Operations were without doubt made more difficult and complex by the war. Thus, under this subfactor, plaintiff is entitled to favorable consideration.

The second area of consideration under the character of business factor is the use of Government-furnished materials by the contractor. 50 U.S.C.App. § 1213(e)(5). A contractor who uses materials furnished by the "customer" is generally not entitled to as large a profit as one who supplies its own materials. See Major Coat, 211 Ct.Cl. at 15–22, 543 F.2d at 105–09; see also 32 C.F.R. § 1460.14(b)(2). In this case, Equipment, Inc. operated under two separate contracts for trucking services; under one contract it was to supply 200 trucks and under the other the Government was to furnish 240 Ford trucks. Equipment, Inc. was responsible under both contracts for building and maintaining a motor pool for all the trucks, maintaining all the trucks, and supplying spare parts for contractor-furnished International Harvester trucks.[27] The Government furnished the fuel and petroleum supplies for all the trucks and spare parts for the Ford trucks. Since it did receive some Government-furnished materials, Equipment, Inc. is entitled to favorable consideration under this subfactor only to the extent that it furnished its own materials or did not receive some advantage from having materials supplied by the Government. Cf. Major Coat, 211 Ct.Cl. at 15–22, 543 F.2d at 105–09.

The third subfactor to be considered under the character of plaintiff's business concerns the use of subcontractors. 50 U.S.C. App. § 1213(e)(5). The Renegotiation Board regulations state that a contractor who subcontracts work generally is not allowed as large profit as one who does the work itself, 32 C.F.R. § 1460.14(b)(3)(i). None of plaintiff's work was given to subcontractors.

The final subfactor to be considered is the contractor's rate of turnover. For purposes of renegotiation, turnover is the amount of sales divided by the value of plaintiff's capital assets. See Aero Spacelines, 208 Ct.Cl. at 735 n. 19, 530 F.2d at 343 n. 19. Turnover is a figure that has relevance only if compared with rates of turnover in similar businesses. While the Government's expert witness, Dr. Silberman, provided calculations of the turnover rate for Equipment, Inc., he did not analyze them in comparison with the rates of other firms. Dr. Silberman did compare Equipment's turnover rate with average turnover rates for the U.S. trucking industry as a whole and with groups within the U.S. trucking industry and found that Equipment's turnover rate was comparable to that of the industry as a whole and to that of contract carriers of hazardous cargo.[28] The Renegotiation Board regulations provide that:

> [t]he rate of turn-over will indicate the use of plant, materials, and net worth. A low rate of turn-over may indicate more complete integration in production or may be related to the type of the product and the nature of the manufacturing process. A high rate of turn-over may indicate a relatively smaller manufacturing contribution or, by comparison with other manufacturers of similar products, a relatively greater efficiency. 32 C.F.R. § 1460.14(b)(4).

From the comparison data available to the court, we are unable to conclude what the significance of Equipment's turnover ratio might be. Since the Government bears the burden of proof, we must therefore accord favorable consideration to Equipment, Inc. under this subfactor.

Character of business is also used to determine which firms' profits are to be compared with plaintiff's for purposes of assess-

---

27. In the second year of the contract for the contractor-furnished trucks, the Army agreed to let Equipment, Inc. order spare parts for the trucks from Army supplies.

28. Dr. Silberman suggested that carrying dangerous cargo could be used to approximate the hazardous conditions under which Equipment, Inc. operated.

ing the excessiveness of plaintiff's profits. Our discussion of character of business in this light is part of our analysis of the defendant's case in chief concerning the excessiveness of plaintiff's profits and appears in a later section of this opinion.

## 2. Contribution to the Defense Effort.

■■■ Another statutory factor to be considered provides that in judging the excessiveness of profits, the court will take into account the "[n]ature and extent of contribution to the defense effort, including inventive and developmental contributions and cooperation with the Government and other contractors in supplying technical assistance." 50 U.S.C.App. § 1213(e)(4). The Renegotiation Board regulations dealing with the statutory factor of the contractor's contributions to the defense effort state that:

[e]very contractor contributes to the defense effort when he performs or assists others to perform a defense contract or subcontract, or when in connection with such a contract or subcontract, he otherwise renders a service of value to a defense program or objective. Credit will be given under this factor, in such degree as the facts may warrant, for (1) superior performance in excess of contract requirements, such as completion of urgent work ahead of schedule at the request of the procuring department, or exceeding specifications in a manner beneficial to the defense effort; ... (3) overcoming difficulties, which others have failed to overcome, in providing materials or services for the defense effort; ... (6) performance under difficult environmental or geographical conditions or hazardous working conditions; (7) cooper-

ation with the Government and with other contractors in contributing proprietary data or in developing and supplying technical assistance to alternative or competitive sources of supply; or (8) performance, assistance, or service considered otherwise exceptional. [32 C.F.R. § 1460.13(b)(1), (3), (6), (7), (8).]

Cases that have interpreted this statutory factor and the Board's regulation have stressed that a contractor is not entitled to favorable consideration under this factor simply because it has fulfilled the requirements of a defense contract.[29] *Major Coat*, 211 Ct.Cl. at 40–41, 543 F.2d at 120; *Mason & Hanger-Silas Mason Co. v. United States*, 207 Ct.Cl. 106, 128–29, 518 F.2d 1341, 1354, *plaintiff's motion for reconsideration denied*, 207 Ct.Cl. 183, 523 F.2d 1384 (1975). This factor is intended to reward exceptional efforts by the contractor for which it would not normally be given credit under the other statutory factors. *Major Coat*, *supra*, at 41, 543 F.2d at 120.

In this case, Equipment, Inc. has shown two instances of performance in excess of the contract requirements. Plaintiff's contracts specifically stated that plaintiff would not be required to "travel over roads considered by the Government as insecure by reason of enemy activities or hostile action." As discussed in the preceding section of this opinion (entitled "Character of Business"), by operating in Vietnam during 1966 through 1968 plaintiff was necessarily operating in a hostile and often insecure environment. Moreover, on two occasions plaintiff was called upon to haul cargo into areas that were officially designated as enemy areas.[30] As the court noted in *Kilgore Corp. v. United States*, the contractor should receive favorable consideration for

---

**29.** We therefore reject plaintiff's contention that "simply performing the service pursuant to its Army contracts should readily be considered *in excess* of the contract requirement" (plaintiff's brief at 33) and entitles plaintiff to favorable consideration. Plaintiff's claims for favorable consideration for contributions to the defense effort based on repairs and improvements on trucks are also rejected. Equipment's contracts with the Army explicitly required Equipment, Inc. to repair the trucks.

Equipment's "improvements" to the trucks were in fact repairs and certainly not the "unusual contributions to the art or inventiveness ... contemplated for special credit under this factor." *Kilgore Corp.*, 222 Ct.Cl. at 199, 613 F.2d at 284.

**30.** Plaintiff may also be given credit for operating in a dangerous and hostile environment based on this evidence.

carrying out its obligations under conditions hazardous to its labor force. 222 Ct.Cl. at 197–199, 613 F.2d at 284–85. The other instance of performance in excess of the requirements of the contract was the efforts of plaintiff's management to prevent thefts of cargo. Under its contracts, Equipment, Inc. was not responsible for stolen cargo except for losses resulting from willful misconduct or bad faith on the part of Equipment's management personnel. Equipment's management nonetheless instituted several theft control measures to prevent disruption of the operation by wholesale thievery of cargo, supplies, and equipment. The security measures that were instituted included: (1) clearance of all new employees by the Vietnamese secret Service;[31] (2) an agreement with other U.S. Government contractors to maintain a current circulating list of all local employees who had been discharged for cause; (3) an in-house security department, which included agents from local police departments and Vietnamese Secret Service; and (4) radio controls that monitored the movement of trucks from one point to another. In October of 1968, a memo by a U.S. Army contracting officer's representative to his commanding officer compared Equipment's rate of theft losses to that of its competitor, Philco-Ford, for the month of September 1968. The memo stated that Philco-Ford had experienced theft of its cargo on 18 out of a total of 7,960 trips, whereas Equipment's cargo had been stolen 5 times out of a total of 18,857 trips.

Under this statutory factor, plaintiff may be given credit for cooperation with the Government in supplying technical assistance in locating alternative sources of services. 132 C.F.R. § 1460.13(b)(7). Mr. Jeter, Equipment's general manager, testified that in 1968 the Army solicited bids for additional trucking services. When he submitted Equipment's bid, Mr. Jeter advised the Army of an alternative and less costly method of obtaining the same services. The Army resolicited bids based on the al-ternative concept, and the contract was subsequently let to another firm at a price lower than any of the original bids.

Finally, under this statutory factor plaintiff may be given credit for exceptional service. An example of such service was plaintiff's early start-up of its trucking operations. In March of 1966, Equipment, Inc. was given a single contract with the Army to provide trucking services with 200 contractor-furnished vehicles beginning July 16, 1966. At the time this contract was awarded the possibility of performing a second contract for the operation of 240 Government-furnished trucks was mentioned to Equipment's general manager, Mr. Jeter. He did not inquire further and nothing more was said about a second contract until the last week in April when Mr. Jeter arrived in Saigon to make preparations to begin operations under the contract for the contractor-furnished trucks. At that time, on April 29, 1966, Equipment, Inc. was asked to undertake a contract to operate 240 Government-furnished trucks and to begin operations immediately with a portion of the trucks. Mr. Jeter began operations under the second contract on May 3, 1966; he was not able to start on May 1 or 2 because these were Vietnamese national holidays. Operations were begun along a busy Saigon street, with a chair and a table under a tree for an office and a narrow alley for a motor pool. Equipment, Inc. was without repair and maintenance facilities, spare parts, trained local drivers, mechanics, supervisors and clerks, proper forms, electricity, and telephone or radio communications. Equipment, Inc. continued to operate without these facilities while its motor pool and other facilities were being constructed. Gradually, it added trucks and drivers until by July 6, 1966, it had 200 trucks operating besides those provided by the Army. Equipment's competition, Philco-Ford, took over six months to put its first trucks on the road when it began its operations.

---

**31.** This was also required by the Vietnamese Army for plaintiff's trucks to be admitted to some military installations.

 Defendant has taken the position that the evidence in this case does not show a contribution to the defense effort by Equipment, Inc. except for Equipment's early start-up. Defendant acknowledges this as a positive contribution, but argues that the contribution cannot be considered because it cannot be quantified. The court agrees with defendant's contention that this contribution cannot be quantified; the record in this case does not contain adequate evidence to quantify Equipment's contribution to the defense effort or any of the other statutory factors. The fact that plaintiff's contributions under a statutory factor cannot be quantified does not, however, provide justification for ignoring those contributions. *Camel Manufacturing Co.,* 215 Ct.Cl. at 502, 572 F.2d 303. Based upon the examples of cooperation with the Army in performing services beyond the scope of its contracts, discussed above, Equipment, Inc. will be given favorable consideration for its contribution to the defense effort.

3. Efficiency.

 The next statutory factor that will be addressed is the efficiency of the contractor. Three sections of the Renegotiation Board regulations pertaining to this factor are relevant to this case:

> Favorable recognition must be given to the contractor's efficiency in operations, with particular attention to the following:
>
> . . . .
>
> (2) Quality of production; for example, maintenance of standards of quality; rejection record; reported mechanical or other difficulties in the use or installation of the product.
>
> (3) Reduction of costs; for example, a decrease in costs per unit of production or per unit of sales as between fiscal years and as compared with other contractors producing the same or similar products when the operations are reasonably comparable; a decrease in administrative, selling, or other general and controllable expenses; a decrease in prices paid ven-

dors for purchased materials and subcontracted items or units. . . .

> (4) Economy in the use of materials, facilities, and manpower; for example, a decrease in the quantity of materials used in relation to production and the number of employees in relation to production; reduction of waste. . . . [32 C.F.R. § 1460.9(b)(2), (3), (4).]

As the court stated in *Major Coat:*

> [t]he renegotiated contractor's ability to meet and even exceed production schedules, to produce a greater volume of goods or services without enlarging his asset base or expanding his work force, and to decrease his controllable expenses, as well as his success in minimizing defects in his products, are significant indices of his efficiency. See 32 C.F.R. § 1460.9(b) (1968). Of course, efficiency in some absolute sense does not exist in any business. Timeliness, heightened production, cost control, and maintenance of quality, all as aspects of efficiency, are to be noted for plaintiff *and for each firm with which it is compared,* in order to assess their efficiencies relative to one another. Determining the efficiency of one firm in relation to another, and not in a vacuum, is the objective of this statutory factor . . . . The information gathered under this factor should show where plaintiff stands among comparable firms as a matter of efficiency, thus helping to locate it on the industry profit range. [211 Ct.Cl. at 34–35, 543 F.2d at 116 (emphasis added).]

Thus, in assessing the evidence presented concerning the contractor's efficiency, the court is concerned that the plaintiff be compared with other firms in its industry.

We will first examine plaintiff's evidence as to the efficiency of its operations, to assess whether plaintiff has made a prima facie showing that it is entitled to favorable consideration under this statutory factor. Defendant's evidence showing that plaintiff's operations were not efficient will then be examined. Finally, a determination will be made as to whether plaintiff will receive favorable consideration under this statutory factor.

With regard to the quality of service that Equipment, Inc. provided, there are several examples in the record of commendation of Equipment's operation by the Army officers responsible for supervising Equipment, Inc. Col. Samuel M. Coggins, the first contracting officer's representative on Equipment's contracts and the commander of military trucking operations in Vietnam, testified that he had always received the "fullest cooperation" of Equipment's management staff and that Equipment's performance was "outstanding". Col. John C. Donohue, rating officer for Equipment's contracts from January to December 1968, evaluated Equipment's general manager, Mr. Jeter, as "absolutely outstanding". Colonel Donohue also observed that Equipment, Inc. had "continually achieved truck availability in a timely manner" and had an "established record of satisfactory performance, integrity, and ability to meet the required delivery schedule." After completion of its final contract, Equipment, Inc. received a commendatory letter from Col. Owen J. Walsh, Director of Transportation for the Saigon Support Command. Colonel Walsh wrote:

> [w]ith the termination of the Equipment, Inc. contract for trucking services contemplated for the end of the year, I feel I should advise you of my complete satisfaction with the services you have rendered in fulfilling the terms of the contract. Your firm has been most cooperative and responsive to our requirements. We have placed demands on your operations staff on short notice, demands impossible to anticipate or foresee, in a total [sic] hostile and armed combat environment. Your performance has always been outstanding. Most notably your management, supervision of drivers, vehicle control, flexibility of response, and innovative operational techniques have been clearly superior to your competition.

The next subfactor relevant to this case is the reduction of costs. In October 1966, Equipment's management worked out a simplified invoicing procedure that benefitted both Equipment, Inc. and the Army auditing staffs. The new procedure reduced the amount of time necessary to audit Equipment's monthly billing, thereby reducing administrative costs.

The record also shows that Equipment, Inc. was able to achieve economies in the use of its assets. In the early months of operation, the Government-furnished Ford trucks developed a chronic malfunction of the starter assembly; spare parts needed to correct the problem were not available from the Army for several months. Rather than let the trucks sit idle, Equipment's mechanics were able to repair them by making structural changes in the starter assembly. The repair was made on approximately 200 Government-furnished trucks that plaintiff was using at the time. Later in the operation another maintenance problem developed with the Ford trucks; the truck beds became worn as a result of using fork-lifts to load the trucks. Efficient loading of the trucks in this condition was not possible. Equipment's mechanics modified the Fords' flat-bed design, using steel fence posts supplied by the Army and hardwood from its own supplies. The modification of the Fords resulted in greater strength and carrying capacity.

Another example of Equipment's use of materials at hand to increase the efficiency and capacity of its operation was the construction from scrap of 15 pole trailers and 44 additional International Harvester trucks. In early 1967 the Army needed special equipment for hauling telephone poles and steel girders. Equipment's mechanics built pole trailers suitable for this purpose from scrap materials available in the area. The trailers which were designed to be used with the Government-furnished Ford trucks were offered to the Army for $2 per hour (in addition to the hourly fee charged for the truck). Prior to the construction of trailers by Equipment, Inc., the Army had employed a local firm that charged $10.30 per hour for hauling poles and that provided inefficient service. The 44 additional International Harvester trucks were rebuilt from scrap by plaintiff's mechanics. The rebuilt trucks were offered for use by the Army at $2 per hour with no minimum guaranteed hours for these trucks.

The record also shows that Equipment, Inc. was able to operate its trucks at a very high level of productivity. The trucks were operated on a continuous basis, seven days a week. Based upon its own experience with military trucking operations, the Army expected that in the initial phases of Equipment's operations about 25 percent of its trucks would be inoperative at any given time. By October 1966, less than six months into the operation, Mr. Jeter was able to report to his superior that the number of trucks out of commission was very low. In February 1968, Mr. Jeter reported that over the two years of operation only 2 to 4 percent of the trucks had been inoperative at any time.

Equipment, Inc. has made a prima facie showing that it is entitled to favorable consideration under the statutory factor focusing on efficiency. Although the court has held that efficiency is not to be considered in a vacuum and is to be assessed by comparing the contractor's performance in the review years with his performance in prior years or with the performance of his competitors, this requirement has not been applied to plaintiff's prima facie case. In *Mills Manufacturing Corp. v. United States,* where the contractor's performance was being compared to his operations in previous years to assess his efficiency, the court held that it was not the plaintiff's burden to establish that his operations during the review years were more efficient than in the prior years. 215 Ct.Cl. at 560, 571 F.2d at 1174–75.

To rebut plaintiff's evidence, the Government relies on evidence it claims shows that Equipment's operation was not an efficient one and therefore not entitled to favorable consideration under this factor. Defendant first points out that the pricing structure of Equipment's 1966 and 1967 contracts did not provide incentives for efficient operation. These contracts provided that Equipment, Inc. was to be paid on a per hour basis. Thus, the incentive in these contracts was, as one witness put it, "to dispatch trucks, put them on the clock, and make the Government liable for their operation." Another problem which defendant

argues was caused in part by the pricing structure of the contracts, was alleged over-billing by Equipment, Inc. Once the Army had the resources to effectively audit Equipment's invoices, beginning in mid-1967, continuing disputes arose between Equipment's management and the Army officials responsible for administering the contracts. The Army made changes in Equipment's later contracts in an attempt to control the billing problem. Equipment's final contract with the Army was priced on a per trip rather than a per hour basis, with additional charges to be paid by the Army for time spent waiting for loading and unloading.

Aside from the difficulty with over-billing, the Army officers who administered Equipment's contracts voiced two other major complaints concerning the efficiency of Equipment's operation. The first group of complaints concerned problems with Equipment's drivers. Many of the drivers were prone to "goof off" while their trucks were carrying cargo and the time being billed to the Army. On several occasions drivers were seen sleeping in their trucks by the side of the road or near the loading facilities. Defendant also produced evidence that Army contract administrators had criticized Equipment's failure to perform adequate preventive maintenance to insure that trucks did not break down while on the road. The contracting officer's representative assigned to Equipment's contracts during the latter half of 1967 testified that Equipment, Inc. experienced significantly more break-downs than did its competition, Philco-Ford, during the months of October, November, and December 1967.

In addition to the problems discussed above, Equipment's management received periodic criticism from Army officials regarding a number of other aspects of its operations. These criticisms were addressed to unsafe vehicle congestion outside the motor pool gate; inadequate fire prevention measures; inadequate driver training; failure of trucks to arrive at loading points at the correct time; improper classification of Vietnamese personnel; inade-

quate power generating equipment; failure to maintain a clean and orderly motor pool; and other matters.

Based on the evidence it has cited, the Government asserts that Equipment, Inc. does not deserve favorable consideration under the statutory factor concerned with efficiency. The court is faced with the task of balancing Equipment's evidence of its efficiency against defendant's evidence that its operations were not efficient and to determine whether defendant has met its burden of proof. Several mitigating factors, which go to the weight to be given to defendant's evidence on this issue, must first be considered.

Defendant's assertions that the pricing structure of Equipment's contracts was a disincentive to efficiency are not proof that its operations were actually inefficient. The per hour pricing presumably was agreed to by both parties to the contract. The fact that the Army modified the contracts shows that the Army was becoming increasingly aware of how to better administer Equipment's contracts and not necessarily that the pricing structure of the early contracts produced inefficiencies in Equipment's operations.

The evidence of Equipment's overbilling is also inconclusive. The record shows that Equipment, Inc. had continuing disputes with the Army over invoices. Some of the disputes resulted in adjustments in plaintiff's accounts in favor of the Army, but other disputes resulted from errors made by the Army auditors and were resolved in favor of plaintiff. The evidence shows errors in the work of the audit staffs of both Equipment, Inc. and the Army, but is not proof that Equipment, Inc. was inefficient.

As for the evidence of dilatoriness among Equipment's drivers, there is other evidence in the record to show that Equipment's management made efforts to improve vehicle and driver performance. Equipment's management established a two-way radio system with about 15 radio-equipped patrol vehicles and two base stations.[32] In addition, to provide better supervision of the drivers (who were Vietnamese) Equipment's management hired Vietnamese supervisors to deal directly with the drivers. These supervisors were responsible for being time-keepers, dispatchers, trip ticket checkers, and disciplinarians. The Vietnamese supervisors were in turn responsible to American supervisors on Equipment's management staff. Thus, while the nature of Equipment's labor force created difficulties in maintaining driver efficiency, Equipment's management did make efforts to correct this problem.

An examination of the source and timing of many of the complaints that defendant cites as evidence of Equipment's inefficiency aids in assessing the weight that should be given to this evidence. The majority of the complaints about Equipment's operations came during the fall of 1966 or in the latter half of 1967. The fall of 1966 was early in Equipment's operation, and during this period, Equipment's management had to contend with the difficulties of setting up operations in an unfamiliar and hostile environment. This period was also one of heavy harassment of Equipment's operations by the Viet Cong. Given these problems, it is not surprising that the efficiency of the operation suffered somewhat at this time. The second major group of complaints was made during the second half of 1967, while Maj. Leroy Hibbits was the contracting officer's representative assigned to Equipment's contracts. Major Hibbits testified at trial for the Government and was openly critical of Equipment's operation. Other evidence in the record indicates that part of the difficulty that Major Hibbits had with Equipment's operation may have stemmed from a personality conflict between him and Equipment's general manager, Mr. Jeter. Within a few months of Major Hibbits' being assigned to oversee Equipment's contracts with the Army, the conflict between Jeter

32. One of the base stations was ultimately given to the Army to enable Army vehicle control units to communicate with their own vehicles as well as with plaintiff's patrol vehicles and motor pool.

and Hibbits became so severe that it was necessary for Jeter's superior, Mr. Spry, to come to Vietnam. Upon his return to the United States, Mr. Spry wrote a report outlining what he viewed as the problem to be corrected. While acknowledging that Major Hibbits had pointed out several areas in which Equipment, Inc. needed to improve its service, Mr. Spry felt that conflicts in personality and in priorities for running the operation had contributed to the problem between Jeter and Hibbits.

Defendant's major failure in presenting its evidence, however, has been its omission of presenting data on other firms. As the court stated in *Major Coat,* efficiency is not to be considered in a vacuum. 211 Ct.Cl. at 34–35, 543 F.2d at 117. Defendant has not provided data comparing Equipment's operation with others and showing that Equipment, Inc. was operating inefficiently. Plaintiff has made its prima facie case on the issue of efficiency, and defendant has failed to meet its burden of proof. In *Major Coat,* considering a similar situation, the court held that:

> [g]iven the general lack of data on plaintiff's relatative efficiency, there is little way of locating plaintiff on an industry profits spectrum, or even of concluding that plaintiff should be ranked above or below an isolated comparable firm, let alone how far above or below in terms of earnings. Merely average efficiency will not be assumed, and the absence of proof that plaintiff was merely average cannot be remedied by defendant's unsupported assertion to that effect. Plaintiff has brought forth enough information about its efficiency for it to be considered an efficient producer under the burden of proof rules in *Lykes Bros., supra.* Since defendant has not established the contrary, plaintiff will be viewed as one of the most efficient producers in its industry for purposes of measuring profit reasonableness. "Not having shown that plaintiff should be compared with the manufacturer at the bottom, mid-point or any particular point on the [industry profit] scale ... the Government has proven only comparabili-ty with the manufacturer who made profits ... at the top of the scale ..." *A.C. Ball Co. v. United States, supra,* 209 Ct.Cl. at 265, 531 F.2d at 1016–017. [211 Ct.Cl. at 36, 543 F.2d at 117.]

Equipment, Inc. will receive favorable consideration under the efficiency factor as a result of the Government's failure to meet its burden of proof on this statutory factor. The court is not persuaded, however, that Equipment's presumed high efficiency precludes the possibility of its having earned excessive profits. *Cf. Mills Manufacturing Corp.,* 215 Ct.Cl. at 564, 571 F.2d at 1178.

4. Extent of Risk Assumed.

Section 103(e)(3) of the Renegotiation Act provides that in determining excessive profits the extent of risk assumed by the contractor is to be taken into account. 50 U.S.C.App. § 1213(e)(3). In addition to the risk attendant to the contractor's pricing policies, other aspects of the risk factor taken into consideration are voluntary price reductions by the contractor, the effect on the contractor's future operations if his defense business is lost, and operational risks faced by the contractor.

Under the Renegotiation Board regulations dealing with risk, a contractor may be given credit for "guarantee[ing] quality and performance of the product notwithstanding uncertainties as to the quality obtainable from their plants, particularly with respect to products which may be more or less abnormal to them ..." 32 C.F.R. § 1460.-12(b)(1). Cases that have dealt with this aspect of the risk factor have noted that when a contractor undertakes a contract in an area in which it has had little or no experience, the risks of unanticipated difficulties are increased and therefore the contractor deserves favorable consideration. *Page-River-Curran v. United States,* 216 Ct.Cl. 246, 270, 574 F.2d 1063 (1978) (trial judge's opinion printed in Court of Claims Reports but not in the Federal Reporter); *A.C. Ball Co.,* 209 Ct.Cl. at 251, 531 F.2d at 1008. These cases are largely concerned with the risks inherent in the contractor's pricing policies.

Equipment, Inc. was formed to undertake the contracts that are the subject of this suit and had no prior experience with providing trucking services. Equipment's parent company, Sea-Land, had extensive experience with trucking operations throughout the world, however. The close working relationship between Equipment's management and that of its parent enabled Sea-Land's management to lend its expertise to Equipment's operation. Therefore, while plaintiff itself had no experience to guide it in entering into or performing contracts, plaintiff's management had resources on which to draw for assistance. The issue then becomes whether Sea-Land had sufficient experience in operating trucking services under the conditions faced by Equipment, Inc. to be able to anticipate accurately the difficulties it would face and the costs it would incur.

. The record does not show whether Sea-Land had performed trucking services under environmental conditions (terrain, climate, road conditions, etc.) similar to those in Vietnam. The record does indicate, however, that Sea-Land did not have cost data on operating in Vietnam during the war when it entered into its agreement with the Army.[33] To this extent, plaintiff is entitled to favorable consideration for undertaking a contract to provide the trucking services without knowledge of the dangers, difficulties, and costs that would arise from the hostilities. Some of the difficulties faced by plaintiff and costs incurred by plaintiff to deal with the dangers and problems it faced are described in the section of this opinion entitled "Character of Business."

■ Under the statutory factor dealing with the risks undertaken by the contractor, a contractor may be entitled to favorable consideration for entering into a firm, fixed-price contract. Normally, a fixed-price contract allocates the risk of cost increases to the contractor. *A.C. Ball Co.,* 209 Ct.Cl. at 248–49, 531 F.2d at 1007. The

court has noted that in some cases even though the contractor had entered into a fixed-price contract in form, other provisions of the contract allocated the risk of increases in costs to the Government. *Kilgore,* 222 Ct.Cl. at 197, 613 F.2d at 284; *See A.C. Ball Co.,* 209 Ct.Cl. at 249–50, 531 F.2d at 1007. The contractor is not entitled to favorable consideration where the Government bears the risk of cost increases. *Kilgore,* 222 Ct.Cl. at 197, 613 F.2d at 284.

■ Under the contracts at issue in this case, Equipment, Inc. was protected from increases in some of its costs. The 1966 and 1967 contracts contained escalation clauses that protected Equipment, Inc. from the risk of increases in labor costs. In addition, the Government's obligation to supply gasoline, spare parts, and petroleum supplies relieved Equipment, Inc. of the risk of cost increases for those items. To show that it bore the risk of increases in other costs, plaintiff presented evidence that the original estimate of management and security personnel and security and maintenance vehicles needed for its operation proved to be inadequate and additional personnel and equipment had to be obtained even though their cost had not been included in the estimates upon which the contract prices had been based. Other evidence suggests that Equipment's management may have made attempts to recover these extra costs by inflating its estimates for maintenance costs for the following year. In early 1967, Mr. Jeter reported to his superior at Sea-Land that the cost of refurbishing the Ford trucks would be about $100 per truck. Jeter added that the Army officials did not realize that the work could be done that cheaply and the cost estimates submitted for the 1967 contracts could exceed the $100 figure. The estimates that were eventually submitted included a figure of $600 for the repair work to be done on the Ford trucks.

Given the above evidence, it is clear that while Equipment's contracts were fixed-

**33.** Plaintiff was able to develop some cost data before the contracts were finalized, but as to many aspects of its operation (e.g. Army demand for services, long term stability of its

labor force, need for security) plaintiff did not have information at the time the final contracts were signed.

price contracts in form, the Government bore the risk of most cost increases. Furthermore, for those costs for which plaintiff did bear the risk of increases, its management may have padded cost estimates to reduce the risk of losing money.[34] Therefore, under this subfactor, the evidence does not warrant giving plaintiff favorable consideration for risks assumed.

Another aspect of the risk factor to be considered concerns the voluntary revision of prices downward by the contractor. The Renegotiation Board regulations provide that:

> [t]he risk assumed by the contractor as a result of its pricing policy will be given particular consideration. A contractor, having initial prices calculated to yield a reasonable profit, who revises such initial prices downward periodically when circumstances warrant, will be given more favorable treatment under this factor than a contractor who does not follow such policy. [32 C.F.R. § 1460.12(b)(2).]

When Equipment's contracts with the Army were originally negotiated, option prices were included in the contracts in the event the Government wished to extend the contracts. When the contract for operation of the Government-furnished Ford trucks was extended to cover the period from July 1, 1967, to June 30, 1968, Equipment, Inc. agreed to reduce its prices from the option price of $3.32 per hour for the first 622,440 hours of operation to $2.95 per hour, and from $2.15 per hour for the hours exceeding 622,440 to $2 per hour. Thus, under this aspect of the risk factor, plaintiff is entitled to favorable consideration.

Another risk that Equipment, Inc. bore under the terms of its contract was that the Army could go elsewhere for trucking services once it had utilized the minimum guaranteed hours in its contracts with Equipment, Inc. In 1967, the Army entered into a contract with another company, Philco-

Ford, to provide trucking services. The Army's contract with Philco-Ford was structured so that the Army had to pay for the trucks whether or not they were being used, while Equipment, Inc. was compensated only for actual use of its trucks. Because of the pricing structure of the contracts, the Army issued a directive that Philco-Ford's trucks be utilized before Equipment's. In *Tool Products Co. v. United States,* this court held that the allowable profits of a company from defense business should include an element to safeguard against insolvency when defense business terminates. 218 Ct.Cl. 486, 495, 589 F.2d 506, 510 (1978). Equipment, Inc. faced a similar situation, since after the minimum guaranteed hours had been completed it had no assurances that the Government would continue to employ it, and in fact the Government did contract for another trucking service (Philco-Ford) and give it priority over Equipment, Inc. In addition, at the time it undertook the contract, Equipment, Inc. had no means of predicting whether the political and military situations in Vietnam would allow it to continue operations for the U.S. Army or to develop local business. Equipment, Inc. therefore faced risks similar to those for which the court awarded credit in *Tool Products,* and should therefore receive credit for risks undertaken.

This court has recognized that in some circumstances a contractor may be given credit because the nature of its contract involves operational risks, including risks to the contractor's employees and equipment. *Kilgore Corp.,* 222 Ct.Cl. at 196, 613 F.2d at 283. The cases in which this aspect of the risk factor is discussed have stressed that credit will be given only when the contractor and not the Government bore the financial responsibility for the risk. *E.g., Mason & Hanger-Silas Mason,* 207 Ct.Cl. at 135, 518 F.2d at 1358. For example, in *Aero*

---

**34.** Mr. Jeter's testimony also lends support to this conclusion.

> So now we may have had some defective pricing, a penny here, a penny there .... In other words, our labor ultimately cost us more than what we figured. Our manage-

ment ultimately cost us more than we figured. Wherever there was a deficiency, there had to be something to counteract it. It all came out even.

*Spacelines,* Trial Judge Colaianni noted that the nature of the contractor's air transport operation created a special insurance risk because the contractor's planes, which the contractor was responsible for insuring, could be insured only for use within specified guidelines. Because of the complexity of the planes, it was difficult for the pilots to operate within the requirements of the guidelines. If a plane were lost while operating outside the guidelines, the contractor could not collect on the insurance policy. 208 Ct.Cl. at 742–44, 530 F.2d at 347–49. On these facts, Trial Judge Colaianni gave the contractor favorable consideration for the operating risks it undertook. *Id.* at 744, 579, 530 F.2d at 344, 357.

Several operating risks were created for Equipment, Inc. by the conditions under which it operated. The dangers to Equipment's employees from operating in the hostile environment in Vietnam have been discussed in detail in the section of this opinion entitled "Character of Business." We will only note further here that 21 of Equipment's employees were listed as known dead in the first two years of Equipment's operation. There is also evidence that a number of employees were injured. The responsibility for insuring its employees against injuries on the job rested on Equipment, Inc. under the terms of its contracts. There is no evidence, however, to show that Equipment, Inc. could not obtain insurance coverage, and the cost of workmen's compensation insurance coverage was included as one of the costs of the contracts in the negotiations. Equipment, Inc. did not bear the financial responsibility for injuries to its employees. With respect to financial responsibility for death or capture of Equipment's employees, the record indicates that Equipment, Inc. was able to obtain insurance to cover at least part of its

potential liability for such events. The Government apparently agreed to assume the cost for "war hazards" for "third country nationals" (employees of Equipment, Inc. that were not United States or Vietnamese citizens) as of July 1, 1968.[35] Therefore, under the cases discussed above, Equipment, Inc. is not entitled to credit for risk of injury to its employees, and is entitled to credit for assuming the financial responsibility for death or capture of employees only to the extent that its insurance or the Government did not cover the liability.

Equipment, Inc. also claims credit for other operational risks it encountered while operating in Vietnam. Due to the hostile environment, Equipment's facilities and equipment were in some degree of danger. With regard to the hazard to plaintiff's equipment, the defendant noted that the rates established by the contracts allowed plaintiff to recover its capital costs during the guaranteed hours in the first-year contracts.[36] Furthermore, during the guaranteed hours of the contract for the International Harvester trucks to be furnished by Equipment, Inc., the Government was obligated to pay the unamortized portion of the cost of any vehicle destroyed by hostile action; if trucks were destroyed by hostile action after the amortization period, the Government would purchase any replacements it required but was not obligated to replace the trucks. In the event that vehicles were destroyed by other causes not covered by insurance, or if the trucks exceeded their useful lives, the Government would pay for any replacement vehicles it required the contractor to purchase. If the Government chose not to replace a truck, Equipment, Inc. lost the future income that truck could produce. Damage to or destruction of Equipment's motor pool facili-

---

**35.** The defendant has asserted that the contracts and the Harbor Workers Act placed financial responsibility for death or capture of Equipment's employees on the Government. We can find no provision of the contracts that places such responsibility on the Government. The Harbor Workers Act (33 U.S.C. §§ 901 *et seq.*) as applied to employees of Government defense contractors (42 U.S.C. §§ 1651–1654 establishes the contractor's maximum liability to its employees for injury, death, or capture and does not impose liability on the Government.

**36.** There were 491,400 guaranteed hours for the International Harvester trucks and 622,400 guaranteed hours for the Government-furnished Ford trucks.

ties due to hostilities or civil disturbances was also the financial responsibility of the Government. Under the contract for the Ford trucks, Equipment, Inc. was relieved of financial responsibility for damage to Government property.

The contracts also placed on the Government financial responsibility for several other operating risks. For example, the Government, rather than Equipment, Inc., bore the risk of loss of cargo unless the cargo was lost through bad faith on the part of Equipment's managerial employees. To some extent, because the 1966 and 1967 contracts paid Equipment, Inc. an hourly rate for its trucks, Equipment, Inc. did not bear the consequences of delays on the road.[37] Travel time lost due to breakdowns or flat tires was paid for by the Government until mid-1967. Also, under the 1968 contract, a provision was added that placed on the Government the risk that drivers would not be available due to hostilities or strikes.

While it is certainly true that Equipment, Inc. operated under conditions that exposed its employees and equipment to substantial risks,[38] it is also evident that the Government recognized these risks when Equipment's contracts were being negotiated. The contracts place most of the financial responsibility for the risks on the Government. The case law concerning the risk factor has focused upon the risk of financial loss from the contractor's operating risks and risks attendant to pricing policies of the contractor. If the financial burden of the potential loss or cost increase falls on the contractor, it is entitled to credit under the risk factor. See Aero Spacelines, 208 Ct.Cl. at 741–45, 530 F.2d at 347–49. If the financial burden is allocated to the Government, however, the contractor is not deserving of

favorable consideration. Mason & Hanger-Silas Mason, 207 Ct.Cl. at 134–35, 518 F.2d at 1358. On the evidence presented in this case, many of the financial burdens of Equipment's operational risks rested on the Government. The Government also bore most of the risks associated with cost increases. However, Equipment Inc. bore some pricing risks, the risk of losing its business, and financial responsibility for some operational risks, and, therefore deserves some favorable consideration under the risk factor.

5. Net Worth and Capital Employed.

Plaintiff does not rely upon this statutory factor for its prima facie case, and took the position that this statutory factor is of no assistance in the analysis of the excessiveness of its profits since its operation was primarily service-oriented. We note here that even for a service-oriented operation, information on net worth and capital employed is useful in determining the excessiveness of profits, especially in selecting firms to be compared with the plaintiff. Defendant has presented expert testimony with regard to this statutory factor as part of its case in chief on the excessiveness of plaintiff's profits, and plaintiff has presented evidence to rebut the testimony of defendant's expert. Since the evidence is centered on showing the excessiveness of Equipment's profits and comparing the profits to those of other firms, we will reserve the discussion of this factor for the section of the opinion dealing with the defendant's proof of excessive profits.

6. Reasonableness of Costs and Profits.[39]

■ Under this statutory factor, Equipment's prima facie case centers on the nego-

---

**37.** The 1966 contracts paid Equipment, Inc. on an hourly basis. The 1967 contracts provided maximum allowed time for trips to each destination served by Equipment, Inc. but travel time in excess of the maximum allowed would be paid for by the Government if the excess time were shown not to be the fault of the contractor. Travel time lost due to flat tires was charged to Government under the 1966 contract.

**38.** Credit for these risks has been given to plaintiff under the statutory factors character of business and contribution to the defense effort.

**39.** The discussion under this statutory factor centers upon Equipment's profits; the reasonableness of costs has been considered in the discussion of other statutory factors, especially efficiency.

tiation of the contracts at issue in this case. Plaintiff makes two assertions based on its evidence concerning the negotiations: that the negotiations were fair and vigorous, thereby insuring that the originally negotiated profit figures were reasonable, and that the profits that it actually earned had been agreed upon in the negotiations. Plaintiff's first assertion has been countered with substantial evidence from the defendant, while the second assertion is not adequately supported by plaintiff's own evidence.

Both parties have presented evidence regarding the negotiation of plaintiff's contracts with the Army. Plaintiff attempts to paint the picture that both sides had equal bargaining positions at the negotiating table. The Government, on the other hand, offered evidence to show that the Army was in effect "up against the wall" in negotiating the contracts and that plaintiff's management was aware of the situation and took advantage of it. We find, as a matter of fact, that the negotiations did not insure that the rates agreed upon for rental of Equipment's trucks produced only reasonable profits. As the court stated in *Major Coat*:

> Statutory renegotiation stems from the premise that "accurate pricing and the control of contractors' profits cannot be achieved during a build-up of production for defense of war." *Mason & Hanger-Silas Mason Co. v. United States*, 207 Ct.Cl. 106, 115, 518 F.2d 1341, 1346–347 (1975). The careful cost analysis and forecasting that usually accompanies negotiated procurement sometimes falters in time of war, as demand for various goods and services suddenly rises to a level that outstrips industry capacity and overwhelms procuring agents. If the inordinately high demand is not sufficient to create a seller's market in the extreme, then the knowledge that the demand is short-term and will just as suddenly fall off surely accomplishes the task. Of course, pressed by the exigencies of war, the Government is unlikely to refrain from purchasing needed supplies and work even though the price is suspiciously

and distastefully high. The result, not surprisingly, is the evaporation of price competition, and the consummation of sales to the defense agencies much higher in price than a competitive market would have allowed. The Government thus relies upon the expedient of renegotiation to recoup the price differential, *Mason & Hanger-Silas Mason Co. v. United States, supra.* The defense demand will neither wait, nor will it provide the incentive, for enough new productive capacity to be opened up (because of the attraction of the profits) "to drive prices down and eliminate 'abnormal' profits," thus serving to "preclude continuing and excessive profits" as typically done in the competitive marketplace. [citation omitted]. Renegotiation merely seeks to reconstruct the competitive price to the Government, and the competitive price for the contractor, that negotiation would have produced absent the suddenness of the wartime demand on the marketplace. [211 Ct.Cl. at 23–24, 543 F.2d at 110. *See also Mason & Hanger-Silas Mason*, 207 Ct.Cl. at 116, 518 F.2d at 1347.]

("The combination of the needed speed, the rise in demand and the all but exclusive interest of procurement officers in volume of purchases overwhelm careful analysis and forecasting, especially in the cases of . . . drawn out negotiations . . ."). In 1966, Chairman Wilbur K. Mills of the House Ways and Means Committee advised Congress that the enormous defense program arising from the war in Vietnam had resulted in such "attenuation of normal competitive forces" that the Renegotiation Act of 1951 should be extended. 112 Cong.Rec. 13289–90 (1966); *see Mason & Hanger-Silas Mason*, 207 Ct.Cl. at 116–17 & n. 8, 518 F.2d at 1347–48 & n. 8. Another concern in renegotiation cases is that unit cost decreases for the contractor produced by increases in volume of production are not matched by unit price reductions. In *Simmonds Precision Products, Inc. v. United States*, the court noted that:

> [w]hile the [Government] . . . got some price concessions doubtless related to vol-

ume, [the contractor] . . . was pocketing the major part of the benefits in the form of a rapidly rising margin of the unit price over the cost of sales, reaching almost 30 cents per unit. This was a situation renegotiation could not ignore. As we said in *Butkin Precision Mfg. Corp. v. United States,* 211 Ct.Cl. 110, 121, 544 F.2d 499, 505 (1976)—

> * * * That the high volume orders were more profitable to fill, than low volume orders, is precisely the situation Renegotiation was invented to deal with. Experience in several wars has shown the tendency for unit prices not to decline as fast as the volume increase would justify. * * * [*Simmonds,* 225 Ct.Cl. 481, 483–85, 640 F.2d 292, 301–02 (1980).

In light of these concerns and of the facts surrounding the negotiation of plaintiff's contracts, we cannot conclude that the negotiations that took place insured the reasonableness of profits actually earned by Equipment, Inc.

The plaintiff has also argued that the negotiated profit per hour was virtually the same as that actually earned by Equipment, Inc. Even if this were true, it is not proof that the profit was reasonable, as discussed above. In addition, there are flaws in plaintiff's calculations. Plaintiff calculated the total number of hours of operation times the negotiated profit per hour and then compared this figure to the actual profits it earned. The record does not include information on the specific negotiated rates of profit for the 1967 and 1968 contracts. The profit per hour that plaintiff asserts was negotiated for the 1967 contracts is based upon the rates that were set out in the option clauses of the 1966 contracts, and plaintiff has not produced evidence to show what, if any, profit figures were negotiated in 1967 when the contracts were renewed at rates lower than those in the option clauses. As for the 1968 profit per hour figure that plaintiff asserts was negotiated, the record shows that the 1968 contract was priced on a per trip and not a per hour basis. Plaintiff's 1968 negotiated profit figure is based upon the average

profit rate that plaintiff claims was negotiated for the hours in excess of the guaranteed hours in the 1967 contracts, but plaintiff has not shown that the negotiated profit in 1968 was based in any way on the 1967 negotiations. In addition, for each year, even if a profit per hour figure had been agreed upon, plaintiff has not shown that the number of hours it worked was the same as the number of hours of operation contemplated when the profit per-hour figure was established. Due to the flaws in plaintiff's argument, the court cannot conclude that plaintiff's negotiated profit and the profit it actually earned were the same.

The reasonableness of the contractor's costs and profits is the pivotal issue in every renegotiation case. The other statutory factors merely provide information needed to compare the performance of the contractor with that of other firms. In assessing the reasonableness of plaintiff's costs and profits, comparative data is needed. As the court noted in *Major Coat,* "[t]he Act requires that the reasonableness of profits be considered because, until it is decided that the renegotiable profits were not competitively set, and that they rose substantially above the competitively fixed profits *of comparable firms,* there can be no finding that excessive profits were realized." 211 Ct.Cl. at 23, 543 F.2d at 109–10 (footnote omitted; emphasis added). After summarizing our views on the parties' presentation on the statutory factors, we will turn to a discussion of the Government's case in chief on the excessiveness of the profits earned by Equipment, Inc.

7. Summary on Statutory Factors.

Based on the evidence presented by the parties on the character of business, contribution to the defense effort, efficiency, and risk, we hold that the plaintiff has established its prima facie case. As stated earlier, the burden on the plaintiff in this regard is minimal. Plaintiff has presented evidence to show that it merits favorable consideration under some of the statutory factors upon which it relies. Coupled with no argument from the defendant that plain-

tiff has failed to make a prima facie case, plaintiff's presentation is sufficient to meet the minimal burden of proof placed on plaintiff.

As the court has stated in several cases, the statutory factors must be, to be useful, evaluated in a comparative approach. *See Shinn Engineering, Inc. v. United States,* 221 Ct.Cl. 708, 719, 611 F.2d 820, 826 (1979). It is not enough for plaintiff to argue (or defendant to concede) that Equipment, Inc. was efficient, that it assumed risks, or that it met another of the statutory criteria; the question is whether Equipment, Inc. was so much more efficient than other contractors (or more than itself in other years) as to justify its allegedly excessive profits in the review years. *Id.* Without such comparative data, the impact of the statutory factors is lessened. *Id. See Camel Mfg.,* 215 Ct.Cl. at 492, 572 F.2d at 298; *Bata Shoe Co. v. United States,* 219 Ct.Cl. 240, 249, 595 F.2d 9, 14 (1979). While the evidence presented demonstrates Equipment's entitlement to some credit under the statutory factors, whether the statutory factors justify Equipment's rate of return in the review years is unclear. *Cf. Shinn Engineering,* 221 Ct.Cl. at 721, 611 F.2d at 827. Given the minimal burden of proof placed upon plaintiff in presenting its prima facie case, the responsibility for presenting comparison data on efficiency, risks assumed, reasonableness of costs and profits, net worth and capital employed, and character of business rests on the Government. *See Wells Marine, Inc. v. United States,* 675 F.2d 274, at 277 (Cl.Ct.1982); *Kay Manufacturing Co. v. United States,* 676 F.2d 555 at 559 (Cl.Ct. 1982). As we have noted in our discussion of the statutory factors, the Government has not presented comparative data concerning efficiency, risks assumed or character of business. We now turn to an exami-

nation of defendant's case concerning the reasonableness of Equipment's profits and the comparison data presented on the reasonableness of those profits and on the net worth and capital employed of firms to be compared with Equipment, Inc.

### III. *Defendant's Proof of Excessive Profits*

■ We now come to the ultimate issue in this, and every renegotiation case: whether the Government has met its burden of proving the existence and extent of excessive profits earned by the plaintiff. To answer this question, we must define precisely the defendant's burden of proof, examine the evidence that the defendant has presented, and determine whether defendant's evidence is sufficient to meet this burden.

In recent years, this court has been concerned with shaping and defining the defendant's burden of proving excessive profits in renegotiation cases. In *Major Coat,* the court placed on the defendant the burden of presenting relevant comparison data by which the court could judge the excessiveness of the plaintiff's profits.[40] The court has accepted three types of comparisons for determining the reasonableness of the profits of a contractor under renegotiation: (1) comparisons between the contractor's profits in prior years and profits earned during the years under review, *Gibraltar Manufacturing Co. v. United States,* 212 Ct.Cl. 226, 234–35, 546 F.2d 386, 391 (1976); (2) comparisons between the contractor's profits from its commercial business during the review years and its renegotiable profits, *Camel Manufacturing,* 215 Ct.Cl. at 497–98, 572 F.2d at 300–01; and (3) comparisons between profits earned by other companies within the contractor's industry and the contractor's renegotiable

---

**40.** Although the court did not explicitly state that *Major Coat* was creating a new, more stringent standard of proof, cases tried before the decision in *Major Coat* have been accorded much greater latitude in terms of the comparison data needed to meet the defendant's burden of proof than cases tried after the decision in *Major Coat* have been. *E.g., Simmonds Precision Products, Inc. v. United States,* 225

Ct.Cl. 481, 485, 640 F.2d 292, 302 (1980); *Shinn Engineering, Inc. v. United States,* 221 Ct.Cl. 708, 715, 611 F.2d 820, 824 (1979). The instant case went to trial on July 16, 1979, well after the decision in *Major Coat,* and therefore will be decided under the stricter burden of proof standard set out in that case and in decisions following it.

profits, *Major Coat,* 211 Ct.Cl. at 28–30, 543 F.2d at 113–14. *See Simmonds,* 225 Ct.Cl. at —, 640 F.2d at 311. In *Carey Industries, Inc. v. United States,* 222 Ct.Cl. 231, 614 F.2d 734 (1980), the court made an exception to the requirement that the defendant produce meaningful comparison data to meet its burden of proof in cases tried after the decision in *Major Coat. Carey Industries* involved a defense contractor that was unique in its field. As the possibility of presenting any relevant comparison data from the contractor's industry was completely precluded,[41] the Government was not held to the standard of proof established by *Major Coat.* 222 Ct.Cl. at 233, 614 F.2d at 735. Instead of requiring comparative data, the court in *Carey* accepted, without explanation, the reasonable profit figure proposed by the Government's expert witness and then adjusted this figure upward to reflect the favorable consideration the contractor had been accorded for some of the statutory factors. 222 Ct.Cl. at 236, 614 F.2d at 737.

In the case of Equipment, Inc. we do not have, as we did in *Carey,* a contractor that is completely unique in its field. In *Carey,* the plaintiff's business consisted of the manufacture of colored smoke mixes that were used in military munitions. 222 Ct.Cl. at 233, 614 F.2d at 735. The record in *Carey* showed that the contractor's business required considerable expertise in a specialized field. *Id.* at 234, 614 F.2d at 736. Both parties in the *Carey* case acknowledged that the contractor was truly unique in its particular field, precluding the possibility of introducing comparative data. *Id.* at 233, 614 F.2d at 735. Such is not the case with Equipment, Inc. Equipment, Inc. was a trucking concern, and throughout the world there are many thousands of trucking firms. More significantly, Equipment, Inc. did not belong to a unique subclass within

the trucking industry because of the hostile conditions under which it operated. The record shows that there was at least one other United States based trucking operation, and several Vietnamese and Asian based firms, operating in Vietnam during the review years. The other United States based firm, Philco-Ford, had contracted to provide trucking services for the military in Vietnam during some of the same years as had Equipment, Inc.[42] The existence of another trucking operation performing services in competition with Equipment, Inc. shows that Equipment, Inc. was not unique in its field. In addition, defendant has, throughout its presentation, compared Equipment, Inc. with other firms in an attempt to show that Equipment's profits, costs, and prices were excessive. Therefore, this is not a case in which, due to the unique nature of the contractor's business, the defendant is excused from presenting comparison data.

The only accepted basis of comparison that can be used in this case to determine the excessiveness of Equipment's profits is a comparison of plaintiff's business with that of other firms, since Equipment, Inc. had no nonrenegotiable business during the review years and had no operating history prior or subsequent to the review years. Defendant's expert witness on economics and finance, Dr. Irwin H. Silberman, presented an analysis of plaintiff's profits based on a comparison of plaintiff and selected groups of trucking firms operating in the United States. Before we can rely on Dr. Silberman's testimony, however, we must examine the adequacy of the comparison data on which it was based. For the purposes of analysis, we will briefly restate Dr. Silberman's testimony, focusing on the comparison data that he employed to reach his recommendations on reasonable profit

---

**41.** The court in *Carey* noted that the contractor had no nonrenegotiable business. 222 Ct.Cl. at 233–234, 614 F.2d at 735–36. The court's opinion does not discuss whether comparison data from years prior or subsequent to the review years was available.

**42.** Neither party to this action has presented any data regarding the costs or profits of plaintiff's competition in Vietnam. What little information we can glean from the record regarding plaintiff's competitor, Philco-Ford, shows that it began operations sometime in the fall of 1967 on a cost-plus fixed-fee contract to provide trucking services for the Army in Vietnam.

figures for the plaintiff's operation during the review years.[43] Dr. Silberman recommended that reasonable profits would be $295,357 for 1966, $827,526 for 1967, and $292,015 for 1968.[44] Dr. Silberman's analysis of the reasonable profits for plaintiff's operation is based on an economic measure of profitability called "return on investment," a ratio of a business's profit to the total amount of capital that has been invested in the business (the investment base). The ratio is expressed as a percentage. Dr. Silberman's analysis estimates a reasonable return on investment percentage for plaintiff's operation. Then, by calculating plaintiff's actual investment base, Dr. Silberman arrived at what he believed to be a reasonable profit figure for Equipment's operations. The return on investment percentage that Dr. Silberman used for his calculation of a reasonable profit figure was 25 percent for each of the review years. Dr. Silberman stated that he had selected this figure because it exceeded the average return on investment achieved by certain groupings of United States based trucking companies during the review years. The United States based firms had characteristics that Dr. Silberman felt made them comparable to Equipment, Inc.[45] Dr. Silberman considered five characteristics of Equipment, Inc. and looked at data on United States based trucking operations that possessed various combinations of these characteristics.

The first characteristic that was used to select comparable firms was that Equipment, Inc. was, by the Interstate Commerce Commission (ICC) definition, a contract carrier, because it dealt only with the Government. A contract carrier deals only with specific customers, while a common carrier holds itself out to do business with the general public. Dr. Silberman also used a second characteristic, the carrying of hazardous cargo, as an approximation of the dangerous environment in which Equipment, Inc. operated. In his analysis, Dr. Silberman considered United States based firms that had both of these characteristics and had operated in all three of the review years. By referring to the financial data on trucking firms that was collected by the ICC, Dr. Silberman calculated the return on investment of four United States based trucking firms [46] that were contract carriers of hazardous cargo for the three review years. The return on investment of the group of firms for each year was: [47]

| | Average Return | Highest Return | Lowest Return |
|---|---|---|---|
| 1966 | 20.28% | 71.54% | -4.43% |
| 1967 | 11.90% | 26.78% | -84.21% |
| 1968 | 10.30% | 19.76% | -10.05% |

For the three-year period, the overall average return was 14.33%.[48]

**43.** A complete summary of Dr. Silberman's testimony can be found in fs. No. 98 through 106.

**44.** These figures do not include the "management fee" Dr. Silberman felt Equipment, Inc. should have earned for operating the Government-furnished equipment. Dr. Silberman also calculated what he felt to be plaintiff's excessive profits for the review years. He subtracted his recommended profits from the defendant's figures for plaintiff's actual profits for the review years. See the section of this opinion entitled "Accounting Issues."

**45.** Dr. Silberman also considered 1966 through 1968 return on investment figures for 21 non-regulated industries in the United States as background for his determination of an appropriate return on investment for Equipment, Inc. The relevance of this data is highly questionable. In his testimony, Dr. Silberman did not state or imply that there was any relationship between the return on investment figures for these other industries and the figure he suggested for plaintiff. There is no evidence in the record that would indicate that these 21 industries are representative of anything relating to the trucking industry, which is clearly the relevant industry group in this case. Therefore, this data cannot be used to support Dr. Silberman's suggested return on investment figures for Equipment, Inc.

**46.** Dr. Silberman has been criticized by the ICC for using four firm "industries" for comparisons.

**47.** The data that Dr. Silberman used to calculate the average return is provided in Appendix I. The average return for each year is weighted according to the investment base of each of the companies for that year.

**48.** The overall average, prepared by Dr. Silberman is weighted by the total of the investment bases of the companies for each year.

The other characteristics that Dr. Silberman considered in his selection of firms to compare with Equipment, Inc. arose from his assessment that Equipment, Inc. was, during the years under review, a carrier of general freight, a local carrier,[49] and a carrier that employed approximately 440 vehicles.[50] Using the data compiled by the ICC, Dr. Silberman found eight carriers that had the characteristics and had operated during all three of the review years. Of the eight carriers, four were owned by railroads and four were not. Dr. Silberman calculated the return on investment of the four railroad-owned carriers separately from his calculation of the return on investment on the other four carriers. The return on the investment of the four railroad-owned carriers[51] for the review years was:[52]

| | Average Return | Highest Return | Lowest Return |
|---|---|---|---|
| 1966 | 23.84% | 31.07% | 8.38% |
| 1967 | 13.77% | 20.30% | −4.62% |
| 1968 | 16.22% | 24.84% | −2.76% |

For the three-year period, the overall average return was 20.58%.[53] The return on investment of the independent carriers[54] for each of the review years was:[55]

| | Average Return | Highest Return | Lowest Return |
|---|---|---|---|
| 1966 | 11.60% | 18.08% | −18.12% |
| 1967 | 8.13% | 14.27% | −10.65% |
| 1968 | 12.59% | 18.14% | −8.74% |

For the three-year period, the overall average return was 10.79%.[56]

Based on the average return on investment percentages that he calculated for the three groups of trucking firms, Dr. Silberman determined that a reasonable return on investment for plaintiff's operation in

Vietnam was 25 percent for each of the review years. The record does not contain a detailed explanation of Dr. Silberman's reasoning in reaching the 25 percent figure. Apparently, Dr. Silberman was aiming for a return on investment percentage that exceeded the return calculated for the three comparison groups. He testified that in formulating the suggested reasonable rate of return he attempted to "err on the side of being overly generous" in order to take into account the risks under which Equipment, Inc. was forced to operate.

The analysis by Dr. Silberman constitutes the only proof offered by the defendant of the existence and extent of excessive profits received by the plaintiff during the years under review. The major difficulties in accepting Dr. Silberman's analysis are that he has failed to persuade the court that the data he presented for the United States based firms reflects operations that are comparable to plaintiff's and that he has employed composite data in his analysis despite the language in *Tool Products* that such data is not sufficient. *See Tool Products,* 218 Ct.Cl. at 491–92, 589 F.2d at 508.

All of the trucking firms that Dr. Silberman used for his comparisons were based in the United States. The conditions under which Equipment, Inc. operated were therefore far different from those faced by the firms in the comparison groups. The section of this opinion entitled "Character of Business" describes in detail the problems that were encountered by Equipment, Inc. in carrying on trucking operations for the U.S. Army in Vietnam. We will only briefly restate the characteristics of Equip-

**49.** In his testimony, however, Dr. Silverman stated that there was no relationship between reliance of a carrier on local cartage and the profitability of the carrier.

**50.** In his testimony, however, Dr. Silberman stated that based on his research on the trucking industry he knew of no association between the size of the carrier and the rate of return.

**51.** *See* n. 46, *supra.*

**52.** The data that Dr. Silberman used to calculate the average returns is provided in Appendix J. The average return for each year is

weighted according to the investment base of each of the companies for that year.

**53.** *See* n. 48, *supra.*

**54.** *See* n. 46, *supra.*

**55.** The data that Dr. Silberman used to calculate the average returns is provided in Appendix K. The average return for each year is weighted according to the investment base of each of the companies for that year.

**56.** *See* n. 48, *supra.*

ment's operation that differentiate it from the United States based firms that were used for comparison.

The most obvious difference between plaintiff's operation and the United States based firms is that Equipment, Inc. was operating in a country that was embroiled in a civil war. The division between enemy and friendly territory in Vietnam was very tenuous during the review years and plaintiff's operations were frequently the target of enemy attacks and harassment. Obviously, there are no conditions comparable to these in the United States.[57] In his testimony, Dr. Silberman recognized that Equipment was exposed to much greater danger than was a carrier of hazardous cargo operating in the United States.

Another aspect of plaintiff's operation that makes comparison of Equipment, Inc. and United States based firms difficult is its labor force. The drivers of Equipment's trucks were all Vietnamese nationals. Language problems, intimidation, and infiltration of the work force by the Viet Cong, and a high attrition rate made Equipment's work force far more unstable and difficult to manage than workers in a United States based operation.[58]

The multitude of other problems faced by Equipment, Inc. do not exist, or exist only in much milder forms, for trucking firms that only operate in the United States. The extent of plaintiff's theft problem and its difficulties in dealing with United States

and Vietnamese Government officials were exacerbated by the war. In addition, the logistical problems of running plaintiff's operation were increased because of the war and by Equipment's management's lack of familiarity with the Vietnamese language and culture. All these problems while they might exist to varying extents for some United States based trucking operations, certainly would not be experienced in the magnitude that they were by Equipment, Inc. in Vietnam.

Another weakness we find in the defendant's comparison data is that the groups of trucking firms chosen for comparison with Equipment, Inc. have characteristics that Equipment, Inc. does not have. The source of defendant's comparison data was "Trinc's Blue Book of the Trucking Industry" (Trinc's). This sourcebook is compiled from data collected by the ICC on trucking firms that operate as interstate carriers. There are no exclusively intrastate, local trucking operations included in Trinc's.[59] Equipment, Inc. operated in a very limited area in and around Saigon[60] as an exclusively local carrier. The comparability of Equipment, Inc. to the Interstate operations that are included in Trinc's was not established. In addition, all of the trucking firms used for comparison had vehicle inventories for 1966 that were at least 50 percent tractor-trailers; their operations were different from Equipment's truck pick-up and delivery service.[61] Defendant's

---

**57.** Dr. Silberman suggested that United States based carriers of hazardous cargo could be compared to Equipment, Inc., using the carrying of hazardous cargo as a "proxy" for the dangerous environment in which Equipment, Inc. operated. Dr. Silberman has failed to persuade the court, however, that the risks entailed in carrying hazardous cargo—which are known and can be planned for—are comparable to the risk faced by Equipment, Inc. in operating in a country at war.

**58.** Dr. Silberman did not consider the number of employees in Equipment's operation in selecting firms for comparison. The comparison firms he selected had from 37 to 1,310 employees in 1966.

**59.** One of the characteristics that Dr. Silberman used to select firms for comparison with Equipment, Inc. was the carrying of local

freight. In Trinc's, carriers that transport 25 percent or more of their business as local freight are denoted local carriers. To be listed in Trinc's, however, a carrier must have at least some interstate business. Dr. Silberman did not address whether and to what extent the interstate component of the U.S. based firms' business affected their comparability to Equipment.

**60.** The 1967 contracts established maximum allowable travel times for the destinations that Equipment, Inc. served. The farthest that plaintiff's trucks had to travel was 2 hours and 15 minutes.

**61.** The make-up of these firms' "fleets" also suggest that the amount of local business carried by the comparison firms may have been limited. See n. 59, supra. In addition, the

expert failed to account satisfactorily for the effect on his analysis of these differences between Equipment, Inc. and the groups of trucking firms he used for comparison. This casts further doubt on the value of the comparison data offered in this case.

Another major difficulty with the defendant's comparison data concerns the manner in which it was selected and grouped for comparison purposes. While we accept the relevance of most of the characteristics of Equipment, Inc. that Dr. Silberman used to select groups of trucking firms to compare with Equipment, Inc., the groupings of these characteristics is without explanation and sometimes appears illogical or irrelevant. Four of the five characteristics selected by Dr. Silberman describe various aspects of Equipment's operation (contract carrier, carrier of general freight, local carrier, size) and should be helpful in classifying Equipment, Inc. for comparison purposes. Dr. Silberman did not use firms that combined these four characteristics in his analysis. Instead, he chose, without explanation on the record, to group the characteristic of being a contract carrier with that of being a carrier of hazardous cargo [62] and selected data from firms that had these two characteristics as part of the comparison data against which he judged plaintiff's profits.[63] The other three characteristics were combined, with the explanation that

they were "operational characteristics," and data was selected for firms that were carriers of general freight, local carriers, and carriers that employed approximately 440 vehicles in their operations. At this point, without explanation, Dr. Silberman injected a sixth characteristic into his analysis without establishing its relevance in drawing comparisons with Equipment's operations. Of the eight trucking firms that were local carriers of general freight and employed approximately 440 vehicles, Dr. Silberman found that four of the eight firms were owned by railroads and the rest were not. Dr. Silberman grouped the carriers by type of ownership and calculated average return on investment for each group.[64] The relevance of defendant's comparison data has been seriously weakened by four flaws: (1) no factor adequately represents the dangers faced by Equipment, Inc.; (2) Dr. Silberman did not satisfactorily explain his groupings of the factors he considered relevant; (3) Dr. Silberman used the number of vehicles employed to select firms for comparison, but testified that he knew of no association between size and profitability; and (4) Dr. Silberman did not adequately examine and resolve whether Equipment, Inc. and the firms in his comparison groups had capital structures sufficiently similar and were equally capital-intensive operations to be expected to produce comparable returns on investments.[65]

comparison firms appear to be much more capital-intensive operations than was Equipment, Inc. This also reflects on the weight to be given to the comparisons made between these firms and Equipment, Inc.

62. Dr. Silberman used the carrying of hazardous cargo to approximate the hostile conditions under which Equipment, Inc. operated. Since one of the other characteristics of Equipment, Inc. that was employed by Dr. Silberman to select comparison firms was the carrying of general freight, it would not be possible to locate trucking firms that had all five characteristics selected by Dr. Silberman. A firm could not be both a carrier of general freight and primarily a carrier of hazardous cargo at the same time.

63. Two of the firms that were contract carriers and carriers of hazardous cargo had consistent losses during the review years. One firm

showed a negative return on investment for all three years, while the other showed a very large return on investment for 1966 (71.54%) and negative return on investment in the other years. Dr. Silberman did not discuss the effect that this aspect of the comparison data had on the relevance and strength of his comparisons.

64. As with the group of comparison firms that were contract carriers and carriers of hazardous cargo, the other two groups of trucking firms included a firm that showed a loss during the review years. One railroad-owned carrier showed losses in 1967 and 1968, while one of the independently owned carriers showed losses for all three of the review years.

65. As noted above, Equipment, Inc. had a very different inventory of trucks than did many of the firms chosen for comparison with it.

In addition, Dr. Silberman did not explain why return on investment was the sole basis of

In addition to these flaws in his analysis, Dr. Silberman compared Equipment, Inc. with industry and subgroup averages rather than with individual firms. The consequences of this deficiency in the defendant's comparison data is established in *Major Coat.* In assessing the Government's evidence in *Major Coat,* the court stated that:

> [t]he risks assumed by plaintiff on contract pricing, production volume, and quality and timing warranties were substantial indeed, especially in light of the fact that neither plaintiff nor any other producer had ever before undertaken to make the complex and costly AG–44 coats.... Plaintiff further assumed the risk of manufacturing a garment far more complicated in design and construction than most commercial garments, including those that it had made in the past, and than most other clothing items procured by the military. Plaintiff's fellow AG–44 manufacturers assumed virtually these same risks.... The extent to which other contractors classifiable under SIC 2310 or 2311 [other manufacturers of suits, formal wear, dress and sport coats, topcoats, vests, tailored coats, and uniforms for men and boys] bore like risks is not discernible from the evidence, though their manufacturing complexities and associated risks appear to have been less than was the case with the AG–44 producers. As was true under the efficiency factor, where the risks assumed by other firms are not known and therefore cannot be weighted relative to the risks undertaken by the plaintiff, a barrier is raised to the use of those other firms' profit figures in determining a reasonable profit for plaintiff. [211 Ct.Cl. at 38–39, 543 F.2d at 118–19 (footnote omitted) [66]]

Dr. Silberman's use of averages for his comparisons, without analysis of the efficiency and risks faced by the individual firms involved, raises the barrier to the use of those averages in assessing the reasonableness of plaintiff's profits.[67]

In making his comparisons, Dr. Silberman relied upon average rate of return figures

comparison he chose to employ, although in *Bata Shoe* and *Mills Manufacturing* this court held that return on capital is not a very useful basis of comparison when the contractor is not in a capital-intensive industry. *Bata Shoe,* 219 Ct.Cl. 240, 257, 595 F.2d 9, 18 (1979); *Mills Manufacturing,* 215 Ct.Cl. 536, 557, 571 F.2d 1162, 1173 (1978).

**66.** With respect to efficiency, the court states: Merely average efficiency will not be assumed, and the absence of proof that plaintiff was merely average cannot be remedied by defendant's unsupported assertion to that effect. Plaintiff has brought forth enough information about its efficiency for it to be considered an efficient producer under the burden of proof rules in *Lykes Bros., supra.* Since defendant has not established the contrary, plaintiff will be viewed as one of the most efficient producers in its industry for purposes of measuring profit reasonableness .... [211 Ct.Cl. at 36, 543 F.2d at 117.]

**67.** In *Simmonds Precision Products,* the court (affirming and accepting Trial Judge Colaianni's opinion *per curiam*) declined to apply *Major Coat* to clear a contractor solely on the basis of inadequacies of the Government's expert testimony regarding industry-wide comparisons. The *Simmonds* court stated that it "assuredly never intended to say it would grant a clearance in the face of indications of excessive profits obvious even to a nonexpert, as a kind of sanction for deficiencies in the Government expert testimony." 225 Ct.Cl. at 487, 640 F.2d at 303. *Wells Marine, Inc. v. United States,* the most recent renegotiation case, limited the scope of *Simmonds.*

> In *Simmonds Precision Products,* in holding that the Government had shown excessive profits even though it had not introduced comparative evidence, we stated: "*Major Coat,* however, was not written to prescribe use of one single method of proving excessive profits and bar all others." 225 Ct.Cl. at 485, 640 F.2d at 302. That statement, however, must be read in light of the case before the court, in which no meaningful comparison bмежду the plaintiff and other firms was possible because the plaintiff was "the sole supplier of the aluminum magazine, a unique component." *Id.* at 485, 640 F.2d at 302. 675 F.2d 274 at 279–280 (Cl.Ct.1982).

As will be discussed more thoroughly later in this opinion, the court's two most recent opinions in renegotiation cases have made it quite clear that the Government must provide adequate comparison data and that the court will no longer assist defendant in meeting this responsibility by making determinations of excessive profits despite the Government's failure to introduce comparative evidence. *See Wells Marine,* 675 F.2d at 278, 279; *Kay Manufacturing Co. v. United States,* 676 F.2d 555 at 565–566 (Cl.Ct.1982).

for the trucking industry and for three groups of trucking firms selected by him based on characteristics they shared with Equipment, Inc. In several cases, the court has considered the use of composite data in assessing the excessiveness of a contractor's profits. In *Tool Products,* the court examined the sufficiency of composite data used for comparisons.

> Plaintiff is not asserted to have been the sole supplier of many of the ordnance parts it furnished, yet defendant in no instance supplied price and cost data as to the same parts obtained from other sources, as it easily could have done. Experts on both sides resorted to composite data.... We have considered this data, and find it not very helpful because there is no way to adjust for differences between plaintiff's business and that of the alleged norms. Informed and reasoned renegotiation requires a clear focus on the uniqueness of the individual concern, which use of this kind of data tends to blur. [218 Ct.Cl. at 491–92, 589 F.2d at 508.]

In the instant case, the Government might have been able to make comparisons based upon data on a firm in direct competition with Equipment, Inc., since Philco-Ford was also providing trucking services for the U.S. Army in Vietnam. Even if Philco-Ford were not directly comparable with plaintiff because it operated on a cost-plus contract, useful information on character of business, risk, and relative efficiency would be available. The Government provided figures for an average rate of return on investment for three groups of trucking firms for comparison with Equipment's return, but defendant's expert failed to "adjust for differences between plaintiff's business and that of the alleged norms." *See id.* The *Tool Products* court noted that "[t]he parties must have had in reach, but did not use, materials that would have permitted a more precise evaluation. Defendant, with the burden of proof, must be the loser by this failure." *Id.* at 500, 589 F.2d at 512. While the plaintiff in *Tool Products* did not receive a complete clearance for the years under review because of the defects in the

Government's case, the court in *Tool Products* had noted that because the trial of that case antedated the warnings given in *Major Coat,* the defendant benefitted from the lenience promised as to trials held before the decision in *Major Coat. Id.* at 491, 589 F.2d at 508. In the instant case, the Government has not provided the information needed to make accurate comparisons of Equipment, Inc. with other firms and has not shown that such information was not available.

In *Shinn Engineering* the court also questioned the use of composite figures for comparison. 221 Ct.Cl. at 723–724, 611 F.2d at 828–29. The court did not grant the contractor in *Shinn Engineering* a clearance, in part, because data on Shinn's profit and return covering years prior to the review years were available. *Id.* at 724, 611 F.2d at 829. The court also noted that:

> [t]his is yet another renegotiation case, tried before the leading decision in *Major Coat* ... in which the court's consideration of excessive profits can be more lenient toward the defendant than it might be under a strict application of the burden of proof set forth in *Lykes Bros. S.S. Co. v. United States,* 198 Ct.Cl. 312, 459 F.2d 1393 (1972). *See Blue Bell, Inc. v. United States,* 213 Ct.Cl. 442, 450, 556 F.2d 1118, 1124 (1977); ... *Manufacturers Service Co. v. United States,* ... *Tool Products Co.... Bata Shoe Co....* In these pre-*Major Coat* cases, the court must satisfy itself from the whole record, before ordering a refund, that excessive profits were in fact made in the review period.... Conversely, plaintiff does not automatically obtain a clearance simply because we reject the Government's presentation and the views of its expert. The record itself must prevail if it shows that there were refundable excessive profits. [221 Ct.Cl. at 716–717, 611 F.2d at 824.]

In the case of Equipment, Inc., the Government faced the more stringent burden of proof to be met in cases tried after the decision in *Major Coat,* and its failure to provide sufficiently detailed comparison

data and an analysis of plaintiff's profits that accounts for differences in capital structure, costs, etc., has resulted in its not meeting its burden.[68]

In both *Manufacturers Service Co.* and *Bata Shoe* the court noted the difficulties in using composite data to determine the excessiveness of a contractor's profits. *Manufacturers Service Co.,* 217 Ct.Cl. at 404–05, 582 F.2d at 571–72, *Bata Shoe,* 219 Ct.Cl. at 255, 595 F.2d at 17. Although the court did not grant the contractor in either of these cases a clearance because of the deficiencies in the Government's presentation, these cases were tried prior to the decision in *Major Coat* and the Government therefore had a lighter burden of proof.[69]

There is another aspect of Dr. Silberman's analysis that raises questions as to the value of his testimony. The figure that Dr. Silberman suggests as a reasonable return on investment for Equipment's operations is 25 percent for all three of the review years. According to Dr. Silberman's testimony this figure was derived by reference to the comparison data that he developed. Nowhere in his testimony, however, did Dr. Silberman explain how he decided that a 25 percent return on investment was reasonable for Equipment, Inc. based on the actual return on investment for the comparison trucking firms. Examination of the

data used to calculate the return on investment for comparison groups[70] does not make selection of the 25 percent figure an obvious conclusion. The average return on investment of the three groups of comparison firms ranged from 8.13 percent for the independent local carriers of general freight in 1967 to 23.84 percent for the railroad-owned local carriers of general freight in 1966. Dr. Silberman's rationale for selecting the 25 percent figure seems to be that it is higher than the average for any of the comparison groups for any of the review years and therefore would be a fair return for plaintiff.[71] Without an explanation from defendant's expert, the selection of the 25 percent return for all three years seems arbitrary and suspiciously convenient for further calculations. Even the "broad brush of renegotiation"[72] cannot be allowed to sweep this broadly in determining an appropriate rate of return for plaintiff. Defendant must support its conclusions before this court will accept them.

Our emphasis on the need for adequate comparative data and our refusal to substitute our own analysis in its absence and carry defendant's burden of proof accords with the treatment in this court's two most recent renegotiation cases on the lack of comparative data. In *Kay Mfg.,* the court granted a contractor a clearance after the Government failed to produce adequate

---

68. *See* n. 67, *supra.*

69. In *Manufacturers Service Co.,* the court noted that the Government's failure to provide meaningful comparative data was not fatal to its case and simply meant that the Government had to meet its burden, if it could, with other proof. 217 Ct.Cl. 387, 405, 582 F.2d 561, 573 (1978). In a footnote the court stressed that composite data, despite its flaws, should not be discounted completely. *Id.* at 404 n. 20, 582 F.2d at 572 n. 20. In commenting on *Manufacturers Service Co.,* the court's most recent renegotiation opinion stated:

The trial judge, however, was of the view that the Government's failure to introduce comparative evidence was not fatal to the Government's case. He stated: "the absence of such data 'simply leaves the Government to meet its burden, if it can, with other proof,'" citing *Manufacturers Service,* 217 Ct.Cl. at 405, 582 F.2d at 573.

*Manufacturers Service,* however, was tried before *Major Coat* was decided. The state-

ment the trial judge quoted merely reflected our willingness to accept for a limited time other evidence in such cases. *C.f. Kay Manufacturing* ("The 'limited span of time' . . . is at an end"). That was the situation in *Shinn Engineering,* also tried before *Major Coat,* where we made our own determination of excessive profits despite the Government's failure to introduce adequate comparative evidence. [*Wells Marine,* 675 F.2d at 279. *See also* n. 67 *supra,* (final paragraph).]

70. *See* notes 47 to 55, *supra,* and accompanying text.

71. Individual return on investment percentages for the comparison firms ranged from a high of 71.54 percent to a low of –84.21 percent during the review years.

72. *Page-River-Curran,* 216 Ct.Cl. at 253–54, 574 F.2d at 1066.

comparative or other evidence to rebut plaintiff's prima facie case. 676 F.2d at 557. In *Wells Marine,* the court granted a contractor a clearance after concluding that the defendant had failed to carry its burden of proving that the contractor's profits for the review years were excessive because defendant did not introduce comparative evidence concerning the plaintiff's profits in relation to the profits of its competitors, as required by *Major Coat,* 675 F.2d at 556. In *Wells Marine,* the court summarized its position on the need for comparative data.

> In the penultimate paragraph of our opinion [in *Major Coat*], we recognized that "[r]enegotiation law is at an early stage in its development in this court." *Id.* at 48, 543 F.2d at 124. Because the court was still "enunciating standards to guide the location and the weighing of" "the kind of proof required to make a convincing case one way or the other," the court undertook
>
> > However reluctantly, and for only a limited span of time, to engage in judgmental adjustments and reworkings of the data placed in the record in order to arrive at a finding of a reasonable profit for the renegotiated contractor— where the state of the evidence permits this to be done in a responsible manner, consistent with the purposes of the Act.
>
> *Id.,* 543 F.2d at 124.

Since *Major Coat,* the court has reiterated the need for the government, in order to sustain its burden of proof that a contractor has realized excessive profits, to introduce comparative evidence. *E.g., Kay Manufacturing Co. v. United States,* 676 F.2d 555 at 558, 563 (Cl.Ct.1982); *Manufacturers Service,* 217 Ct.Cl. at 412 n. 28, 582 F.2d at 577 n. 28 ("[D]efendant escapes the harsh judgment of a clearance—because of failure to provide some sort of meaningful comparative data—because this case was tried prior to the more explicit decisions of this court explaining the need and calling for such comparative information"); *Instrument Systems Corp. v. United States,* 212 Ct.Cl. 99, 107, 546 F.2d 357, 361 (1976); *cf. Shinn Engineering, Inc. v. United States,*

221 Ct.Cl. 708, 719, 611 F.2d 820, 826 (1979) ("[T]he statutory factors must, to be useful, be evaluated in a comparative approach"). *See also Shinn Engineering,* 221 Ct.Cl. at 733–35, 611 F.2d at 833–34 (Kunzig, J. dissenting).

Of course there may be situations where the government cannot produce evidence comparing a contractor and his competitors, such as where the contractor is unique. In those situations the court has accepted comparisons between the contractor's business and the renegotiable years and in other years, and between the contractors renegotiable and nonrenegotiable business. *Simmonds Precision Products, Inc. v. United States,* 225 Ct.Cl. 481, 501, 640 F.2d 292, 311 (1980). Moreover, in cases tried before *Major Coat* in which the government had not introduced comparative evidence, we have determined ourselves whether the profits were excessive on the basis of the other evidence in the record—as we indicated in *Major Coat* we would do "for only a limited span of time." *E.g., Shinn Engineering,* 221 Ct.Cl. at 716–17, 611 F.2d at 824; *Manufacturers Service,* 217 Ct.Cl. at 405–06, 582 F.2d at 573.

In our most recent renegotiation opinion, *Kay Manufacturing,* we reversed a trial judge's recommended decision that the plaintiff had realized excessive profits. We took that action because the government had not carried its burden of proof. We concluded our opinion with the following statement:

> Defendant has fallen far short of providing the kind of hard evidence that would enable us to determine what portion, *if any,* of plaintiff's profits were unreasonably high. Although the type of "judgmental adjustments and reworkings of the data" engaged in by the Trial Judge may have been permitted (though not encouraged) by our 1976 decision in *Major Coat,* it cannot be said that the five-year transition period (which the government has now reveled in long enough) has been too short. The implications were clear in

1976; the court will no longer carry defendant's burden in 1982. The "limited span of time" granted by our *Major Coat* decision is at an end. (emphasis in original). 676 F.2d at 566

In this case, the Government has not provided the evidence that would enable the court "to determine what portion, *if any*, of plaintiff's profits were unreasonably high." *See Kay Manufacturing,* 676 F.2d at 566 (emphasis in original).

## CONCLUSION

Due to defendant's failure to meet its burden of proof, it is found that for its fiscal years 1966, 1967, and 1968, the plaintiff realized no excessive profits on its renegotiable business. The defendant's counterclaim is dismissed. The plaintiff is entitled to a refund of all moneys paid to defendant, if any, as excessive profits, together with interest as provided by the Renegotiation Act of 1951, as amended.

### Findings of Fact

1. The plaintiff, Equipment, Inc., was incorporated under the laws of Delaware on April 29, 1966, as a wholly owned subsidiary of Sea-Land Service, Inc., [Sea-Land] a trucking and shipping company, with its principal place of business in Elizabeth, New Jersey. Sea-Land was the principal operating subsidiary of McLean Industries, Inc., [McLean] a holding company. During the years under review, Equipment, Inc. had its principal place of business in Saigon, Vietnam.

2. Equipment, Inc.'s renegotiable profits in 1966 arose out of two contracts with the U.S. Army. Under one of the contracts, Equipment, Inc. was to operate 200 company-furnished International Harvester trucks (Contract No. DAJB 1166-C-0126, hereinafter "International Harvesters contract"). The other contract was for the operation of 240 Government-furnished one and one-half ton Ford trucks (Contract No. DAJB 1166-C-0232, hereinafter "Fords contract"). Equipment, Inc. .was required by the contracts to construct motor pool facilities and to supply spare parts for the

International Harvesters. In addition, the company was responsible for maintaining all the trucks and managing all aspects of the operation. The Government was to furnish all fuel and spare parts for the Ford trucks.

3. The original contract for the International Harvester trucks was executed on March 4, 1966, under Letter Contract No. DAJB 1166-C-0126 and was subsequently formalized under the same contract number for the period July 1, 1966, through June 30, 1967. Under the letter contract, plaintiff was to be paid an hourly fixed price not to exceed $11 per hour. This letter contract specifically provided:

A service type contract of a definitive nature is contemplated.... The target date for definitization of the contract is 20 June 1966.

4. Equipment, Inc. commenced the operation and maintenance of the Ford trucks on May 3, 1966, under Letter Contract No. DAJB 1166-C-0232, at a rate that was not to exceed $6.16 per hour. This letter contract also contemplated a "service type" agreement, to be definitized by July 15, 1966.

5. Firm fixed-price agreements for both contracts were finalized with the Army on August 31, 1966. These contracts were extended under Contract Nos. DAJB 1168-D-0001 (Fords) and DAJB 1168-D-0002 (International Harvesters) from July 1, 1967, to June 30, 1968. The contract rate for the Fords during the first year of the contract ranged from $3.39 for the first 622,440 hours to $2.15 per hour for hours exceeding 622,440. The contract rate for the International Harvesters during the first year of operation ranged from $9.59 for the first 208,000 hours of operation, $4.40 per hour for hours 208,001 to 491,400, and $2.73 per hour for hours in excess of 491,400. In the second year of the contract for the Fords, the rates decreased to $2.95 and $2.00; In the second year of the contract for the International Harvester trucks, the rates decreased to $4.17 per hour for the first 491,400 hours and $2.73 per hour for hours over 491,400.

6. Under the 1966 contracts, The Government furnished gasoline, petroleum supplies and spare parts for the Ford trucks, and gasoline for the contractor-furnished trucks. In the second year of the two contracts, the Army agreed to furnish all gasoline and petroleum supplies for the International Harvesters and to allow Equipment, Inc. to order all spare parts from Army supplies.

7. From July 1, 1968, through December 31, 1968, Equipment, Inc. performed a phase-out contract (Contract No. DAJB 1169-D-0030) whereby it was paid a "per trip" price for operation and maintenance of both the Ford and International Harvester trucks.

8. In addition to the operation of the Fords and the 200 company-furnished International Harvesters, Equipment, Inc. operated and maintained from July 1, 1967, to December 31, 1968, 44 rebuilt International Harvester trucks and 15 pole and bridge trailers. Both the trucks and the rebuilt International Harvesters were provided to the Army for $2 per hour.

## I. *Accounting*

9. The years subject to review are the calendar years 1966, 1967, and 1968. The positions of the parties concerning the accounting issues in this case are summarized in Appendices A, B, and C. The parties differ on the treatment of three areas: (1) allocation of parent general and administrative expense (G & A expense); (2) depreciation of capital assets; and (3) the calculation of deferred compensation of Harry T. Jeter, plaintiff's vice president and general manager.

10. The G & A expenses allocated to Equipment, Inc. from Sea-Land and McLean were $402,965 in 1966, $446,962 in 1967, and $363,588 in 1968. Equipment, Inc. argues that the entire amount for each of the review years should be deducted from renegotiable sales to arrive at figures for renegotiable profits, while the Government argues that parent G & A expenses should not be allocated to Equipment, Inc. and therefore the deductions should be disallowed.

11. Summary of Plaintiff's Evidence in Support of Its G & A Allocation. (a) Mr. Joseph Barbera, chief accountant for Sea-Land from 1965 to 1970, testified regarding the method used to allocate G & A expense to Equipment, Inc. from its parent. Mr. Barbera explained that the allocation of the G & A expense of McLean [1] to Equipment, Inc. was determined by the ratio that Equipment, Inc.'s revenues bore to the total revenues of its parent.[2] This method of allocation is known as the sales method.

(b) Mr. Barbera testified that the sales method of allocating parent G & A expenses was used consistently for all the subsidiaries of McLean Industries. The method had been used for internal management purposes for several years and had proved to be accurate. In addition, Mr. Barbera noted that if this method had not been accurate, he would have received protests from top management personnel of the various subsidiaries and operating divisions at Sea-Land, since the G & A allocation figured into the various divisions' net profits upon which the bonuses and incentives awarded to these managers were based.

(c) The Sea-Land/McLean G & A expense to be allocated was the sum of the expenses of the administrative departments that could not be charged directly to subsidiaries and operating divisions that used the services of those departments. Examples of these services that plaintiff claims were

---

1. Prior to and during the years under review, McLean was a holding company that had no revenues or employees. Sea-Land performed overall management functions for McLean and various operating divisions and subsidiaries. Expenses for only a few corporate functions (*e.g.* the preparation and filing with various Government agencies of consolidated financial statements) were directly incurred by McLean and carried on McLean's books as McLean's general and administrative expenses.

2. Rather than allocate a portion of the total McLean/Sea-Land G & A expense pool to plaintiff, the G & A expenses were first reduced by the items that were not related to Equipment's operation. *See* 32 C.F.R. §§ 15.201-2, 15.201-3, 15.201-4 (1966).

558

not charge directly to Equipment, Inc. but benefitted the company are:

(1) assistance by Sea-Land in preparing the proposal for the International Harvester's contract;

(2) periodic monitoring of day-to-day operations through written reports by Equipment's vice president and general manager, Mr. Harry Jeter, to the vice president of Sea-Land, Mr. W.D. Spry;

(3) trips by various officials of Sea-Land to Vietnam to assist in particular aspects of Equipment's operations; and

(4) the availability of the existing corporate departments of Sea-Land to advise and perform services for Equipment, Inc.

(d) The method of allocating G & A expense of plaintiff's parent was discussed during the negotiations for the finalized Ford and International Harvester contracts in July and August of 1966. Initially, the Army negotiators refused to accept Equipment's proposed G & A allocation from its parent. By the time the final contracts were signed, plaintiff's proposal was accepted by the Army. The G & A allocation reflected in these contracts is identical to that reflected in plaintiff's proposed G & A allocation for the purposes of this litigation.[3]

(e) In May of 1967, Equipment's cost figures for the contracts were audited by the Defense Contract Audit Agency. The DCAA auditor concluded that plaintiff's allocation of G & A expense was acceptable.[4]

12. *Summary of Defendant's Evidence in Support of Disallowing Deduction of Parent G & A Expenses.* (a) Mr. Bernard Lynn testified for the defendant regarding the propriety of plaintiff's G & A allocation. Mr. Lynn was qualified as an expert witness in accounting and contract cost alloca-

tion. In addition to his own education and experience, Mr. Lynn reviewed the 1963 report of the National Industrial Conference Board, *Studies in Business Policy, No. 108: Allocating Corporate Expenses;* Paul M. Trueger's *Accounting Guide for Defense Contracts;* Charles T. Horngren's *Cost Accounting: A Managerial Emphasis; The Defense Contract Audit Manual,* and numerous periodicals. Mr. Lynn stated that, in his expert opinion, plaintiff's use of sales as an allocation method for G & A expenses was without merit.

(b) Mr. Lynn stated that in his opinion the allocation of Sea-Land and McLean's G & A expense should be based on the extent to which the parent corporation provides benefits for the subsidiary or on the extent to which the subsidiary causes the parent to incur costs. The use of sales as a basis for allocating G & A expense is not acceptable, in Mr. Lynn's opinion, because a subsidiary generating most of the sales without drain on the parent could be burdened with the majority of the G & A expenses, whereas an unprofitable and poorly managed subsidiary would be allocated only a small portion of G & A expense when it might, in fact, represent a much greater drain on the parent's resources.

(c) Mr. Lynn also disagreed with plaintiff's allocation method because only sales made to outside entities were used to determine the denominator of the ratio that represented plaintiff's allocation of G & A expense from its parent (see f. 11(a), *supra* ). Parent company G & A expenses were not allocated to companies operating solely within Sea-Land, even if they received support or management from the home office. In Mr. Lynn's opinion, this had the effect of unduly burdening those subsidiaries, like Equipment, Inc., that sold to outside entities.[5]

3. See appendices A, B, and C.

4. The auditor did question the inclusion of certain advertising costs in the allocation base. Inclusion of these costs was discussed with officials of Sea-Land and subsequently these officials deducted these costs from the allocation base. *See* 32 C.F.R. § 15. 205–1 (1966).

5. Sea-Land's chief accountant for the period in question and defendant's expert in economics and finance both testified that it was necessary to exclude transactions between Sea-Land and its subsidiaries from the total sales base in order to prevent distortions in the ratio used to determine the allocation of Sea-Land's G & A expense to its subsidiaries under the sales method.

(d) Mr. Lynn admitted that the records he examined indicated that some of the parent's G & A expense should be allocated to Equipment, Inc. Based on his experience, he suggested 1 or 2 percent of the parent's costs would be appropriate.

13. In 1966, Equipment, Inc. expended $1,608,144 for 200 International Harvester trucks, equipment, land, and improvements for a motor pool. Equipment, Inc. and the Government agreed that Equipment would be allowed to recover these initial capital expenditures over the 208,000 guaranteed hours of service for the International Harvesters, and the contract rates were structured to carry out this agreement. Equipment, Inc. wrote off the entire $1,608,144 in 1966, and now argues that this is the proper allocation of depreciation for purpose of renegotiation. The Government has taken the position that the capital expenses incurred by Equipment, Inc. should be amortized over the entire period these assets were employed in Vietnam.

In addition, Equipment, Inc. has argued that the International Harvester trucks had no salvage value, while the Government contends that the $250,000 Equipment, Inc. realized from the sale of the trucks in 1970 represents their salvage value and should be taken into account in calculating depreciation.

14. *Summary of Plaintiff's Evidence to Support its Depreciation Figures.* (a) Equipment's letter contract with the Army for the International Harvester trucks, executed on March 23, 1966, was an "indefinite quantity" contract for hourly trucking services. In structuring the hourly prices for the 1966 contracts, the only information that Equipment, Inc. had about the hours over which fixed costs could be distributed were the number of hours of service the Government was willing to guarantee would be requested.

(b) The Army agreed that Equipment, Inc. should recover its initial capital expenditures for the International Harvesters and other assets during the guaranteed hours under the International Harvesters contract.

(c) The letter contract for the International Harvesters guaranteed a minimum of 1,040 hours per vehicle during the first year of the contract. The contract called for 200 vehicles, so 208,000 hours of service were guaranteed.

(d) On August 31, 1966, the International Harvester contract was formalized. The contract guaranteed a minimum of 40,950 hours per month of actual vehicle operation during the first contract year, for a total of 491,400 hours for the year. During the first year of the contract, plaintiff achieved 491,-000 hours of operation by November 1966.

(e) The Ford contract guaranteed a minimum of 51,870 hours of actual vehicle operation in each calendar month during the first contract year, for a total of 622,400 hours for the year. During the first contract year, the plaintiff achieved 622,400 hours of vehicle operation by November 1966.

(f) The International Harvester's contract provided that plaintiff be paid $9.59 for the first 208,000 hours of vehicle operation to enable plaintiff to recover its investment in the International Harvester trucks and other capital assets required in the performance of the contracts. Six dollars and forty-four cents of the $9.59 was earmarked for the recovery of costs related to the capital assets. Twenty-seven cents of the $9.59 was earmarked for recovery of land-rent and improvements. The Ford contract provided that the plaintiff be paid $3.39 per hour for the total number of guaranteed hours of operation. Twenty-two cents of the $3.39 was earmarked for recovery of the investment in land-rent and improvements.

(g) Plaintiff wrote off the entire $1,608,-144 (cost of International Harvester trucks, equipment, land, and motor pool) in 1966 for two reasons:

(1) The estimated economic useful life of the capital assets corresponded with the number of guaranteed hours under the contract because the hostile environment created difficulty in estimating the actual physical life of the assets. In addition, the fact

that the Vietnamese Government would impose customs duties greater than the value of the trucks if the trucks were sold or taken out of Vietnam or used for other than military purposes, made it doubtful that the trucks would have any economic useful life after the termination of the contracts. Likewise, the leasehold improvements could not be removed and thus would be economically useless to the plaintiff after the termination of the contracts.

(2) Plaintiff's general manager, Mr. Jeter, and the chief accountant for Sea-Land, Mr. Barbera, testified that since the contracts were priced to recover the total cost of the capital assets during the guaranteed hours, they considered it proper to write off the assets over the same period during which their costs were recovered.

(h) For the same reasons listed in (g) above, the trucks were carried on plaintiff's books with zero estimated salvage value.

15. In support of its position concerning the depreciation of capital assets the defendant offered the following evidence:

(a) Mr. Bernard Lynn, defendant's expert in accounting and contract cost allocation, testified regarding the period over which the cost of plaintiff's capital assets should be depreciated. In Mr. Lynn's opinion, the cost of the capital assets should have been amortized over the entire period that the assets were utilized by the plaintiff in the performance of the contracts. This schedule of depreciation would be appropriate, in Mr. Lynn's opinion, because the assets were used to produce revenue for all three of the review years. In accordance with the basic rule of accounting that costs should follow revenues, the cost of the assets should have been amortized over the entire period that the assets produced revenue.

(b) For the purposes of Federal income tax filings, plaintiff was required to depreciate its capital assets over the entire period covered by the contracts with the Government.

(c) In 1970, plaintiff sold the 200 International Harvester trucks used in carrying out its contracts with the Government. Plaintiff realized $250,000 on this sale. In Mr. Lynn's opinion, this $250,000 should be treated as salvage value and should reduce the capitalized value of the trucks for depreciation purposes.

16. Equipment, Inc. argues that, for the review years, it owes deferred compensation to Mr. Jeter in the amount of $106,684 for 1966, $180,791 for 1967, and $18,897 for 1968. Equipment, Inc. has taken the position that Mr. Jeter's compensation was to be based on net profits before renegotiation and that because the deferred compensation was a reasonable and necessary cost of carrying out its contracts with the Army, the entire amount owed to Mr. Jeter should be deducted from renegotiable sales to reach the figure for renegotiable profits for each of the review years.

The Government contends that Mr. Jeter's deferred compensation should be based on net profits after renegotiation.

17. In support of its position concerning the allowable amount of deferred compensation for Harry T. Jeter, Equipment's vice president and general manager, plaintiff offered the following evidence:

(a) Mr. Jeter was the chief operating officer of Equipment, Inc., and supervisor of plaintiff's management staff in Vietnam. Mr. Jeter was not a stockholder of Equipment, Inc. and owned an insignificant amount of stock in McLean. Mr. Jeter made an arm's length agreement with McLean to go to Vietnam in return for a salary of $35,000, living allowance, and a bonus of 5 percent of plaintiff's net profits before taxes (computed in accordance with the regular accounting principles and practices of Equipment, Inc. and Sea-Land). Mr. Jeter's bonus was deferred over a ten-year period to give him full advantage of the Federal income tax laws and to keep it in line with the bonus formula previously used throughout the parent company.

(b) Mr. Jeter's agreement with McLean was evidenced by a letter dated June 1, 1966, from Mr. Spry to Mr. Jeter. This letter did not indicate whether or not Mr. Jeter's 5 percent bonus would be based on net profits before or after renegotiation.

(c) Mr. Jeter and Mr. Barbera, chief accountant of Sea-Land, testified that it was their understanding that the June 1 letter referred to profits before renegotiation as the basis of Mr. Jeter's bonus.

18. In support of its position concerning the allowable amount of deferred compensation for Mr. Jeter, defendant offered the following evidence:

(a) The contracts on which plaintiff's net profits were based were by their own terms subject to renegotiation.

(b) In a letter dated December 2, 1966, Mr. Spry wrote to Mr. Jeter concerning Equipment's possible liability under the Renegotiation Act.

Harry, I know you are aware that we somewhere down the road will be faced with the Renegotiation Act of 1951 with regard to any earnings we generate from the Government, unless we are able to get an exemption, which is fairly unlikely but hopefully not impossible. I therefore thought that some part of the generated earnings, after taking into account adequate reserves for excess costs which may be encountered in future years for various elements of cost or expense, may be considered for an early payment to you of a part of your incentive if this might be helpful. Of course, when the contracts have either been exempt, which as indicated is unlikely, or the statutory time for determination is expired, we can firm up your incentive; but in the interim we'll have to sort of fly, I guess, by the seat of our pants.

(c) In a letter dated December 6, 1966, Mr. Jeter replied:

Yes, I am aware of the Renegotiation Act of 1951. Colonel Fulbruge, Detwiler, and Thornily stated back in September, that it would never be applied, and if so, with wide latitude. They said it is not the Government's policy to renegotiate where there was high risk and danger involved. It is very possible that this was just conversation. Surely the Government does have the right under the terms of the Act. As such, you are right, we must fly by the seat of our pants. Therefore, any action you may take regarding my incentive for the calendar year of 1966 is fine by me if it is more convenient or, if it appears to be more beneficial to me, you may make any payment in keeping with the intent.

(d) Dr. Irwin H. Silverman, who was qualified as an expert in economics and finance, provided a method by which Mr. Jeter's deferred compensation, based on post-renegotiation profits, can be computed. Dr. Silverman testified that the following equation could be used to determine this figure:

$$X - .05X = \quad + .25 \ (RB - \quad .05X) \ (1)$$

$RB$ = Investment Base Prior to Accrual of Deferred Compensation

$.25$ = Dr. Silverman's estimate of reasonable return on investment for Equipment, Inc.

$X$ = Operating Income before Deferred Compensation (2)

$.05X$ = Deferred Compensation (2)

$(RB - .05X)$ = Investment Base *After* Accrual of Deferred Compensation

Note: (1) .25 times the "Investment Base After Accrual of Deferred Compensation" was used in this formula because this was deemed by Dr. Silverman to be a reasonable return on investment and was used by him to calculate what the Government asserts are reasonable profits on plaintiff's contracts. (See f. 97(c) and Appendix G, (*infra*)).

(2) 7/12 of deferred Compensation and Operating Income must be used for 1966.

19. Mr. Jeter's compensation was to be 5 percent of net profits after renegotiation. Dr. Silberman's formula represents an appropriate method for calculating this compensation, subject to adjustment of his .25 (25 percent) figure for reasonable return on investment.

## II. *Statutory Factors*

### A. *Background*

20. In 1965, the United States began a rapid build-up of combat forces in the Republic of Vietnam. From April 1965 to January 1969, the authorized troop level in South Vietnam increased from 33,000 to 550,000. This development presented several difficult logistical problems, including a

rapid influx of military cargo. From mid-1965 to late 1966, cargo moved primarily by ship to Saigon Port.

21. The Saigon Port, in 1965 and 1966, was a scene of chaos, due to archaic regulations and a fixed physical capacity overtaxed by the influx of military cargo. As military supplies and equipment began arriving in Vietnam to support the build-up in allied troop strength, it became apparent that effective solutions to these logistical problems were urgently needed. Ships were backed up in the harbor, the South China Sea, the Philippines, Japan, and the United States. Saigon Port channels of distribution were clogged by military cargo and the local Vietnamese truckers did not have adequate equipment to remove the cargo. Consequently, the United States Government was losing money as a result of: (i) demurrage charges on the ships, which had been waiting as long as 100 days to be unloaded; (ii) the expense of bringing other ships out of "mothball" to alleviate the shortage of ships caused by the delays in unloading ships at Saigon; (iii) the cost of war risk bonus payments to merchant seamen, required because their ships lay idle in a hostile area; and (iv) the pilferage occurring while cargo, unloaded from the ships, remained on the docks. The Army established clearing the port of incoming cargo as a goal of high priority.

22. An Army film, introduced into evidence, illustrated the problems confronting the military in early 1966, including the inability of the U.S. and Vietnamese officials to transport military cargo away from the docks of Saigon Port.

23. In late 1965 or early 1966, Malcolm McLean, head of Sea-Land, was asked by a United States Government official to go to Vietnam to see if he could offer any solutions to the problems that the Army was experiencing at Saigon Port. Mr. McLean determined that the condition of the port would not permit an efficient container-tractor-trailer operation, of the type in which Sea-Land usually engaged. When he returned from Vietnam, McLean asked his special assistant, Harry Jeter, to put to-gether a proposal for a pick-up and delivery trucking operation for the Army.

24. In 1966, Mr. Jeter went to Hawaii to meet with General John Crowley and various military officers to present his plan for a trucking operation in Saigon. About 10 days later, Mr. Jeter was invited back to Hawaii and asked to visit Saigon to see what the specific problems were. A few days after his return from his trip to Saigon, Mr. Jeter was telephoned by Colonel Sam Boot, chief of the Procurement and Contract Division, First Logistical Command, and requested to submit a proposal for supplying and operating 200 10-ton trucks for the Army.

25. The Army decided to use commercial trucking operations rather than military trucks for a number of reasons: (i) there was a world-wide shortage of military trucks: (ii) it was cheaper to utilize commercial trucking operations; and (iii) the Army was short of military personnel and for political reasons did not want to send more military personnel to Vietnam.

26. Mr. Jeter took his proposal for the truck operation, based upon the best cost data available at the time, to Saigon around March 23, 1966. After a negotiating session with Colonel Boot, Mr. Jeter was given a letter contract to commence operations with 200 company-owned trucks.

27. Shortly after plaintiff received the letter contract for the 200 company-furnished trucks, Mr. Jeter received a phone call from Colonel Boot asking him to submit a proposal to operate 240 Government-owned trucks that were already in Vietnam. Mr. Jeter heard nothing further regarding this contract until the end of April 1966, when he returned to Saigon to supervise construction of the motor pool for the company-furnished truck operation.

28. The letter contract executed on March 26, 1966, for the 200 company-owned trucks contemplated that the operations would commence on July 16, 1966, thereby providing an opportunity for an orderly start-up of the operation. Mr. Jeter, who had been named vice president and general manager of Equipment, Inc., returned to

Saigon in the last week of April to make preliminary arrangements for the commencement of the operation. During the trip to Vietnam, on April 29, 1966, Equipment, Inc. was asked to undertake the contract to operate 240 Government-furnished Ford trucks and to commence operations immediately with a portion of those trucks. Mr. Jeter agreed to undertake this contract.

29. Equipment, Inc. began operations on May 3, 1966, not having been able to start on May 1 or 2 because of a Vietnamese national holiday. Operations began alongside a busy Saigon street with a chair and table under a tree as an office and a narrow alley for a motor pool. Equipment, Inc. was without repair and maintenance facilities, spare parts, trained local drivers, mechanics, supervisors and clerks, proper forms, electricity, and telephone or radio communications.

30. Although the target dates for entering into formal contracts for the operation of the Government-furnished Ford trucks and the contractor-furnished International Harvester trucks were in July of 1966, the finalized agreements were not signed until August 31, 1966. Under the contracts, Equipment, Inc. was responsible for maintaining the trucks and managing all aspects of the trucking operation. The two contracts initially covered the period from July 1, 1966 to June 30, 1967, and were subsequently extended through June 30, 1968. From July 1, 1968 to December 31, 1968, Equipment, Inc. continued to serve the Army under a phase-out contract that compensated Equipment, Inc. with fixed fees based on the destination of the cargo rather than on an hourly basis as had been the case for the first two years of the contracts.

B. *Character of Business*

1. *Environment*

31. Equipment, Inc. was not contractually obligated to operate in combat zones but due to the nature of the war in Vietnam, however, there were no clearly defined combat zones. The Department of the Army described the conditions in Vietnam during the period from 1965 through 1970 as follows:

There was no, neat, linear division between enemy and friendly forces; no front line; and no rear boundaries. Consequently, there was neither an Army service area, nor a communications zone. In fact, the combat zone and the communications zone were one and the same. At no time were there really "secure" ports, depots, storage facilities, service areas, or supply routes. The relative degree of security varied from time to time and place to place. Attacks on logistic facilities and operations at all levels were common, even in the later years of the war. These attacks included major ambushes of supply convoys; harassment by small arms fire; rocket and mortar bombardment; and vicious sapper [sic] attacks against general depots, ammunition pads, and petroleum tanks. Later in the war there were some more or less "cleared areas". In 1965, there was quite literally no "friendly" territory.

The Army also recognized that the Viet Cong posed a constant threat to the movement of cargo:

Convoy commanders were continually faced with security problems in the movement of cargo from one location to another over the insecure highway system in Vietnam. Support from artillery fire support bases and medical units, and military police escort were arranged when such was available.

32. Throughout the time that plaintiff operated in Vietnam its trucks and facilities were in danger from the Viet Cong. Mr. Jeter, in his correspondence with Mr. Spry, described many incidents in which plaintiff's operations were disrupted by combat activities.

(a) July 9, 1966:

"The Vietnamese regular Army had stationed 12 men on our property at Thu Duc. This morning early the V.C. ambushed the men and killed 3 . . . ."

(b) Letter dated July 13, 1966 (August 13 probable date):

Thursday night the V.C. set up a temporary road block on our back road. We have to use it for both entrance and exit. The V.C. had a submachine gun and lots of bullets. The Army (U.S.P.) opened the road with no effort. I believe the grapevine warned the V.C. not to show resistance to the Army. One Lieutenant in a jeep did the job.

(c) September 17, 1966:

Wednesday at 1:10 to 1:20 a.m. the V.C. hit the motor pool from all sides, with heavy mortar fire. They had slipped into the motor pool earlier and placed time bombs in virtually all of the trucks in the yard. They put up a machine gun at the front entrance. Anyone who ran from the building was cut down with a machine gun. The first mortar hit the dispatch area wiping out records and keys. The house trailer was hit a few seconds later. It was unrecognizable after the blast.

The stockroom was hit hard. We had a full (5,000 gallons) tanker of gasoline. The time bomb was removed (by me) at 3:00 a.m. The Aussies [Australians] had put the fire out on the gas tanker at 1:30 a.m. A truck parked 4 feet from it was an inferno but the tanker was unhurt, thanks to the Aussies. Bombs around the Power Plant and Building failed to explode. In fact, 72 bombs failed to explode. The Army demolition crew removed them Wednesday during the day. During the night we organized a search party for the two missing Aussies and Mr. Chambers. He (Chambers) was last seen in the house trailer. We pried apart the rubble but Chambers had got out a few seconds earlier and had gone home without our knowledge. I found Mr. Boylan (?), an Aussie, and a Vietnamese in the Mango Grove. Mr. Boylan was in shock (he couldn't speak). We sent him to the hospital but he was OK in a few hours. We tried till daylight to find the lost Aussie, Henry John Stephenson. We got word about 7:21 a.m. that he had been captured. Word came in via an emissary.

We had twenty hand-picked Vietnamese soldiers here; Saturday, Sunday and Monday.

They did not fire a shot at the V.C. and looted after the bombing. We got Vietnamese Police to guard against the looters. Then had to get more police to guard the first police.

Later in the same letter Mr. Jeter described the equipment lost in the attack:

We lost 19 Internationals. Some have salvage value but they are virtually irrepairable [sic]. The cabs were blown off. We lost 39 Fords. Some have salvage value but cabs are also blown off. We believe 6 Internationals were stolen that night. There was some looting by Vietnam troops. A typewriter, 2 adding machines, some of my personal effects, a small radio, etc. The house trailer was 100% destroyed. The grease trailer was half destroyed. It can be repaired, however.

In a letter dated September 20, 1966, Mr. Jeter repeated his report on damage to trucks.

We lost nineteen Internationals and possibly six stolen.... We lost 37 Fords and possibly some of them were stolen.

(d) Letter dated October 15, 1966:

[T]he Viet Cong came back to snoop October 11 in the day time. Equipment, Inc. security caught 3 Viet Cong in front of the Motor Pool. The V.C. were among the thousands of sightseers. One of the V.C. caught was a wheel. His confessions implicated some of the officers in the V.N. Army. October 11 at night they (V.C.) came back just to keep our G.I.'s alert. Without warning early in the evening a G.I. shot out some of our lights that created silhouette. Of course, the rifle shots scared off our drivers. Then October 12 a G.I. accidently shot off a flare.

This too sent the drivers off in a panic. October 13 the V.C. sent a few rifle shots in just to keep our G.I.'s alert (and scare the hell out of our people). October 14 they came back to case the joint. The Chief of Police of Thu Duc gave me a

lengthy statement of the V.C. activity. He said 6 cased the place, then went to the surrounding villages to warn the people of their attack on us. The V.C. told the villagers to go away. The V.C. are going to capture one of our trucks, load it with Plastique [?], then drive into the Motor Pool. The Army says if it were successful and with enough plastique (500 lbs.) it would wipe out the Motor Pool and all hands. I notified the Army immediately. They will bring in more troops and a few big guns on a tank. We stop all trucks twice before they are allowed in the yard. We do not let the regular drivers in the yard. We are taking every precaution. There will be an extra radio (3) and an extra armed helicopter tonight. This report was not anonymous. It was signed by the Police Chief. The easy way to put us out of business is to shoot a driver or two every night. I don't know why they want us so bad. We have even taken extra daytime precaution as that too is in the V.C. plan.

(e) Letter dated November 19, 1966:

We have had a disturbance in the past few days, that has been delicate to handle. Back in October, a unit of the Vietnamese Army was hijacking our trucks loaded with sheet metal. Through some fancy cloak and dagger work, we broke up the ring. Over the past two weeks, there have been isolated incidents of hijacking our trucks loaded with cement. Of course this has been brought to the attention of all the investigating agencies of the U.S. and Viet Nam. In the past week, plywood seems to be the item added to cement as the most logical to be hijacked. Thursday, we had thirteen loads of plywood hijacked. We were able to recover ten. On Thursday night, in an attempt to hijack a load of plywood, the Vietnamese Army, led by a Captain, fired on one of our trucks. He destroyed two tires, the gas tank, and one of the bullets came through the seat and missed the driver by about an inch. The truck, with evasive action, lost its load of plywood in a ditch. It got awfully complicated. The Vietamese Army Captain broke the foot

of the driver with his gun butt. We took the driver to an American Hospital and we hope to have the Vietnamese Captain in jail soon.

In the meantime, we had about 200 drivers on the property, who refused to drive their trucks through the area controlled by the Vietnamese Army . . . .

(f) Letter dated December 13, 1966:

Over the past two weeks, every morning there are one to three written complaints that our drivers have been coerced or beaten up by ARVM troops. On occasions, they refuse to drive in the area. For the past three nights, we have had a rasher of incidents with American troops. Two American G.I.'s, the night before last tried to hijack a load of cement. They beat up our driver severly. In fact, he has a fractured skull. . . . By the time information gets back to our drivers, the rumor is that the driver is killed.

(g) Letter dated January 14, 1967:

Last night, about 6:30, the Viet Cong lobbed in 12 hand grenades from the village behind us. Only six exploded. Their aim was poor and no real damage was done and no one was hurt. . . . Some thirty drivers left. . . . We took our first convoy into enemy territory.

(h) Letter dated February 4, 1967:

The Viet Cong hit Third Ordnance again, a few miles north of us here. The highway has been closed off, due to the continuing Ordnance explosions. A couple of our trucks received shrapnel scars and a couple of our drivers are missing. We don't know whether they were captured, fled, or what . . .

(i) Letter dated December 3, 1967:

Last night the V.C. hit with 6 mortars. The asphalt chemicals and lumber were hit. It is still burning. They have been able to isolate large areas so the fire won't spread. They can't put out the fire, so it will burn itself out. We have about 25 trucks trapped inside. We feel they are not damaged. None of our drivers or supervisors were hurt.

(j) Letter date December 27, 1967:

On Christmas night, the V.C. dropped in a couple of rifle grenades and some small arms fire on our motor pool. We sustained no damage. Our G.I.'s on duty are under suspect. So, we are not sure whether it was VC or G.I. Anyway, it scared our people and caused me some more lost sleep. We got immediate help, but we are not sure who was the enemy.

(k) Letters dated February 2, 6, and 8, 1968, describe the disruptions in plaintiff's operations caused by the 1968 Tet offensive.

At the time of the V.C. attack, 2:55 a.m. Jan. 31, we had about 250 trucks on the road.... We were able to shepard our trucks back to relative safety. Our patrols were able to get to safety. At this time we still have about 250 trucks out. They are parked at New Port, Saigon Port, and Ho Nai. The Bien Hoa highway has been blocked for 3 days. The New Port Bridge is closed and the Gia Diuh intersection 400 yds. toward town from New Port has been in V.C. hands for 2 days.... We lost four drivers to the V.C. We don't know how many, if any trucks ...

* * * * * *

We are trying to get the trucks back in operation. We had a few drivers this (February 6). The V.C. had intimidated them in their homes, so heaven knows how many will get to work. We will have to escort them with GI's as there is a strict curfew on V.N.'s—from 8 a.m. to 2 p.m. is the only time they are allowed on the streets. So it is going to be rough trying to get back to a profitable operation.

* * * * * *

The fight between here and Saigon has closed off the highway. The rumors of 1000 V.C. at the cement factory plus the continuous artillery barrage has our people scared to death. To make it worse, the VN that waited to go home can't go beyond a mile and half from the motor pool.

Heaven knows how many drivers we can get tomorrow after this mess today. Yes! and we had 65 drivers at the Gia

Hiuh intersection who can't get to work because of the fight.

If this mess isn't cleaned up by next Monday we will have to virtually lay off most of our management. We can't operate with VN employees with Saigon and its arteries occupied by V.C.

(*l*) Letter dated March 28, 1968:

The stretch of highway from about a half mile south of us to a half mile north of us is considered "running the gauntlet." Our convoys pick up two armed personnel carriers and a tank for protection through this area. As I wrote you yesterday, the Viet Cong either are bold enough or stupid enough to attack the carriers, and night before last, the tank.

(m) Letter dated June 1, 1968:

The Viet Cong have stepped up their activity on a continuing harassment. They peck away at the outskirts on a regular basis. The real problem at the moment is that they hole up in some isolated spot outside the city and fire a few shells at random with no specific target in mind .... This has played real havoc with our driver supply. Ten days ago we had a small surplus. Today we are 100 short. We have advertised on a continuing basis. The supply is not good, but [sic] the attendance is erratic.

2. *Labor*

33. Although Equipment's contracts with the Army did not require that Vietnamese drivers be hired, as a practical matter the local population provided the most readily accessible labor force. Additionally, it was significantly cheaper for Equipment, Inc. to hire Vietnamese workers because their wages were set by local law and were significantly less than U.S. wage scales for comparable work.

The labor component of the price per hour negotiated in Equipment's contracts was based on Vietnamese wage scales. Thus, by Equipment's figures, in order to make profits on the contracts, Equipment, Inc. had to hire Vietnamese drivers.

34. The nature of plaintiff's work force created a variety of problems:

(a) Equipment's Vietnamese drivers were assaulted and threatened by the Vietnamese Army.[6]

(b) Equipment's drivers were also harassed by soldiers from the U.S. Army.[7]

(c) In an undated letter received by Mr. Spry on October 13, 1966, Mr. Jeter explained problems caused by Vietnamese Army security requirements that affected native drivers:

> The Army requires a Security Pass. The Pass must be obtained from the Vietnamese Secret Service. The Vietnamese Secret Service demands that each driver bring 2 sponsors to their office and sign for the driver. The sponsor must be of Civil Service rank or in the Vietnamese Army above the rank of Sergeant. This gets real rough in that it's hard for the drivers to get sponsors. And the sponsors have to spend a day or two waiting for an appointment at the Secret Service office. So it's one Helluva mess. . . .

(d) A letter dated October 1, 1966, explained the problem of a high turnover rate among drivers and measures that were necessary to insure an adequate supply of drivers.

> Our attrition rate on truck drivers has been abnormally high. This is partly due to the fact that the Vietnamese Government has put on a concerted drive to round up Army deserters and draft dodgers. The local paper said there were 50,000 in Saigon alone and the Army intended to catch them all. I do not know how many of ours were caught or how many fled town or are still in hiding but we lost 50 drivers the first day. The Secret Service will probably pick up another 20 to 50. We probably have some 800 drivers but rarely do more than 250 report to work on any single shift. We have a backlog of some 120 approved applicants but getting them in a truck takes some real doing. We are trying to hire as fast as we can and in order to insure a little higher ratio of applicants to "show up" driver we run our personnel truck to 152 Nguyen Cong Tru to load up the applicants, bring them to Thu Duc for testing, load them in the truck, take them to the doctor for examination, take them to the Vietnamese Secret Service for security application then bring them back to Thu Duc for employment. . . .

(e) Intimidation of drivers by the Viet Cong was also a problem, as a letter dated October 18, 1966 indicates:

> They [the Viet Cong] have instilled so much fear into our drivers, that you cannot get one into the Compound before 5 a.m. and not after 10 p.m. In fact, if you cannot dispatch the drivers out by 8:30 or 9 at night, they vanish into the darkness . . .

**6.** *See* f. 32(e), (f). Mr. Jeter testified that at one point the drivers went on strike to get protection against the Vietnamese troops.

**7.** In a letter to Mr. Spry, dated December 13, 1966, Mr. Jeter reported:
> For the past three nights, we have had a rasher of incidents with the American troops. Two American G.I.'s the night before last, tried to hijack a load of cement. They beat up our driver severely. In fact, he has a fractured skull. Fortunately the M.P.'s arrived and put down the fight, but the G.I.'s fled. One of the G.I.'s was wounded very badly and the other one was captured. By the time the information gets back to our drivers, the rumor is that the driver is killed. Of course he wasn't, but sometimes it is hard to put down rumors. Thank heaven the M.P.'s arrived in time.

*See also* f. 32(f).
In a July 4, 1967, letter, Mr. Jeter informed Mr. Spry that "we had a 3 hour strike last night. Two GI's beat up 4 of our drivers." Mr. Jeter reported further difficulties between U.S. soldiers and the Vietnamese drivers on October 6, 1967:
> We had a 4 hour work stoppage Tuesday night because one of our drivers was badly mauled by a MP at CSA 1 [new part of Saigon Port]. He is still in the hospital but no longer on the critical list. . . .
> The Army has been kept fully informed. This is the fifth time this has happened at this depot. Yes, there will be a court martial. Two of our patrol supervisors tried to prevent the beating.

### 3. *Theft*

35. Theft and pilferage of Government cargo was a constant problem in Vietnam. The House Committee on Government Operations noted that:

> U.S. officials and informed observers who studied security conditions in the port of Saigon made widely varying estimates, ranging all the way from 5 percent to 40 percent, of the amount of goods that were being pilfered or otherwise diverted from port. No one knows the true figure because of the lack of auditing and inspection. Committee on Government Operations, An Investigation of the U.S. Economic and Military Assistance Programs in Vietnam, H.R.Rep. No. 2257, 89th Cong.2d Sess. 66 (1966) [not reprinted in U.S.Code Cong. & Ad.News.]

The Army also recognized the difficulties caused by the pilferage problem and the lack of security. An official report on the logistics environment in Vietnam explained that "pilferage and sabotage were prevalent at many installations" and listed 10 courses of action that were taken to minimize pilferage and sabotage.

36. The following excerpts from correspondence by Mr. Jeter with Mr. Spry and from Mr. Jeter's testimony at trial illustrate the nature and extent of the theft problem faced by plaintiff in Vietnam.

(a) Mr. Jeter testified that drivers continually stole gasoline from the trucks' gasoline tanks and would fill the tanks with dirt to conceal the theft. As a result, Equipment, Inc. had to redesign the gas tank on the trucks to prevent clogging of the fuel systems of the trucks. At one point plaintiff's management tried to prevent the stealing of gasoline by installing locking gas caps on the trucks. The result of this action is described in a letter dated March 18, 1967:

> The night before last, six trucks came in with the gas caps broken open. We promptly suspended the drivers, who in turn promptly called a strike and riot. They hit one of our third country nationals in the head with a brick and a few windows were broken. I was concerned about my glasses and eyesight.

(b) In a letter dated October 1, 1966, Mr. Jeter described a series of thefts:

> They [Viet Cong or Chinese syndicates] have been stealing our tarps on a one at a time basis. However, last week they hijacked a truck which was hauling fifteen tarps to the Port, beat up the driver and of course took the tarps. We dispatched fifteen more with an armed G.I. escort. The G.I. stacked the tarps in a circle, pill-box style. It is hard to believe but these too were hijacked, the soldier was beaten up and the tarps and truck taken. Fifteen more were taken to the Port, locked in a conex box, so they stole the conex box and the fifteen tarps.

(c) Mr. Jeter also described in his letter security measures that Equipment, Inc. was paying for to lessen pilferange and theft of trucks. In a letter of December 24, 1966, he described another theft.

> The other night, we were tipped off that a load of 33 airconditioners with the value of about $40,000, was being unloaded into the Catholic Church, at an off limits village called Ho Nai. . . . Upon the arrival of our patrol truck, everybody fled but the priest. When we started to take possession of the truck and the cargo, people seemed to come out of the woodwork. The priest was defiant, so we radioed for help. . . . We were able to recover the truck and the cargo. . . .

(d) In a letter dated April 29, 1967, Mr. Jeter again discussed the theft problem:

> It seems that a major part of the management's energy here is expended on the prevention of thefts of cargo and trucks. At the moment, some five International trucks are stolen . . .
>
> Last week, some four trucks were stolen; two were recovered fairly well stripped, including the bodies removed; and two were returned less batteries.

### 4. *Local Government Corruption and Red Tape*

37. Plaintiff's operations were disrupted on a number of occasions due to local government corruption and red tape.

(a) In a letter dated October 15, 1966, to Mr. Spry, Mr. Jeter described difficulties with the local police:

We actually found 2 of our stolen Internationals. We had a tip that the V.N. Police had them. The V.N. Police would not let us in their compound to check. So we sent an Aussie in an Army Helicopter over the compound and sure enough they had two. So we got a writ to search the place. We established proof and should get them back on Tuesday.

(b) In November of 1966, a truck was hijacked by the Vietnamese Army.[8]

(c) In a letter dated March 10, 1967, Mr. Jeter discussed another occasion when the local police held Equipment's trucks:

We did get three of our trucks back from the Vietnamese Police. One which they had held almost two months and had used, came back with six tires, battery, starter and alternator missing. That episode cost us $500 for parts and about $3,000 lost revenue.

(d) Mr. Jeter describe further difficulties with the local police in a letter dated March 18, 1967:

The Vietnamese Government is still holding seven International trucks . . . with some luck we might have them back by April 1. The Vietnamese Government has forced us to put license plates on all of our trucks. . . . They were going to arrest all of our trucks come March 15 if this was not done, but a small bribe prolonged the agony till April 1.

Another little harrassment by the Vietnamese petty officials, forbids us to use the front gate for entrance and exit. I have pointed out that we have a Viet Cong village at our back gate and that the road is only forty feet wide. We could not ask Americans or Vietnamese to guard the back gate, with shrubbery and houses as perfect ambush. They finally agreed, but this is also going to call for a bribe. . . .

(e) Plaintiff's trucks in Vietnam all had license plate numbers beginning with the letters TN. In September of 1967 the Vietnamese Government put out an order that all vehicles bearing this type of license plate would have to have their license numbers changed by November 1. Mr. Jeter met with Vietnamese officials and obtained their permission to extend the deadline indefinitely. Without warning on December 30, 1967, the Vietnamese Government announced that all vehicles with TN license plates would be impounded as of midnight December 31. On January 2, 1968, the Government began impounding plaintiff's trucks as well as those belonging to the U.S. military. It took four days before most of Equipment's trucks were released by the Vietnamese police.

### 5. U.S. Army Support and Supervision

38. The inexperience and inefficiency of the U.S. Army personnel responsible for supervision of Equipment's operations created problems for Equipment, Inc.:

(a) During the first months of Equipment's operations, the Army was unable to provide necessary spare parts for the Government-furnished Ford trucks being used by Equipment, Inc., although providing the parts was an obligation imposed on the Army by its contract with Equipment, Inc.

(b) The Army's failure to make promised deliveries of gasoline during the first months of Equipment's operations caused disruptions in service.

(c) As a result of the security problems with Vietnamese drivers, on several occasions, the Army directed Equipment, Inc. to use G.I. drivers. The G.I. drivers exercised little care for the condition of the trucks and repeatedly caused considerable damage to the trucks.

(d) The turnover of American military personnel in Vietnam meant that Equipment's management was often dealing with inexperienced Army personnel. Equipment's operations were disrupted

---

**8.** See f. 32(e) *supra.*

when new contracting officers attempted to institute policies and procedures that in the experience of the prior contracting officer had proved inefficient or unworkable due to the particular problems of running a trucking operation in Vietnam.

### 6. *Recruitment of Management*

39. Due to the conditions in Vietnam, Mr. Jeter had difficulty recruiting management personnel to serve there. During the attack on Equipment's motor pool on September 14, 1966,[9] one of Equipment's management staff, an Australian national, was captured by the Viet Cong. He subsequently died in a Viet Cong prison camp. Another member of the staff became emotionally unstable and had to be sent back to the United States. The attack of September 14, 1966, also caused some personnel who had agreed to come over from the United States to change their minds.

40. Another problem in recruiting management staff for Equipment's operations in Vietnam was the Army's policy of not allowing civilians working in Vietnam to bring their dependants to the country. Mr. Jeter was able to circumvent this policy to some extent by finding jobs for dependants of Equipment's management personnel with Equipment, Inc., or with other businesses or charities in Vietnam.

### 7. *Loading and Unloading of Cargo*

41. Delays in loading and unloading of plaintiff's trucks by the Army were a problem throughout the period Equipment, Inc. operated in Vietnam. The delays were beyond the control of Equipment's management.

42. Early in Equipment's operations the Army's top priority was the removal of cargo stacked on docks and on ships at Saigon Port.[10] During this period, Equipment's trucks were sometimes used for interim storage of cargo.

43. In 1967, even after the backlog of ships in Saigon Port had been reduced, waiting time for loading and unloading of trucks was still a major problem. An Army audit report dated February 19, 1968, noted that plaintiff's trucks were actually in operation only 50 percent of the time after being dispatched. The report also said that average waiting time for loading and unloading varied between three and seven hours depending on the truck's destination.

### 8. *Traffic Conditions*

44. Traffic in Saigon was extremely heavy and slow moving. The streets were narrow and crowded with many forms of transportation, *i.e.,* water buffalos, bicycles, carts, motor bikes, trucks, and Equipment, Inc. and military traffic. The poor traffic conditions were aggravated for Equipment, Inc. because Vietnamese officials, who did not want trucks passing through certain areas of the city because of the noise and diesel fumes that they produced, had imposed route restrictions on Equipment's trucks.

### C. *Contribution to the Defense Effort and Efficiency* [11]

### 1. *Proof of Efficient Operation and/or a Positive Contribution to the Defense Effort*

45. Equipment, Inc. began its operations in Vietnam on May 3, 1966, with ten Government-furnished trucks. By July 6, 1966, plaintiff had 200 of the 210 Government-furnished Ford trucks operating. Mr. Jeter commenced operations, on less than a week's notice, ten weeks earlier than had been contemplated in the original letter

---

9. *See* f. 32(c), *supra.*

10. *See* fs. 20 and 21, *supra.*

11. Efficiency and contribution to the defense effort are two separate factors for consideration under the Renegotiation Act (50 U.S.C. App. § 2013(e)). Much of the evidence in this case that can be used to show whether plaintiff made a positive contribution to the defense effort is also relevant to show its level of efficiency in the performance of the contract. Therefore, the findings of fact relating to these two factors have been consolidated under one heading.

contract.[12] Operations were started despite the lack of a motor pool, maintenance shop, office and adequate management personnel, and the lack of spare parts for the trucks. Plaintiff's competitor, Philco-Ford, took over six months to get its motor pool ready for operation and put its first truck on the road.

46. Plaintiff's contracts with the Army specifically stated that the contractor would not be required to haul cargo over roads that were unsafe because of enemy activities or hostile action. In January 1967, Mr. Jeter was asked by the Army to haul cargo into enemy territory, and agreed to do so as "a special favor" to the Army. A convoy of plaintiff's trucks, escorted by tanks, armored cars, and helicopters, was used to move the cargo. On another occasion, in November of 1968, Mr. Jeter agreed to send three pole trailers[13] to Mekong Delta to help out the Army in an emergency. In addition, plaintiff's trucks routinely operated on roads in and around Saigon that were unsafe due to enemy activities.[14]

47. All the Government-furnished Ford trucks had a chronic malfunction of the starter assembly. Spare parts to replace a defective gear in the assembly were not available from the Army for several months, so to keep the trucks functioning, plaintiff's mechanics repaired the defective gears and fly-wheels by taking off the ring gear, turning it backwards, hand-pliering new teeth in the starter wheel and welding it back on again. This repair enabled plaintiff to keep the Government-furnished trucks running during the initial months of operation. The repair work was performed on all the Government-furnished trucks plaintiff was using during this period.

48. In April 1967, plaintiff constructed from scrap material 15 pole trailers for use in hauling telephone poles and steel girders.

The trailers were designed to be used with the Government-furnished Ford trucks which plaintiff received $2.15 per hour for operating. The trailers were offered to the Army at $2 per hour. Thus, the total cost to the Army of renting a pole trailer rig was $4.15 per hour. Prior to renting the trailers from Equipment, Inc. the Army had been using a local trucking firm that charged $10.30 per hour for hauling girders and poles and provided inefficient service. The Army officer who requested the use of plaintiff's equipment for hauling poles recognized that Equipment, Inc. had the necessary management and control procedures to provide more efficient service.

49. Early in 1967, truck beds of the Government-furnished Ford trucks began to wear out. The truck beds had been damaged by the fork lifts used to load the trucks and the fork lifts were no longer able to load the trucks efficiently. Equipment's mechanics modified the Ford's flatbed design, producing greater strength and carrying capacity, by using steel fence posts supplied by the Army and wood supplied by Equipment, Inc.

50. Plaintiff's mechanics built from scrap 44 International Harvester trucks. On August 1, 1967, the International Harvester's contract was modified to add the rebuilt trucks to the contract at $2 per hour with no guaranteed minimum hours.

51. In October 1966, Equipment's management worked out a simplified invoicing procedure that benefitted both Equipment's and the Army's auditing staffs.

52. In order to improve vehicle control and utilization, Equipment, Inc. established a two-way radio system with two base stations and approximately 15 radios. One of the base stations was given to the Army to improve the Army's ability to communicate

12. The first letter contract that plaintiff had with the Army was for 200 company-owned vehicles (International Harvesters). Under the contract, Equipment, Inc. was to commence operations in Vietnam on July 16, 1966. Mr. Jeter came to Saigon in late April 1966 to make arrangements for the operation. When he arrived in Saigon, Mr. Jeter was approached by

the Army concerning a contract to operate Government-furnished trucks (Fords). The contract for the Government trucks was the one plaintiff began performing on May 3, 1966.

13. See f. 48, infra.

14. See f. 32, supra.

with its own jeeps and Equipment's patrol vehicles and motor pool.

53. In 1968, the Army solicited bids for additional trucking services. When Mr. Jeter submitted his bid, he advised the Army that there was an alternative and less costly way of organizing the contract. The Army resolicited the bids based on the alternative plan and the contract was subsequently awarded to another firm at a price lower than any of the original bids.

54. Under its contracts with the Army, Equipment, Inc. was not liable for stolen cargo, with the exception of losses resulting from willful misconduct or lack of good faith on the part of plaintiff's management personnel.[15] Despite its limited liability, Equipment's management instituted measures to prevent theft of cargo. The measures taken were described in a letter dated July 27, 1968, from Mr. Jeter to Lt. Col. Rulon P. Madson, chief of the transportation branch of the U.S. Army Procurement Agency in Vietnam.

> All employees prior to being hired must be cleared by the Vietnamese MSS [Secret Service]. We have an arrangement with the other U.S. invited contractors whereby we do not hire any of their ex-employees without a release and they furnish us a list of any employee discharged for cause. If any of these employees find their way on our payroll, they are automatically discharged. Stealing of company or U.S. owned equipment is automatic grounds for discharge.
>
> We have by ordinary criteria an extraordinarily large Security Department. We have also on our payroll agents from the Gia Dinh Police Department, Thu Duc Police Department, the National Police, and the Vietnamese MSS. In fact, our Union President is an MSS agent.
>
> We have an elaborate network of radio controls. Each truck moving from one

point to the next is radioed by the consignor to the consignee. If the truck takes longer than one hour more than legitimate travel time, an all-points bulletin is issued. If it cannot be located in another hour, the U.S. Army is notified through their intricate radio network.

55. On October 14, 1968, a memo from Major Edwin Rochelle, the contracting officer's representative, to his commanding officer compared Equipment's loss of cargo due to theft with that of its competitor, Philco-Ford, for the month of September. The data presented by Major Rochelle indicated that Philco-Ford had experienced 18 thefts in 7,960 trips while Equipment, Inc. had only 5 thefts in 18,857 trips. The ratio of thefts to trips was .0003 for Equipment, Inc. and .0023 for Philco-Ford. Major Rochelle stated in his report that it was "apparent that Philco-Ford has made no progress in reducing cargo loss."

56. Col. Samuel M. Coggins, the first contracting officer's representative on Equipment's contracts in 1966 and the commander of military truck operations in Vietnam, testified that Equipment's performance was "outstanding" and that he always received the "fullest cooperation" of its management staff. Col. Coggins explained that Mr. Jeter had suggested staggering the ordering of trucks to alleviate some of the expense and congestion caused by unloading problems. Coggins also testified that Equipment, Inc. had exceeded requirements of the contract by carrying supplies to combat units.

57. Based on its experience with military trucking operations, the Army expected that in the initial phases of Equipment's operation about 25 percent of its trucks would be out of commission at any given time. By October of 1966, less than six months into the operation, Mr. Jeter was able to report that "[we] are getting ex-

---

**15.** A memorandum prepared during the Army's consideration of plaintiff's 1967 contract proposals stated that:

> In general terms an American contractor using Vietnamese drivers cannot reasonably exercise the control that is required to assure

no thefts of cargo. More importantly both Equipment, Incorporated and Philco Ford (which has the identical liability as Equipment, Inc.) attempted in vain to obtain insurance for such cargo losses.

tremely high efficiency out of our trucks, even if we had good circumstances, so the utility factor and the deadline factor are almost unbelievably low." In February 1968, Mr. Jeter reported to Mr. Spry that over the past two years of operation only 2 to 4 percent of the trucks had been out of commission.

58. The condition of the roads and the port area in Saigon caused a substantial flat tire problem for Equipment's trucks. In an effort to combat this problem, Equipment's management outfitted six maintenance vehicles with tire changing capacities and maintained an inventory of spare tires at locations outside the motor pool.

59. In a letter dated December 1, 1966, Mr. Jeter outlined steps taken to improve vehicle control:

We are installing a change, to control drivers better.... We'll have 12 supervisors days, and 12 supervisors nights, who will control about 30 drivers each. This supervisor will be time-keeper, dispatcher, trip ticket checker and disciplinarian. He will be Vietnamese, but each six supervisors will have an American supervisor backing him up.

This will change our overhead picture.... Yes, it will cost us more money, but we believe it will give us better control of the drivers and possibly even allow us to schedule them better, relieving the daily fluctuation in the number that report for work. So conceivably, the overall cost might be less than the present method.

60. Upon completion of its final contract with the Army, Equipment, Inc. received a letter from Col. Owen J. Walsh, Director of Transportation for the Saigon Support Command, praising its performance:

With the termination of the Equipment, Inc. contract for trucking services contemplated for the end of the year, I feel I should advise you of my complete satisfaction with the services you have rendered in fulfilling the terms of the contract. Your firm has been most cooperative and responsive to our requirements. We have placed demands on your

operations staff on short notice, demands impossible to anticipate or foresee, in a total [sic] hostile and armed combat environment. Your performance has always been outstanding. Most notably, your management, supervision of drivers, vehicle control, flexibility of response, and innovative operational techniques have been clearly superior to your competition. In addition.to the fulfillment of contract terms and the sense of accomplishment and praise due your company, your staff can feel pride in having made a significant contribution to the National aims and objectives of assisting the maintenance of the Vietnamese people and their Republic.

61. General M. McDonald Jones, the Commanding General of the Saigon Support Command from July 1, 1967, to December 30, 1968, stated that he "had nothing but the deepest of admiration [for Equipment's management staff], not that it was the most efficient set-up in the world, but for their dedication, and they never stopped trying to improve." General McDonald also compared the performance of Equipment, Inc. to that of Philco-Ford in his testimony.

As I understood it, it was port to depot. However, certain things evolved where I had to change that. I never could get Philco-Ford to do it, and the only way I can describe Philco-Ford is what I call a five o'clock soldier. They do what they have to do and no more, and go home at five o'clock.

Whereas I approached Mr. Jeter, and I said, "I know you don't have to under the contract, but I have some bad problems because my military trucks are down, and I have got some stuff I have to haul out in the boonies, and they will have to go under armed convoy because they are in secured areas."

And, he said, "I will help you any way I can." So I started moving his trucks. There was Xua Loc. As a matter of fact, there was Phu Quang. We had to literally open the road and demine it once every 30 days, and keep it open for about four days to run in a series of supplies. Down

to the Cambodian border, down to the Mekong Delta, I used them anywhere and everywhere.

And we started, by the way—we got so daggone mad about the Tet from Long Hi, and I implemented it eagerly. We said, "The Viet Cong are no longer going to own our roads at night," and we, although it wasn't the most efficient thing to have done, we ran convoys around the clock on the prime road systems we had, just to let them know that [they] were ours, and it worked beautifully.

But it was tiring and hard on Mr. Jeter's people, and it was double-tough on a lot of military drivers, but we felt it was an important phsychological thing, I guess you can say, to do.

62. Major John C. Donahue, who was present in Vietnam from January 1, 1968, to December 23, 1968, was the rating officer for plaintiff's contracts. Major Donahue made the following comments regarding plaintiff's performance in a "Service Contractor's Performance Rating" dated October 12, 1968:

Equipment, Inc.'s performance under this contract was outstanding. The contract was written initially as a letter contract to correct the port clearance problem in Saigon Port. Ships had previously been backed up 90 days and more because they were unable to discharge cargo in the congested port. Equipment, Inc. was responsive to the requirement and their efficient operation contributed significantly to the mission of this command.

Major Donahue also evaluated plaintiff's general manager, Mr. Jeter, as "absolutely outstanding", adding that he did more than was asked of him. Major Donahue also stated that he "never had one problem or one complaint or any trouble from an operational point with Equipment, Inc." In other reports, Major Donahue observed that plaintiff had "continually achieved truck availability in a timely manner" and had an "established record of satisfactory performance, integrity, and ability to meet the required delivery schedule."

2. *Proof of Inefficient Operation and/or Lack of a Positive Contribution to the Defense Effort.*

63. Plaintiff's 1966 and 1967 contracts, which provided that Equipment, Inc. was to be paid on a per-hour basis, did not provide an incentive for efficiency. Col. Donahue testified there were no incentives in the contract to force the contractor to operate efficiently, and that the pricing structure of the contracts encouraged Equipment, Inc. to dispatch trucks, put them on the clock, and make the Government liable for their operation.

The Army recognized that the contracts would not encourage efficient operation even before the first letter contract was issued. A February 1966 message to the First Logistical Command Headquarters in Japan stated that:

[T]he use of an hourly rate to buy trucking svc is considered here to [be] highly inefficient as no profit incentive is placed on contractor to exert sound traffic mgt, notwithstanding other contract provisions which definitely require contractor to exercise such mgt responsibility. Excessive govt surveilance in contract admin usually becomes necessary to insure that each truck-hour is gainfully used. A graduated mileage per trip rate, normal free time for loading and unloading with a demurrage rate for detention or standby required by govt is the preferable base for procurement.

64. Prior to mid-1967, the Army lacked the resources to audit plaintiff's invoices, but from mid-1967 on reviews of plaintiff's invoices by Army officials revealed instances of over-billing. In September of 1967, plaintiff over-billed the Army almost $14,000 out of a total bill of over $800,000 for that month. Mr. Jeter's letters to Mr. Spry indicate continuing disputes with the Army over invoices through 1968.

65. The Army made changes designed to decrease over-billing in the 1967 and 1968 contracts with Equipment, Inc. The 1967 contracts instituted maximum allowable travel times to the destinations served by Equipment, Inc. Due to lack of Army re-

sources, this provision proved to be unenforceable. Accordingly, the contract commencing July 1968, paid plaintiff on a per-trip basis rather than a per-hour basis.

66. For the first year and a half that Equipment, Inc. performed its contracts in Vietnam, the Army officials there complained about the control and management of Equipment, Inc's operation. The Army's primary complaint was that Equipment, Inc. drivers were "goofing off" while their trucks were under load and the Army was being charged for the time. Excerpts from memoranda written by Army officials illustrate the complaints made.

(a) A letter from Col. S.M. Coggins to Equipment, Inc. dated October 31, 1966, revealed the Army's perception of the "goofing off" situation.

During my normal travels about the Saigon-Long Binh area, I have noted an increasing number of vehicles operated by your firm parked along the sides of the road. While some obviously are victims of mechanical trouble, the great majority of them are simply parked. In many cases, especially at night, the drivers are asleep.

. . . .

Since vehicles can be readily observed at almost any hour parked indiscriminately . . . surely your supervisors must see them too. This leads to the conclusion that your supervisory personnel are not making an active effort to reduce the incidence of loafing among your drivers.

(b) A letter from Major Leroy Hibbitts to Mr. Jeter dated August 2, 1967, also criticized Equipment's management of its work force.

I receive numerous complaints from the users regarding Equipment Incorporated trucks specifically, about drivers pulling vehicles in between stacks of cargo in depots and sleeping, trucks not reporting as ordered, and drivers not proceeding to the consignee location on a timely basis. Your firm has agreed to provide the necessary supervision and *management* which will insure that responsive service is provided for the vehicle users. [Emphasis in original.]

67. Through January 1968, Army officials responsible for administering Equipment's contracts found fault with the maintenance procedures followed by Equipment, Inc. Specific problems that were noted included failure to perform adequate preventative maintenance to insure that trucks did not break down while on the road and failure to maintain trucks so as to insure adequate vehicle safety.

68. Major Leroy Hibbitts, the contracting officer's representative assigned to plaintiff's contracts during the latter half of 1967, testified that during October through December of 1967 there were significantly more break-downs experienced by Equipment, Inc. than by its competitor Philco-Ford. Notes from Major Hibbitts' files for this period indicate that for the month of September 1967, Equipment, Inc. experienced 435 break-downs while Philco-Ford had only 10 for the same period.

69. Equipment's management received periodic criticism from Army officials concerning:

(a) unsafe vehicle congestion outside Equipment's motor pool gate.

(b) inadequate fire prevention measures;

(c) inadequate driver training;

(d) failure of trucks to arrive at loading points at the correct time;

(e) improper classification of Vietnamese personnel;

(f) inadequate power generating equipment; and

(g) failure to maintain a clean and orderly motor pool.

70. The majority of the Army's complaints were made during the fall of 1966 or in the second half of 1967 when Major Hibbitts was the contracting officer's representative for plaintiff's contracts. Correspondence from Mr. Jeter to Mr. Spry during Major Hibbitts' tenure indicates that there was a major personality conflict between Jeter and Hibbitts. The conflict was aggravated by the two men's different priorities for running plaintiff's operation.

Because of the personality conflict between Jeter and Hibbitts, Mr. Jeter's superior at Sea-Land, Mr. Spry, found it necessary to take action. Sometime in November of 1967, Mr. Spry visited Equipment's operations in Vietnam and met with Major Hibbitts to discuss problems with Equipment's performance. After his trip to Vietnam, Mr. Spry reported to other officials at Sea-Land on the problems that had arisen and the need to make improvements in Equipment's performance. His report contained the following observations:

Prior to Hibbitts (July 1967) Jeter was working with people who were familiar with the mammoth task Jeter had encountered in inaugurating this service, each of whom was dedicated to one result—getting home. They were extremely lenient in their requirements with respect to the operation, and through the exercise of his brilliance, Jeter was able to talk and walk his way around any criticism that arose. He has a tendency to play the same record over and over, but with these people it worked.

Conversely, Hibbitts is a different animal. While obviously quite intelligent, Hibbitts is a frustrated civilian dedicated to a military career, with an agreed 18-months' assignment rather than a year (which is customary) and as far as he is concerned, Jeter's earlier hardships are important only for history writers and, while he expressed genuine respect for Jeter's brilliance, his tactics only tend to infuriate Hibbitts. Indeed, much of his criticism is meritorious and there is vast room for improvement in the areas to which he has pointed so forcefully. Yet, "there is much right about the operation,": and with Jeter's cost consciousness and profit motive, he has made the operation quite successful economically. However, it is now abundantly clear that some major concessions and procedural and operational changes are necessary to insure a continuance of this project and a reasonable degree of satisfaction on behalf of the Contracting Officer and the Contracting Officer Representative.

In short, we have to give them something to salve Hibbitts' ego and to improve the service...

71. Army interoffice memoranda indicate that at two separate times, November 1966 and September 1967, consideration was given to terminating Equipment's contract. No action was taken in this regard, however.

72. The Government produced no evidence comparing Equipment, Inc. with its competition in Vietnam ("Philco-Ford) or with other trucking firms in terms of efficiency.

D. Risk

1. Proof of Risks Borne by the Plaintiff

73. Plaintiff's contracts were firm, fixed-price contracts. An Army report described the firm, fixed-price contract as one that provides:

for a price which is not subject to adjustment by reason of the cost experience of the contractor in the performance of the contract. All costs are borne by the contractor and his profit (or loss) is the difference between these costs and the contract price. Thus, this type of contract places the maximum risk and responsibility upon the contractor and affords him the greatest incentive for efficient performance with a resultant benefit in earnings.

A memo written by a U.S. Army Procurement Agency auditor, dated December 30, 1968, commented upon how the risks of a firm, fixed-price contract related to plaintiff's contracts, as follows:

A review of the contract file disclosed that accurate cost data upon which to base the hourly rates was difficult to compile since the service to be performed was a "first" in Vietnam and consequently there are many unknown factors, even with extensive utilization of DCAA [Defense Contract Audit Agency] at the time. It would appear, to look at the matter in retrospect that other than a firm fixed price contract should have been used when there were so many un-

known factors. But in accepting a firm fixed price contract, the Contractor assumed all the risk of performing in accordance with the contract and therefore the consequences of his cost and profit factors became his full responsibility.

74. Equipment's original estimates of the number of management personnel and security and maintenance vehicles needed for its operations had proved to be too low. Extra personnel and equipment had to be obtained, even though their costs had not been included in the original cost estimates upon which plaintiff's contracts were based.

75. Although Equipment's contracts with the Army established guaranteed minimum hours, the company could not be assured that the Army would use its services beyond these minimums. The Army was free to utilize the services of other contractors for trucking needs beyond the minimum hours guaranteed to Equipment, Inc. by the contract. In 1967 the Army did contract with another trucking company, Philco-Ford, to supply trucking services for the U.S. Army in Vietnam, in competition with Equipment, Inc. Philco-Ford's contract was structured so that the Army had to pay for Philco-Ford's trucks whether or not the trucks were being used by the Army. Equipment, Inc., on the other hand, was only compensated for actual use of the trucks. Because of the pricing structure of the two contracts, the Army issued a directive that Philco-Ford's trucks be utilized before Equipment, Inc. was asked to provide trucks.

76. Due to the hostile environment in which Equipment, Inc. operated, its personnel and facilities were continually in danger.[16] In a letter dated July 17, 1968, Mr. Jeter provided to Lt. Col. John Carpenter, Director of Property Administration for the U.S. Army Procurement Agency in Vietnam, a list of plaintiff's personnel known to be dead as a result of enemy action. Twenty-one of Equipment's personnel were killed: 7 Vietnamese employees in September 14, 1966, during attack on the motor pool; 1 Australian supervisor, captured

September 14, 1966 died in Viet Cong prison November 25, 1966; 1 Vietnamese employee, October 10, 1966,; 6 Vietnamese employees, from TET 1968 to the date of the letter.

77. When plaintiff's contracts were originally negotiated, option prices were included in the contracts in the event the Government wished to exercise its option to extend the contracts. When the contract to operate the Government-furnished Ford trucks was extended through June 30, 1968, plaintiff agreed to reduce its prices from the option price of $3.22 to $2.95 per hour for the first 622,440 hours and from $2.15 to $2 per hour for the hours in excess of 622,440. This reduction resulted in savings to the Government of $290,231 for the period from July 1, 1967, to June 30, 1968.

### 2. *Proof of Lack of Risk to the Plaintiff*

78. Equipment's original letter contracts with the Government guaranteed recovery of Equipment's start-up costs. Equipment, Inc. was able to recover the costs of its initial capital investment in approximately the first six months of operation.

79. There is some evidence that plaintiff's maintenance costs were inflated for bidding purposes. In response to a request from Mr. Spry to supply cost information for 1967 bidding purposes, Mr. Jeter replied that

[T]he local Army personnel here are fully aware that the entire Ford fleet is to have the bodies rebuilt. Actually, this is probably cost cash out of pocket, amounting to $100 each, or a total of $20,000. I am sure you are looking for much more money than that. I am also sure that the Army does not realize that it can be done for that price, so they probably have a figure in their mind of double or triple that amount.

For conversation purposes in Elizabeth, it is safe to say that every Ford needs a hood, grill, fenders, running board, radiator, and some body work. You can put any figure you want on it. The same

---

16. *See* f. 32, *supra.*

holds true for the International Harvester.... In other words, for discussion purposes, there is a backlog of at least $1,000 against each International Harvester, in maintenance unperformed.

Mr. Spry then prepared to submit a figure of $600 for the cost of repairing each of the Ford trucks. The risk of losing money on other cost factors in Equipment's contracts was reduced by the margin of profit on maintenance costs.

80. The 1966 contract for the contractor-furnished International Harvester trucks guaranteed that the cost of the trucks would be amortized over 208,000 hours, and a minimum of 491,000 hours of operation was guaranteed. If the trucks were destroyed by hostile action prior to amortization, the Government would pay the unamortized portion of their cost; if the trucks were destroyed after the amortization period, the Government would purchase any replacements required. If the Army chose not to replace a truck, as it could under the contract, Equipment, Inc. lost the income that the truck could have produced. The Army did bear all costs associated with replacing the trucks lost in the 1966 motor pool attacks. In the event a vehicle exceeded its useful life or was destroyed by a cause not covered by insurance, the Government would pay for any replacement required. Damage to or destruction of the motor pool facilities due to hostilities or civil disturbances was also the financial responsibility of the Government. In 1967, while the Government was no longer bound to replace contractor-owned vehicles that had been damaged by non-war causes or exhausted their useful lives, it did agree to bear the costs of transporting replacement vehicles to Vietnam.

81. The 1966 contract for the Government-furnished Ford trucks guaranteed a minimum of 622,440 hours of operation and relieved Equipment, Inc. of any financial responsibility for damage to Government property. Subsequent contracts also guaranteed set minimum number of hours or trips.

82. The 1966 and 1967 contracts contained clauses protecting Equipment, Inc. from increases in labor costs. Moreover, the Government obligation to supply gasoline, petroleum supplies, and spare parts relieved Equipment, Inc. of the risk of increases in the cost of these items.

83. The Government, rather than Equipment, Inc. bore the risk of loss of cargo unless the cargo was lost through the bad faith of Equipment's managerial employees.

84. Under the 1966 and 1967 contracts, Equipment, Inc., was protected from losing revenue due to trucks being delayed on the road; the 1966 contracts paid plaintiff on an hourly basis, and the 1967 contracts provided that travel time in excess of the maximum allowable would be paid if the excess could be shown to be not the fault of the contractor. Until mid-1967, the Government paid for travel time lost due to flat tires on Equipment's trucks.

85. Under its final contract with Equipment, Inc. the Government bore the risk that drivers would not show up for work due to hostilities or strikes.

86. The contracts and the Harbor Workers Act allocated to Equipment, Inc. the burden of insuring personnel against capture or death other than by natural causes.

87. The Government produced no evidence comparing the risks borne by Equipment, Inc. to the risks faced by other trucking firms operating in Vietnam or U.S. based trucking firms.

### E. *Net Worth and Capital Employed*

88. Equipment, Inc. expended $1,608,144 for equipment and facilities in setting up its operations in Vietnam.

89. Equipment, Inc. utilized approximately $700,000 worth of Government furnished equipment in its operations in Vietnam. In addition, Equipment's contracts with the Government provided that the Government would supply gasoline, petroleum supplies, and spare parts. Thus, plaintiff's need for working capital was reduced.

## F. Reasonableness of Costs and Profits

90. Plaintiff takes the position that the negotiation of the contracts for the Ford and International Harvester trucks helped to insure that the cost and profit figures for those contracts were reasonable. In support of this contention, plaintiff cites the following evidence:

(a) The initial letter contract for the International Harvester trucks provided for the payment of an hourly rate to be "agreed upon during negotiations which shall supersede this letter contract" in an amount not to exceed $11 per hour for the first 1,040 hours of operation of each truck.[17] The letter contract for operation and maintenance of the Ford trucks contained a similar provision.[18]

(b) During the course of the early negotiations, both before and after the issuance of the letter contracts, Equipment, Inc. maintained that an appropriate profit on the contract should not be computed on the basis of percentage of cost. In a cover letter that accompanied plaintiff's submissions of cost data to the Army, Mr. Spry explained the rationale for this position.

As for management charge or profit, we earnestly submit in light of the fact that performance under the proposed contracts consists principally of management services, as distinguished from construction, manufacturing or industrial undertakings, and in an area where labor is both abundant and very cheap, a pricing formula calculated on costs would be patently inequitable to any firm undertaking such a task. This, we feel, is clearly demonstrated by the following example of hypothesis:

We pay pick-up and delivery drivers in the New York-New Jersey area, a base wage of approximately $3.50 per hour, and in Anchorage, Alaska, approximately $6.36 per hour. Adding overtime and Sunday, holidays, night penalty, vacation, insurance, and other fringes, these base wage costs on an annual basis are slightly more than

doubled. Hence, any pricing formula for identical services in the New York-New Jersey area would reflect a cost of labor alone of approximately $7.00 per hour; and in Alaska, of approximately, $14.00 per hour. Accordingly, if it is assumed that other cost remains substantially the same, the base amount on which a profit for the contractor may be calculated would range from $10.00 to $11.00 per hour in New York-New Jersey, to $17.00 to $19.00 per hour in Alaska, disregarding entirely the ownership and depreciation on trucks and other contractor-furnished equipment.

The application of a reasonable percentage factor to such cost would therefore produce a reasonable profit for the contractor. The administration and management of such an operation in Saigon is far more complex and expensive than in either Eastern United States, or Alaska. Therefore, the inequities inherent in such pricing practice for a contemplated operation in Viet Nam [sic] manifest themselves in the very low labor cost here.

(c) At the time negotiations for definitive contracts began, Mr. Jeter (Equipment's general manager) had accumulated some rough cost data. He had ascertained the hourly rate paid to Vietnamese drivers, mechanics, and other laborers, the amount of rent for the land used as the motor pool, and the cost of the trucks and equipment. He also had made estimates of maintenance costs based upon experience in the United States and of the size of the management and supervisory staff needed to monitor the operation. The cost data that had been accumulated after one month of operation was presented to the Army on or about June 20, 1966.

(d) The Army decided to conduct an audit before pursuing any negotiations to finalize the contracts. The audit was conducted by a Defense Contract Audit Agency (DCAA) auditor, and was based in part, upon costs actually incurred by plaintiff in

17. See f. 3 *supra*.

18. See f. 4, *supra*.

its operation of the Ford trucks from May 3, 1966, through July 1966. The audit did not include a review of the contractor's proposed insurance, maintenance, or home office general and administrative expense; these items were not susceptible to audit evaluation due to the absence of supporting documentation.

(e) Equipment, Inc. and Sea-Land officials held a number of meetings with Army personnel from May 1966 through August 1966, regarding each cost element for Equipment's operation in an effort to definitize both contracts. Mr. Jeter met with Army negotiators on April 30, June 24–25, July 22, August 16, and August 28–31, 1966, to discuss the cost and profit elements of the proposed fixed-price contracts. Mr. Spry traveled from New Jersey to Saigon on two occasions during this period to participate in the negotiations.

(f) The contract negotiations culminated with a three-day session on August 28–31, 1966, in Saigon. Seven representatives of the Army in addition to its DCAA auditor were present. Equipment, Inc. was represented by Mr. Jeter, Mr. Spry, and the chief accountant from Sea-Land, Mr. Barbera. Every element of the hourly rate for the trucks, including profit, was discussed and agreed to.

(g) The Government had its own sources of information regarding costs, tonnage, hours of operation, and scope of plaintiff's work. Col. Coggins participated in the negotiations because of his experience with military truck operations. The contracting officer's representative, who had almost daily contact with Equipment, Inc. during its operations under the contract, was asked by the contracting officer to gather data regarding the number of vehicles operating per day and to provide a realistic appraisal of the Army's daily requirements for vehicles and of the number of hours of operation to be guaranteed by the contract.

(h) Over the course of the negotiations, plaintiff's requested profit margin was dropped from $2 to $1.48 per hour of truck

19. *See* fs. 18–22, *supra.*

operation. The profit element of the rates that were ultimately agreed upon was as follows:

Ford's Contract

First 622,440 hours

| | |
|---|---|
| Profit | $1.00 |
| Cost | 2.39 |
| Rate | 3.39 |

All hours over 622,440

| | |
|---|---|
| Profit | .85 |
| Cost | 1.30 |
| Rate | 2.15 |

International's Contract

First 208,000 hours

| | |
|---|---|
| Profit | .00 |
| Cost | 9.59 |
| Rate | 9.59 |

Next 283,400 hours

| | |
|---|---|
| Profit | 1.25 |
| Cost | 3.15 |
| Rate | 4.40 |

Excess over 491,000 hours

| | |
|---|---|
| Profit | 1.25 |
| Cost | 1.48 |
| Rate | 2.73 |

(i) The negotiations resulted in final contracts for the operation of the International Harvester and Ford trucks dated August 31, 1966. The contracts were for one year and could be renewed by the Government at agreed-upon renewal prices for two additional years.

91. Defendant argues that the nature of the negotiations for the Ford and International Harvester contracts did not insure the reasonableness of plaintiff's costs and profits. In support of its position, defendant cites the following evidence:

(a) In 1966, the Army faced an urgent need for trucking services.[19] The cover letter of plaintiff's letter contracts stated that

[T]here is an urgent requirement for transport services to move military cargo between Saigon Port, Republic of Vietnam, and points within the Republic, and also between various points outside Saigon. Negotiation of definitive contract

calling for these services in sufficient time to meet these requirements is not possible.

The letter also stated that "no other source of trucking service was presently available to undertake immediately the scope of services required." There was great pressure on the contracting officers to let and definitize the trucking contracts as quickly as possible. Mr. Jeter's letters to Mr. Spry indicate an awareness of the urgency of the Army's need.

(b) When Mr. Jeter first presented his proposal for a trucking operation to the Army in January 1966, he received indications that Equipment, Inc. would be offered a contract on a sole source basis (i.e., that the contract would not be offered for competitive bidding).

(c) At the final negotiation session on the contracts, held in late August 1966, Equipment's profit figure was $1.25 per hour. The Government negotiators proposed a profit of $.63 per hour at this final negotiating session, the Government capitulated to plaintiff's position regarding the amount of profit for the International Harvesters contract. The final profit figure for the Fords contract was a compromise between the parties' positions.[20]

(d) In 1970, a DCAA audit revealed that some of the cost data Equipment, Inc. had submitted to the Army negotiators in June 1966 was inaccurate. The costs for public liability and property damage insurance, war risk insurance, and Federal excise tax on certain equipment were found to be overstated. As a result, Equipment, Inc. was required to return $24,254 to the Army pursuant to a defective pricing claim under 10 U.S.C. § 2306(f).[21]

(e) After the final contracts had been negotiated in late August, the contracting officer for the Army, Major McGrail, refused to sign the contract for the contractor-furnished International Harvester trucks. Major McGrail believed the hourly rate for the trucks, established in the contract, was excessive because the contractor was recovering its capital costs too quickly. He favored giving the contractor more guaranteed hours at a lower rate. His superior signed the contract instead.

(f) Major McGrail did sign the contract for the Government-furnished Ford trucks. At trial he testified that regarding the final price in the contract, he had "problems with the price in that one but I had to take into consideration the period [in which it] had to be definitized and this was really the best price we could get at the time. Again, you have to realize our ability to negotiate under such circumstances is quite limited."

(g) Major John L. McCormick, another member of the Government's negotiating team, submitted the following opinion of the terms of the contract for the contractor-furnished International Harvester trucks.

. . . . .

2. As my opinion does not fully coincide with the other members, I am submitting a separate opinion.

3. It is my understanding that:

a. The trucking service is vitally needed.

b. The U.S. Army can not supply it from in-house capability.

c. The terms of the present contract were the minimal ones acceptable to the Contractor.

4. In my opinion, the following contractual provisions are questionable from a business standpoint.

a. The Contractor is guaranteed 491,400 hours of operation.

b. The Contractor has no liability for lost cargo except for "willful misconduct or lack of good faith" of managerial personnel.

c. The procurement was sole source in nature.

d. It provides for complete recovery of capital costs within six month[s].

In short, from a business view, it would appear that a considerable premium may

---

20. *See* f. 90, *supra.*

21. *See* 32 C.F.R. § 3.807–5.

be paid for the importation of this contractor.

5. It must be noted that the Government was in the position of agreeing to Contractor's demands or of not having a contract. It must be further noted that the Government negotiators were bound by the terms of the letter contract which contained all the above provisions. It is my opinion that the Government negotiators did an excellent job in that they successfully reduced the proposed rates by a very substantial amount.

Faced with the cold hard reality of a critical need for service and bound by the terms of the letter contract, it is apparent that the only acceptable course of action is to accede to the Contractor's proposals at the reduced rate achieved by negotiators.

(h) The Army's need for trucking services continued into 1967. In the spring of that year, the Army had not found another contractor capable of commencing service on July 1, 1967, when Equipment's first year contract was to expire. Accordingly, Equipment's contracts for trucking service were renewed again without significant competition.

(i) During 1967, Equipment, Inc. put into service pole trailers and 44 rebuilt International Harvester trucks.[22] Although the pole trailers cost very little to construct, they were offered to the Army at the same price as the trucks used to pull them. The price structure for the salvaged International Harvesters was such that Mr. Jeter reported to his superior that their costs would probably be recovered in the first month of operation.

(j) For purposes of negotiation of the 1967 contract, some of plaintiff's costs were inflated.[23]

The negotiations that preceded the finalizing of the contracts do not insure that the rates agreed upon produced a reasonable rate of profit on the contracts.

**G. Summary of the Testimony of Dr. Irwin H. Silberman**

92. To show that Equipment, Inc. realized excessive profits from its 1966, 1967, and 1968 contracts with the Army, defendant presented the testimony of Dr. Irwin H. Silberman, a teacher and researcher in the areas of corporate finance and Government control and regulation of business. The focus of Dr. Silbernman's most recent research had been the transportation industry in the United States. In 1973, Dr. Silberman published a study entitled "The Sum of Money," an analysis of financial data on the motor carrier industry in the United States with an emphasis on the revenue needs of the industry. Dr. Silberman also participated in rule-making proceedings before the Interstate Commerce Commission in which the Commission established standards by which it would evaluate the profitability needs of the motor carrier industry. Dr. Silberman was qualified as an expert in the area of economics and finance as they apply to the transportation industry.

93. Dr. Silberman defined several terms he would be using in his analysis of Equipment's profits for the review years.

(a) Operating ratio: operating expenses divided by operating revenues.

(b) Return on investment: operating income divided by the investment base.

(c) Investment base: Working capital (current assets minus current liabilities), property and equipment, other assets (net of allowed depreciation), and deferred taxes.

(d) Operating income: operating revenues minus operating expenses.

(e) Turnover: number of dollars of revenue generated by a dollar of investment.

(f) Profit margin: operating income divided by operating revenues.

Dr. Silberman also explained that the sum of the operating ratio and the profit margin will always be equal to 1 and that the return on investment can be computed by multiplying the profit margin by turnover.

---

22. See f. 48 and 50, *supra*.

23. See F. 79, *supra*.

94. Dr. Silberman testified that in his opinion the best measure of profitability for the motor industry in general would be return on investment. He also noted that this measure of profitability has particular advantages in the analysis of this case because of the capital structure of Equipment, Inc.; it is difficult to determine whether Equipment, Inc. was financed through debt or equity from its parent. By using return on investment as a measure of profitability, the method by which Equipment, Inc. was financed becomes irrelevant. In addition, Dr. Silberman testified that the use of return on investment as the measure of profitability eliminates a potential difficulty in comparing the plaintiff to United States based companies. Equipment's profit and investment base were measured in U.S. dollars. If the measure of profitability used to analyze Equipment's profits had taken into account expenses, as would be the case if the operating ratio were used, distortions could arise. Wage rates were lower in Vietnam than in the United States and Government-furnished equipment and supplies were used in Equipment's operation; this would reduce plaintiff's expenses and cause distortions in any measure of profitability that took expenses into consideration. In Dr. Silberman's opinion, the best measure of profitability in this case would therefore be return on investment.

95. Dr. Silberman analyzed Equipment's profits for the three review years in terms of return on investment. To calculate return on investment, Dr. Silberman first determined Equipment's investment base for the years in question. Dr. Silberman calcu-

lated plaintiff's investment base for the year ended December 31, 1966 by referring to Equipment's balance sheet dated December 31, 1966.[24] His calculation of Equipment's investment base for the calendar year 1966 is reproduced below with explanatory notes:

Equipment, Inc.
Computation of Investment Base
December 31, 1966

| | | |
|---|---:|---:|
| Current Assets: | | |
| Cash | $ 56,690 | |
| Accounts Receivable – Trade | 678,300 | |
| Prepaid Insurance | 47,799 | 782,789 |
| Less: | | |
| Current Liabilities | | |
| Accounts Payable – Trade | 11,628 | |
| Accrued Liabilities | 114,271 | 125,899 |
| | | 656,890 |
| Property and Equipment – Net | | 1,117,022 |
| Other Assets – Net | 218,789 | |
| Less: | | |
| Deferred Taxes | (59,257) | |
| Deferred Compensation (7/12 of annual) | 15,545 | 262,501 |
| INVESTMENT BASE, December 31, 1966 | | 2,036,413 |

The "Cash" and "Accounts Receivable-Trade"[25] figures were taken directly from the balance sheet. The only other item Dr. Silberman included in his calculation of the current assets was prepaid insurance. The figure for prepaid insurance was the sum of the prepaid insurance figure on the balance sheet and the "other assets and deferred charges" on schedule 6 of Equipment's pretrial accounting statement.[26] The first item under "Current Liabilities" is "Accounts Payable—Trade."[27] Also included under current liabilities is the item entitled "accrued Liabilities."[28] Dr. Silberman did not

24. The balance sheet is reproduced in Appendix D to this opinion, and was part of defendant's response to the court's pretrial order on accounting issues.

25. The next item on the balance sheet per the defendant is "accounts receivable—inter-company." Dr. Silberman did not include this item in his calculation of the investment base because his analysis of the financing patterns of Equipment, Inc. showed that this account represented payments from the plaintiff to its parent that were actually dividends. As such the amounts in this account are not includable as current assets in the calculation of plaintiff's investment base.

26. At trial, Dr. Silberman denoted this item as "insurance." Evidently, that was the title of the account from which this figure was taken.

27. The figure for "Accounts Payable—Trade" was taken from the defendant's balance sheet (Appendix D).

28. The figure for "Accrued Liabilities" was taken from the balance sheet in plaintiff's pretrial accounting statement. Dr. Silberman explained that he employed plaintiff's figures because defendant's figures reflected adjustments to taxes payable that defendant had computed based on its demonstration of plaintiff's profits

include "Notes and Accounts Payable-Inter-company" in his calculation of current liabilities. This account represented dividends paid by Equipment, Inc. to Sea-Land and therefore was not a current liability.

"*Working Capital*" was calculated by subtracting the sum of current assets from the sum of current liabilities.

The figure for "Property and Equipment —Net" was taken from the balance sheet in defendant's pretrial statement on accounting.

The figure for "Other Assets—Net" was calculated by subtracting "Other Assets and Deferred Charges" from schedule six of plaintiff's pretrial accounting statement from "Other Assets and Deferred Charges" from the balance sheet in defendant's pretrial accounting statement. This adjustment was necessary because the figure from plaintiff's pretrial accounting statement represented insurance payments that had been included under the prepaid insurance item of current assets. The figure for deferred taxes was taken from "Operating Reserves and Deferred Taxes" on schedule seven of plaintiff's pretrial accounting statement. The figure for "Deferred Compensation" represents the amount that Dr. Silberman calculated to be a reasonable allowance for Mr. Jeter's deferred compensation based on Equipment's operating income after renegotiation.[29] This figure was annualized to reflect the fact that Equipment, Inc. did not operate for the entire 12 months of 1966.[30]

Dr. Silberman arrived at a figure for the investment base by subtracting "Deferred Taxes" and "Deferred Compensation" from "Other Assets—Net," then adding the result of this calculation to the "Property and Equipment—Net" and "working Capital" figures, as shown above. Dr. Silberman explained that the investment base reflects the amount that would have been required to have been invested by Sea-Land to support the assets employed in Equipment's operations in Vietnam.

96. Dr. Silberman's calculations of Equipment's investment base for the calendar years 1967 and 1968 are reproduced below. The method used to calculate the investment bases for these two years is the same as that used to calculate the 1966 investment base.[31]

Equipment, Inc.
Computation of Investment Base
December 31, 1967

| | | |
|---|---|---|
| Current Assets: | | |
| Cash | $ 92,372 | |
| Accounts Receivable – Trade | 2,339,561 | |
| Prepaid Insurance | 5,025 | 2,436,958 |
| | | |
| Less: | | |
| Current and Other Liabilities | | |
| Accounts Payable – Trade | 98,171 | |
| Accrued Liabilities | 192,737 | 290,908 |
| | | 2,146,050 |
| Property and Equipment – Net | | 701,466 |
| Other Assets – Net | 130,831 | |
| Less: | | |
| Deferred Taxes | (390,865) | |
| Deferred Compensation | | |
| Last year | 15,545 | |
| This year | 43,554 | 462,589 |
| Investment Base, December 31, 1967 | | $3,310,113 |
| | | ======== |

---

29. Dr. Silberman's calculation of Mr. Jeter's deferred compensation are contained in Appendix G.

subject to renegotiation (i.e., profits per defendant's version of the accounting issues discussed in findings 8–14, *supra*). Since defendant claims the profits for 1966 to be approximately $2 million more than the figure plaintiff claims, the additional tax liability would have been added to Sea-Land's investment in the plaintiff. In order to reflect the additional investment that Sea-Land would have had to make, Dr. Silberman assigned plaintiff's value to accrued liabilities account rather than that advanced by the defendant.

30. To annualize a figure, the figure is multiplied by the reciprocal of the fractions of the year that is relevant. In this case, financial records were kept of plaintiff's operations for seven months of 1966; therefore, the result of the calculation of the deferred compensation allowance is multiplied by $^{12}/_{7}$.

31. *See* f. 95, *supra*. The figures in the tables in f. 96 are drawn from Equipment's balance sheets for 1967 and 1968. The balance sheets are reproduced in Appendices E and F.

Equipment, Inc.
Computation of Investment Base
December 31, 1968

| Current Assets | | |
|---|---|---|
| Cash | $194,646 | |
| Accounts Receivable – Trade | 765,125 | 959,771 |
| Less: | | |
| Current Liabilities | 190,428 | |
| Accrued Liabilities | 152,566 | 342,994 |
| | | 616,777 |
| Property & Equipment – Net | | 250,000 |
| Other Assets – Net | 3,810 | |
| Less: | | |
| Deferred Taxes | (371,940) | |
| Deferred Compensation | | |
| 1966 | 15,545 | |
| 1967 | 43,554 | |
| 1968 | 15,369 | 301,282 |
| Investment base, December 31, 1968 | | 1,168,059 |

97. Proceeding with his analysis of plaintiff's profits for the calendar year 1966, Dr. Silberman calculated plaintiff's excess profits for that year. His calculations are reproduced below with explanatory notes.

Equipment, Inc.
Computation of Profits, Revenues and Excessive Profits
Based upon 25 percent Before-Tax return on Year-End
Investment Base, 1966

| | |
|---|---|
| Investment Base, December 31, 1966 | $2,036,413 |
| Before-Tax Profit Needed to Produce 25% Return on Investment – 7 months basis | 295,357 |
| Add: Expenses Excluding Deferred Compensation | 1,776,035 |
| Deferred Compensation | 15,545 |
| | 1,791,580 |
| Adjusted Receipts Required to Yield 25% Annual Rate of Return on Investment | $2,086,937 |
| Operating Ratio, 1966 | 85.85% |
| Investment Turnover (annualized) | 1.76x |
| Adjusted Actual Receipts (per Defendant's Amended Accounting Response, Schedule II) | $5,853,760 |
| Less: Adjusted Receipts Required to Yield 25% Annual rate of Return on Investment | 2,086,937 |
| Excessive Profits | 3,766,823 |

Dr. Silberman began his analysis by calculating what he believed would be a reasonable profit, in dollars for Equipment, Inc. for the seven months it operated in 1966. To arrive at a figure, he took 25 percent of the investment base for 1966, and then adjusted the figure to account for the fact that Equipment, Inc. had operated for only seven months in 1966. The figure appearing in the calculations reproduced above is the 25 percent return on investment base for the seven-month period. Dr. Silberman selected 25 percent of investment base as the appropriate return because it exceeded the average return on investment earned in the U.S. trucking industry as a whole and exceeded the average return on investment achieved by groups of United States based trucking companies with characteristics Dr. Silberman felt made them similar to Equipment, Inc.[32]

The figures for "Expenses Excluding Deferred Compensation" and "Deferred Compensation" were derived from the figure for Equipment's expenses on the income statement for 1966 that appears in the defendant's pretrial statement on accounting.[33]

"Adjusted Receipts Required to Yield 25 percent Annual Rate of Return on Investment" (Required Receipts) represents the amount of sales to yield the $295,357 before-tax profit.

The "operating Ratio" was calculated by dividing the total expenses by the "Required Receipts". Dr. Silberman testified that the operating ratio indicated that Equipment, Inc. had a 14.15 percent profit margin.

"Investment Turnover" was calculated by dividing the "Required Receipts" by the investment base. The figure is adjusted to reflect the fact that Equipment, Inc. operated for only seven months of 1966.

The figure for "Adjusted Receipts" was taken from the income statement for 1966 that appears in Appendix A. Both parties agree that this figure reflects plaintiff's actual revenues for 1966.

32. The characteristics that Dr. Silberman used to select U.S. based trucking companies to compare with Equipment, Inc. are discussed in detail in f. 102, infra.

33. The income statement appears in Appendix A. Dr. Silberman explained that he separated the deferred compensation because this figure was dependent on what was determined to be a reasonable profit (see fs. 15 and 17, supra). Since deferred compensation is a cost that must be known so that profit may be calculated, it was necessary to calculate the deferred compensation based on reasonable profits by means of a set of simultaneous equations. For details of this calculation see Appendix A.

Dr. Silberman calculated "Excessive Profits" by subtracting the "Required Receipts" from the "Adjusted Actual Receipts". Dr. Silberman testified that based on his analysis of Equipment's sales, expenses, and profits, a total of $3,766,823 in revenues were received by the plaintiff in 1966 in excess of the revenues required to yield a 25 percent rate of return on investment.

98. Dr. Silberman also calculated Equipment's excessive profits for 1967 and 1968. The calculation of the excessive profit for these two years, follows the same approach as the calculation of excessive profits produced below. In Dr. Silberman's opinion Equipment received $3,050,681 in 1967 and $891,751 in 1968 in excess of the amount of revenues required to yield a 25 percent rate of return on investment.

### Equipment, Inc.
Computation of Profits, Revenues and Excessive Profits Based Upon 25 Percent Before-Tax Return on Year-End Investment Base, 1967

| | |
|---|---|
| Investment Base, December 31, 1967 | $3,310,113 |
| Annual Rate of Return | .25 |
| Before-Tax Profit | 827,526 |
| Add: Expenses Excluding Deferred Compensation | 4,652,770 |
| Deferred Compensation | 43,554 |
| | 4,696,324 |
| Adjusted Receipts Required to Yield 25 Percent Annual Rate of Return on Investment | $5,523,850 |
| Operating Ratio, 1967 | 85.02% |
| Investment Turnover | 1.67x |
| Adjusted Actual Receipts (per Defendant's Amended Accounting Response, Schedule IV) | $8,574,531 |
| Less: Adjusted Receipts Required to Yield 25% Annual Rate of Return on Investment | 5,523,850 |
| Excessive Profits | $3,050,681 |

### Equipment, Inc.
Computation of Profits, Revenues and Excessive Profits Based Upon 25 Percent Before-Tax Return on Year-End Investment Base, 1968

| | |
|---|---|
| Investment Base, December 31, 1968 | $1,168,050 |
| Annual Rate of Return | .25 |
| Before-Tax Profit | 292,015 |

| | |
|---|---|
| Add: Expenses Excluding Deferred Compensation | $4,800,746 |
| Deferred Compensation | 15,369 |
| | 4,816,115 |
| Adjusted Receipts Required to Yield 25 Percent Annual Rate of Return on Investment | $5,108,130 |
| Required Operating Ratio, 1968 | 94.28% |
| Investment Turnover | 4.37x |
| Adjusted Actual Receipts (per Defendant's Amended Accounting Response, Schedule VI) | $5,999,881 |
| Less: Adjusted Receipts Required to Yield 25 Percent Rate of Return on Investment | 5,108,130 |
| Excessive Profits | $891,751 |

99. Dr. Silberman testified that in addition to recovering its expenditures in the operation of the Government-furnished Ford trucks, Equipment, Inc. should, in his opinion, receive compensation for the management of the equipment. Dr. Silberman explained that return on investment is not an appropriate measure of the profit that should be earned from the operation of the Government-furnished equipment because Equipment, Inc. did not make any capital investment in this equipment. Equipment, Inc. did, however, manage the equipment and should therefore be rewarded with a management fee. Dr. Silberman's calculations are reproduced below with explanatory notes.

### Schedule of Imputed Net Book Value of GFE

| | |
|---|---|
| Initial value of Ford trucks | $1,320,000 |
| Less: Depreciation (20% for ½ 1966) | 220,000 |
| Assumed Net Book Value of GFE, 12/31/66 | 1,100,000 |
| Less: Depreciation (40% for 1967) | 440,000 |
| Assumed Net Book Value of GFE, 12/31/67 | 660,000 |
| Less: Depreciation (40% for 1968) | 440,000 |
| Assumed Net Book Value of GFE, 12/31/68 (Assumed Salvage Value) | 220,000 |

### Management Fee
(Schedule of Allowed Earnings on Imputed Net Book Value of GFE)

| Year | Amount | |
|---|---|---|
| 1966 | $19,250 | (7/12 of annual) |
| 1967 | 19,800 | |
| 1968 | 6,600 | |
| Total | $45,650 | |

To compute the "Schedule of Imputed Net Book Value of GFE" Dr. Silberman estimated the value of the Government-furnished Ford trucks and multiplied that value by the number of Ford trucks provided by the Army to Equipment, Inc. (240 trucks). Dr. Silberman explained that he chose $5,500 as the value of the Ford trucks because it was lower than the $6,300 cost of the contractor-furnished International Harvester trucks which were larger than the Ford trucks.[34] Dr. Silberman then calculated an assumed net book value for the assets for each of the review years by taking 20 percent depreciation for one-half of 1966, and 40 percent depreciation for 1967 and 1968, and assuming a salvage value of $220,000.

To calculate the allowed management fee on the Government-furnished equipment, Dr. Silberman multiplied the "Assumed Net Book Value" for each of the three years by 3 percent.[35] Dr. Silberman chose the 3 percent figure by analogizing to the utility industry. He explained that when a utility company purchases assets with Government-provided funds,[36] it is allowed a rate of return on the value of the equipment between 1 and 2 percent. In this case, Dr. Silberman allowed a rate of return on the Government-furnished equipment of 3 percent, presumably to be generous in his allowance for the plaintiff's management of the equipment. By totaling the allowances for the three years, Dr. Silberman obtained a figure of $45,650 as his estimate of plaintiff's management fee for the Government furnished equipment.

100. A summary of Dr. Silberman's conclusions on the excessive profits he felt were earned by Equipment, Inc. appears below.

| Year | Adjusted Receipts Per Defendant's Amended Accounting Response | Required Adjusted Receipts | Excessive Profits | Excessive Profits Adjusted to Reflect Management Fee |
|------|------|------|------|------|
| 1966 | 5,853,760 | 2,086,937 | 3,766,823 | 3,747,573 |
| 1967 | 8,574,531 | 5,523,850 | 3,050,681 | 3,030,881 |
| 1968 | 5,999,881 | 5,108,130 | 891,751 | 885,151 |
| | | | 7,709,255 | 7,663,605 |

101. Dr. Silberman testified that his analysis of Equipment's profits did not attempt to take into account any of the statutory factors to be considered in determining the excessiveness of profits for renegotiation purposes. Dr. Silberman testified that in his analysis he tried to "err on the side of being overly generous" to compensate the plaintiff for the risks its operation was subject to in Vietnam.

102. To justify his choice of a 25 percent return on investment as an appropriate rate of profit for Equipment's operations during the review years, Dr. Silberman presented data on rates of return and turnover for various industries and for some groups within the trucking industry in the United States. Dr. Silberman examined the rate of return on investment for 21 nonregulated industries in the U.S. for the years 1966 through 1968.[37] He testified that he employed this general data to develop a broad perspective from which to evaluate the rates of return that were being earned by Equipment, Inc. during the review period. Dr. Silberman noted that of the 21 industries he considered, only four achieved a

---

**34.** Dr. Silberman admitted at trial this methodology could be used to determine an appropriate management fee with a different figure substituted for the value of the Ford trucks.

**35.** The 1966 figures were annualized.

**36.** In this context, funds are said to be Government-provided when they arise from deferred taxes due to accelerated depreciation on equipment.

**37.** *See* Appendix H.

three-year average return in excess of 25 percent.

Dr. Silberman then examined the return on investment of three groups of United States based trucking firms selected because of characteristics they had in common with Equipment, Inc. The data used to select the groups and to compare them with Equipment, Inc. was taken from "Trinc's Blue Book of the Trucking Industry." One of the groups selected for comparison with Equipment, Inc. consisted of contract carriers of hazardous cargo that had operated in all three of the review years. Dr. Silberman explained that a trucking concern may be either a common carrier or a contract carrier; a common carrier holds itself out to do business with the general public, while a contract carrier deals with specific customers. Equipment, Inc. was a contract carrier during its operations in Vietnam; its only customer was the Government. Dr. Silberman explained that he used the carrying of hazardous cargo to approximate the dangerous environment in which Equipment, Inc. operated, although he also recognized that Equipment, Inc. was exposed to much greater danger than a carrier of hazardous cargo would be. Of the firms that were contract carriers and handled hazardous cargo, there were four firms that had operated for all three of the review years. Using the financial data listed in Trinc's, Dr. Silberman calculated the investment base, operating income, return on investment, and turnover for all four firms for each of the review years. He then computed an average for each of these measures for all three years, and an average for the three years combined, and made comparisons with Equipment, Inc. on the basis of the three-year average. Dr. Silberman noted at trial that the 25 percent rate of return that he recommended as a reasonable rate of return

for Equipment, Inc. was nearly double the average rate of return (14.33 percent) for the three-year period under consideration.[38]

Dr. Silberman also compared Equipment, Inc. to other United States based trucking firms based on three characteristics of Equipment's operation. Equipment, Inc. was, during the review years, a carrier of general freight, a local carrier, and a carrier that employed approximately 440 vehicles. Dr. Silberman found United States based carriers that shared these three characteristics and had operated for all three of the review years. Four of the carriers were owned by railroads and four were independent. Dr. Silberman testified that the average return on investment and the average turnover for the railroad-owned carriers indicate that the 25 percent rate of return he had chosen to produce a reasonable profit for Equipment, Inc. was appropriate. Dr. Silberman did not compare the profitability measures of the independent carriers to the rate of profit recommended as reasonable for Equipment, Inc.[39] Dr. Silberman testified that based on his research on the trucking industry, he knew of no association between size and rate of return and no relationship between reliance of a carrier on local cartage and the profitability of the carrier.

103. Dr. Silberman compared Equipment's operation against industry averages and averages for groups of firms within the trucking industry. Dr. Silberman did not compare Equipment, Inc. with individual firms or attempt to consider the statutory factors in making his comparisons.

104. The Government did not present data comparing Equipment, Inc. with Philco-Ford's operation in Vietnam although Philco-Ford was Equipment's competition in Vietnam and operated under the same

---

**38.** 14.33% represents the average of the figures calculated as the average return of this group of firms for each of the review years. In 1966, the average return for the group was 20.28 percent, in 1967 the average was 11.90 percent and in 1968 the average was 10.30 percent. Dr.

Silberman's figures are reproduced in Appendix I.

**39.** Appendix J summarizes Dr. Silberman's data on the railroad-owned carriers and Appendix K covers the independent carriers.

adverse conditions and hazards that Equipment, Inc. did.

105. Equipment, Inc. had no nonrenegotiable business and had no operating history prior or subsequent to the review years.

106. Dr. Silberman did not discuss whether Equipment, Inc. and his comparison firms had capital structures sufficiently similar and equally capital-intensive operations to be expected to produce comparable returns on investment.

## CONCLUSION

Due to defendant's failure to meet its burden of proof, it is found that for its fiscal years 1966, 1967, and 1968, the plaintiff realized no excessive profits on its renegotiable business. The defendant's counterclaim is dismissed. The plaintiff is entitled to a refund of all moneys paid to defendant, if any, as excessive profits, together with interest as provided by the Renegotiation Act of 1951, as amended.

## APPENDIX A

### EQUIPMENT, INC.

### INCOME STATEMENT

#### FOR THE PERIOD APRIL 29, 1966 (INCEPTION) THROUGH DECEMBER 31, 1966

| | Per Plaintiff | Per Defendant | Difference |
|---|---|---|---|
| RENEGOTIABLE SALES | $5,853,760* | $5,853,760* | |
| **EXPENSES:** | | | |
| Advertising | 10,972 | 10,972 | |
| General & Administrative: | | | |
| Home Office Direct Charges | 51,674 | 51,674 | |
| Deferred Compensation | 106,684 | 15,545 | $ 91,139 |
| Parent Allocation | 402,965** | – | 402,965 |
| Officers Salaries | 35,000 | 35,000 | |
| Terminal Expense | 1,454,296 | 1,454,296 | |
| Depreciation and Amortization | 1,608,144 | 282,013 | 1,326,131 |
| Adjustment from Book to Tax Basis: | | | |
| Provision for Contingency | (367,961) | (367,961) | |
| Amortization of Organization Expense | (9,959) | (9,959) | |
| Prior Year Tax Accrual | – | | |
| TOTAL EXPENSES | 3,611,815 | 1,791,580 | 1,820,235 |
| NET PROFIT FOR RENEGOTIATION | $2,241,945 | $4,062,180 | ($1,820,235) |

* This figure includes an adjustment of $24,254, returned to the Government in payment of a defective pricing claim pursuant to 10 U.S.C.A. § 2306 (f).

** This figure includes a voluntary adjustment of $74,650 by plaintiff reflecting a concession to defendant's position concerning the method by which the General & Administrative Expense: Parent Allocation was calculated.

APPENDIX B

EQUIPMENT, INC.

INCOME STATEMENT

FOR THE YEAR ENDED DECEMBER 31, 1967

| | Per Plaintiff | Per Defendant | Difference |
|---|---|---|---|
| RENEGOTIABLE SALES .............. | $8,574,531 | $8,574,531 | |
| EXPENSES: | | | |
| Advertising ...................... | – | – | |
| General & Administrative: | | | |
| Home Office Direct Charges ...... | 130,179 | 130,179 | |
| Deferred Compensation .......... | 180,791 | 43,554 | $ 137,237 |
| Parent Allocation ................ | 446,962 | – | 446,962 |
| Officers Salaries ................. | 50,136 | 50,136 | |
| Terminal Expense ................. | 3,856,220 | 3,856,220 | |
| Depreciation and Amortization ........ | 92,117 | 588,964 | (496,847) |
| Provision for Contingency .......... | 650,000 | 650,000 | |
| Adjustment from Book to Tax Basis: | | | |
| Provision for Contingency ......... | (731,156) | (731,156) | |
| Amortization of Organization Expense | (5,148) | (5,148) | |
| Prior Year Tax Accrual .......... | 113,575 | 113,575 | |
| TOTAL EXPENSES ................. | 4,783,676 | 4,696,324 | 87,352 |
| NET PROFIT FOR RENEGOTIATION .. | $3,790,855 | $3,878,207 | ($ 87,352) |

APPENDIX C

EQUIPMENT, INC.

INCOME STATEMENT

FOR THE YEAR ENDED DECEMBER 31, 1968

| | Per Plaintiff | Per Defendant | Difference |
|---|---|---|---|
| RENEGOTIABLE SALES .............. | $5,999,881 | $5,999,881 | |
| EXPENSES: | | | |
| Advertising ...................... | – | | |
| General & Administrative: | | | |
| Home Office Direct Charges ...... | 113,829 | 113,829 | |
| Deferred Compensation .......... | 18,897 | 15,369 | $ 3,528 |
| Parent Allocation ................ | 363,588 | – | 363,588 |
| Officers Salaries ................. | 62,880 | 62,880 | |
| Terminal Expense ................. | 3,874,178 | 3,874,178 | |
| Depreciation and Amortization ........ | 55,729 | 635,013 | (579,284) |
| Provision for Contingency ........... | – | – | |

| EXPENSES: | Per Plaintiff | Per Defendant | Difference |
|---|---|---|---|
| Adjustment from Book to Tax Basis: | | | |
| Provision for Contingency ......... | $ 114,846 | $ 114,846 | |
| Amortization of Organization Expense | – | – | |
| Prior to Year Tax Accrual ........ | – | – | |
| TOTAL EXPENSES .................. | 4,603,947 | 4,816,115 | $ (212,168) |
| NET PROFIT FOR RENEGOTIATION .. | $1,395,934 | $1,183,766 | ($ 212,168) |

APPENDIX D

EQUIPMENT, INC.

BALANCE SHEET

DECEMBER 31, 1966

| | Per Plaintiff | Per Defendant | Difference* |
|---|---|---|---|
| ASSETS: | | | |
| Cash ........................... | $ 56,690 | $ 56,690 | |
| Accounts Receivable – Trade | 678,300 | 678,300 | |
| Accounts Receivable – Intercompany | 1,622,705 | 1,622,705 | |
| Prepaid Insurance .................. | 21,033 | 21,033 | |
| Other Assets and Deferred Charges ... | 36,446 | 245,555 | $ 209,109 (2) |
| (Net of Accumulated Depn. or Amort.) | | | |
| Property and Equipment ............ | – | 1,117,022 | 1,117,022 (2) |
| (Net of Accumulated Depreciation) | | | |
| TOTAL ASSETS .................... | $2,415,174 | $3,741,305 | $ 1,326,131 |
| | | | |
| LIABILITIES AND NET WORTH | | | |
| Notes and Accounts Payable – | | | |
| Intercompany .................... | $ 820,864 | $ 343,249 | $ (477,615) (1) |
| Accounts Payable – Trade ........... | 11,628 | 11,628 | |
| Accrued Liabilities .................. | 114,271 | 1,006,644 | 892,373 (4) |
| Operating Reserves and Deferred | | | |
| Taxes........................... | 415,388 | 360,024 | (55,364) (3) |
| Total Liabilities ............. | 1,362,151 | 1,721,545 | 359,394 |
| | | | |
| Capital Stock ...................... | 1,000 | 1,000 | |
| Earned Surplus .................... | 1,052,023 | 2,018,760 | 966,737 |
| | | | |
| TOTAL LIABILITIES AND NET WORTH | $2,415,174 | $3,471,305 | $ 1,326,131 |

APPENDIX E

EQUIPMENT, INC.

BALANCE SHEET

DECEMBER 31, 1967

| | Per Plaintiff | Per Defendant | Difference* |
|---|---|---|---|
| **ASSETS:** | | | |
| Cash ............................. | $ 92,372 | $ 92,372 | |
| Accounts Receivable – Trade ......... | 2,339,561 | 2,339,561 | |
| Accounts Receivable – Intercompany .. | 4,096,466 | 4,096,466 | |
| Prepaid Insurance .................. | 5,025 | 5,025 | |
| Other Assets and Deferred Charges ... | 3,013 | 130,831 | $127,818 (2) |
| (Net of Accumulated Depn. or Amort.) | | | |
| Property and Equipment ............ | – | 701,466 | 701,466 (2) |
| (Net of Accumulated Depreciation) | – | | |
| TOTAL ASSETS ..................... | $6,536,437 | $ 7,365,721 | $829,284 |
| | | | |
| **LIABILITIES AND NET WORTH** | | | |
| Notes and Accounts Payable – | | | |
| Intercompany .................... | $2,714,991 | $1,790,414 | $(924,577)(1) |
| Accounts Payable – Trade | 98,171 | 98,171 | |
| Accrued Liabilities ................. | 192,737 | 1,115,447 | 922,710 (4) |
| Operating Reserves and Deferred | | | |
| Taxes ........................ | 985,481 | 817,029 | (168,452)(3) |
| Total Liabilities ............ | 3,991,380 | 3,821,061 | (170,319) |
| | | | |
| Capital Stock ...................... | 1,000 | 1,000 | |
| Earned Surplus .................... | 2,544,057 | 3,543,660 | 999,603 |
| TOTAL LIABILITIES AND NET WORTH | $6,536,437 | $ 7,365,721 | $829,284 |

EQUIPMENT, INC.
BALANCE SHEET
DECEMBER 31, 1968

| | Per Plaintiff | Per Defendant | Difference* |
|---|---|---|---|
| **ASSETS:** | | | |
| Cash ........................... | $ 194,646 | $ 194,646 | |
| Accounts Receivable – Trade ........ | 765,126 | 765,126 | |
| Account Receivable – Intercompany .. | 7,803,129 | 7,803,129 | |
| Prepaid Insurance ................. | – | – | |
| Other Assets and Deferred Charges ... | 3,810 | 3,810 | |
| (Net of Accumulated Depn. or Amort.) | | | |
| Property and Equipment ............ | – | 250,000 | $250,000 (2) |
| (Net of Accumulated Depreciation) | | | |
| TOTAL ASSETS .................... | $8,766,711 | $9,016,711 | $250,000 |
| | | | |
| **LIABILITIES AND NET WORTH:** | | | |
| Notes and Accounts Payable – | | | |
| Intercompany .................... | $2,714,991 | $1,426,826 | $(1,288,165)(1) |
| Accounts Payable – Trade ........... | 190,428 | 190,428 | |
| Accrued Liabilities ................. | 152,566 | 953,788 | 801,222 (4) |
| Operating Reserves and Deferred | | | |
| Taxes ......................... | 908,458 | 754,401 | (154,057)(3) |
| Total Liabilities ............. | 3,966,443 | 3,325,443 | (641,000) |
| | | | |
| Capital Stock ...................... | 1,000 | 1,000 | |
| Earned Surplus .................... | 4,799,268 | 5,690,268 | 891,000 |
| TOTAL LIABILITIES AND NET WORTH | $8,766,711 | $9,016,711 | $250,000 |

APPENDIX G

## EQUIPMENT, INC.
## COMPUTATION OF DEFERRED COMPENSATION INCLUDABLE AS OPERATING EXPENSE, 1967

$RB$ = Investment Base *Prior* to Accrual of Deferred Compensation
$X$ = Operating Income Before Deferred Compensation
$.05X$ = Deferred Compensation
$(RB - .05X)$ = Investment Base *After* Accrual of Deferred Compensation

$$X - .05X = .25(RB - .05X)$$
$$.95X = .25RB - .0125X$$
$$.9625X = .25RB$$
$$X = .25974(RB)$$
$$X = .25974(3,353,663)$$
$$X = 871,080$$

Deferred Compensation $\qquad .05X =$ <u>43,554</u>

Operating Income After
Deferred Compensation $\qquad X - .05X =$ $<u>827,526</u>

For 1966

$X = .25974(2,051,958) = 532,975$ Operating Income Before
Deducting Deferred Compensation

| | |
|---|---|
| Annual Deferred Compensation | 26,649 Deferred Compensation |
| Operating Income | 506,326 |
| 7/12 Deferred Compensation | 15,545 |
| 7/12 Operating Income | 295,357 |

For 1968

$X = .25974(1,183,428) = 307,384$
$\qquad\qquad\qquad\quad .05X = 15,369$
Operating Income $\qquad\qquad\quad 292,015$

APPENDIX H

RATIOS OF BEFORE–TAX OPERATING
INCOME TO YEAR–END INVESTMENT BASE
TWENTY–ONE NONREGULATED INDUSTRY GROUPS
(1966 – 1968)

| Industry Grouping | Before-Tax Rate of Return (%) | | | |
|---|---|---|---|---|
| | 1966 | 1967 | 1968 | Average |
| Motor Vehicles and Equipment | 28.4 | 20.9 | 28.6 | 26.0 |
| Electrical Machinery | 24.7 | 20.6 | 20.4 | 21.7 |
| Other Machinery | 24.4 | 21.6 | 21.3 | 22.3 |
| Other Fabricated Metal Products | 23.0 | 20.7 | 20.8 | 21.5 |
| Primary Iron and Steel | 15.0 | 10.7 | 11.2 | 12.3 |
| Primary Nonferrous Metals | 20.2 | 15.2 | 14.4 | 16.4 |
| Stone, Clay and Glass Products | 15.0 | 12.6 | 14.4 | 14.0 |
| Furniture and Fixtures | 23.2 | 20.5 | 21.9 | 21.8 |
| Lumber and Wood Products | 13.3 | 11.4 | 19.1 | 14.8 |
| Instruments and Related Products | 34.1 | 28.3 | 27.0 | 29.4 |
| Food and Kindred Products | 18.6 | 18.3 | 19.2 | 18.7 |
| Tobacco Manufacturers | 27.0 | 27.6 | 28.5 | 27.8 |
| Textile Mill Products | 17.7 | 14.0 | 16.7 | 16.1 |
| Apparel and Other Finished Products | 22.5 | 19.7 | 22.5 | 21.6 |
| Paper and Allied Products | 15.6 | 13.4 | 14.8 | 14.6 |
| Printing and Publishing | 24.2 | 20.4 | 21.1 | 21.8 |
| Basic Chemicals | 19.1 | 15.3 | 17.0 | 17.1 |
| Drugs | 37.1 | 30.9 | 34.3 | 33.9 |
| Petroleum Refining & Related Industries | 12.2 | 12.1 | 11.5 | 11.9 |
| Rubber and Miscellaneous Plastic Products | 18.5 | 16.2 | 19.8 | 18.2 |
| Leather & Leather Products | 21.4 | 20.8 | 22.7 | 21.7 |
| Equipment, Inc. (Proposed) | 25.0% | 25.0% | 25.0% | 25.0% |

Source: Federal Trade Commission-Securities and Exchange Commission
Quarterly Financial Reports of Manufacturing Corporations.

APPENDIX I

FINANCIAL PROFILE (1966 – 1968)

FOUR CONTRACT CARRIERS OF EXPLOSIVES OR DANGEROUS ARTICLES

| | INVESTMENT BASE (000) | | | OPERATING INCOME (000) | | | RETURN ON INVESTMENT BASE | | | | TURNOVER (Revenues/Investment) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1966 | 1967 | 1968 | 1966 | 1967 | 1968 | 1966 | 1967 | 1968 | Average | 1966 | 1967 | 1968 | Average |
| C. E Lizza, Inc. | 271 | 244 | 209 | (12) | (2) | (21) | -4.43% | -0.82% | -10.05% | -4.83% | 2.58 | 2.68 | 2.81 | 2.68 |
| National Tank Car Delivery | 380 | 360 | 415 | 87 | 98 | 82 | 22.89% | 26.78% | 19.76% | 23.00% | 3.21 | 3.34 | 2.75 | 3.09 |
| Edw. M. Rude Carrier Corp. | 130 | 57 | 44 | 93 | (48) | (4) | 71.54% | -84.21% | -9.09% | 17.75% | 10.50 | 13.09 | 19.82 | 12.91 |
| Willets Transports Inc. | 195 | 224 | 235 | 30 | 58 | 36 | 15.38% | 25.89% | 15.32% | 18.96% | 1.72 | 2.61 | 3.67 | 2.73 |
| TOTAL | 976 | 891 | 908 | 198 | 106 | 93 | 20.20% | 11.90% | 10.30% | 14.33% | 3.71 | 3.60 | 3.83 | 3.71 |
| EQUIPMENT INC. (Required for 25 percent return on investment) | 2036 | 3310 | 1168 | 295 (7 mos.) | 828 | 292 | 25.00% (annualized) | 25.00% | 25.00% | 25.00% | 1.76 | 1.67 | 4.37 | 2.18 |

## APPENDIX J

### FINANCIAL PROFILE (1966 – 1968)
### FOUR RAILROAD-OWNED LOCAL CARRIERS OF GENERAL FREIGHT

| | Investment Base (000) | | | Operating Income (000) | | | Return on Investment Base | | | | Turnover (Revenues/Investment) | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 1966 | 1967 | 1968 | 1966 | 1967 | 1968 | 1966 | 1967 | 1968 | Average | 1966 | 1967 | 1968 | Average |
| Missouri Pacific Truck Lines | 4186 | 4331 | 4679 | 359 | (200) | (129) | 8.58% | -4.62% | -2.76% | 0.23% | 2.57 | 2.63 | 2.70 | 2.63 |
| New York Central Transportation Co. | 16909 | 20110 | 21555 | 5258 | 4082 | 5455 | 31.07% | 20.30% | 24.84% | 25.09% | 1.15 | 1.16 | 1.69 | 1.35 |
| Pennsylvania Truck Lines | 4664 | 4801 | 5224 | 830 | 258 | 49 | 17.80% | 5.37% | 0.94% | 7.74% | 1.93 | 1.87 | 1.67 | 1.82 |
| Union Pacific Motor Freight | 1980 | 2230 | 2323 | 166 | 194 | 204 | 8.38% | 8.70% | 8.78% | 8.63% | 1.44 | 1.77 | 1.36 | 1.32 |
| TOTAL | 27739 | 31472 | 33781 | 6613 | 4334 | 5479 | 23.84% | 13.77% | 16.22% | 20.58% | 1.52 | 1.47 | 1.80 | 1.87 |
| EQUIPMENT INC. (Required for 25 percent return on investment) | 2036 | 3310 | 1168 | 295 (7 mos.) | 828 | 292 | 25.00% (annu-alized) | 25.00% | 25.00% | 25.00% | 1.76 | 1.67 | 4.37 | 2.18 |

APPENDIX K

FINANCIAL PROFILE (1966 – 1968)

FOUR INDEPENDENT LOCAL CARRIERS OF GENERAL FREIGHT

| | Investment Base (000) | | | Operating Income (000) | | | Return on Investment Base | | | | Turnover (Revenues/Investment) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1966 | 1967 | 1968 | 1966 | 1967 | 1968 | 1966 | 1967 | 1968 | Average | 1966 | 1967 | 1968 | Average |
| Daniel Hamm Drayage Co. | 1159 | 401 | 618 | (210) | (64) | (54) | -18.12% | -10.65% | -8.74% | -15.06% | 2.90 | 7.48 | 4.41 | 4.17 |
| Signal Trucking Service Ltd. | 3505 | 3342 | 4165 | 511 | 477 | 401 | 14.58% | 14.27% | 9.63% | 12.61% | 3.26 | 3.56 | 3.04 | 3.27 |
| United States Trucking Corp. | 6479 | 6571 | 7014 | 786 | 582 | 1272 | 12.13% | 8.86% | 18.14% | 13.16% | 2.08 | 2.10 | 2.21 | 2.13 |
| Willett Company | 3163 | 4775 | 4228 | 572 | 232 | 398 | 18.08% | 4.86% | 9.41% | 9.88% | 2.72 | 1.74 | 2.38 | 2.22 |
| Total | 14306 | 15089 | 16025 | 1659 | 1227 | 2017 | 11.60% | 8.13% | 12.59% | 10.79% | 2.58 | 2.45 | 2.56 | 2.53 |
| Equipment Inc. (Required for 25 percent return on investment) | 2036 | 3310 | 1168 | 295 (7 mos.) | 828 | 292 | 25.00% (annualized) | 25.00% | 25.00% | 25.00% | 1.76 | 1.67 | 4.37 | 2.18 |